UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

~~LAFAYETTE-OPELOUSAS DIVISION~~

U. S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
FILED

MAY 2 3 2003

ROBERT H. SHEMWELL CLERK
BY
DEPUTY

| | |
|---|---|
| UNITED GAMEFOWL BREEDERS ASSOCIATION, INC., SANDY JOHNSON, EMANUEL MASSA, MARK JOHNSON, DON PERDUE, LARRY ROMERO, and BRUCE KINSINGER | * * * * * * * |
| Plaintiffs, | |
| VERSUS | |
| ANN VENEMAN, Secretary, United States Department of Agriculture, PETER FERNANDEZ, Acting Administrator, Animal and Plant Health Inspection Service, and JOHN ASHCROFT, Attorney General of the United States | * * * * * * * * * * * |
| Defendants. | * * |

CV03-0970 L-O

CIVIL ACTION

No.   JUDGE DOHERTY

SECTION

MAG.

MAGISTRATE JUDGE HILL

* * * * * * * * * * * * * * * * * * * * * *

---

## COMPLAINT FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY AND PERMANENT INJUNCTION, AND OTHER RELIEF

---



1

**NOW INTO COURT**, through undersigned counsel, come plaintiffs United Gamefowl Breeders Association, Inc. ("UGBA"), Sandy Johnson, Emanuel Massa, Mark Johnson, Don Perdue, Larry Romero, and Bruce Kinsinger, who respectfully represent to this Honorable Court as follows:

## I.

### NATURE OF THE ACTION

Plaintiffs bring this action to enjoin as unconstitutional the operation and enforcement of the amendments Congress made in 2002 to the provisions dealing with cockfighting in the Animal Welfare Act (the Act), 7 U.S.C. § 2156 as part of the Farm Security and Rural Investment Act of 2002 (the farm bill), Pub. L. No. 107-171, §§ 10302(a)(1)-(3), and (b) and 10303(a)(1)-(2), and (b), 116 Stat. 134, 491-92 (2002).

This action is being brought to review the constitutional validity of the amendments to the Act because plaintiffs will be injured by losing their jobs and their livelihoods, or else access to their hobby under the threat of being arrested and criminally prosecuted, when these amendments take effect on May 13, 2003 as the statute Pub. L. No. 107-171, §§ 10302(b) and 10303(b), 116 Stat. 492 (2002), and the Notice of Animal Fighting Venture Prohibition, 68 Fed. Reg. 25315-16 (May 12, 2003) indicate.

The amendments, which are reproduced as part of the text of the law, with the changes they made underlined in the Addendum to this Complaint, make it a crime, punishable by one

year in jail or a fine of $15,000 or both, 7 U.S.C. § 2156(c), Farm Security and Rural Investment Act of 2002, Pub. L. No. 107-171, § 10303(a)(1), 116 Stat. 134, 492 (2002) for a person in a state such as Louisiana, where it is not in violation of the law to conduct fighting ventures involving live birds, "to sponsor or exhibit a bird in [an] animal fighting venture if the person knew that any bird in the fighting venture was knowingly bought, sold, delivered, transported, or received in interstate or foreign commerce for the purpose of participation in the fighting venture." 7 U.S.C. § 2156(a)(2) (entitled "Special rule for certain States"), Farm Security and Rural Investment Act of 2002, Pub. L. No. 107-171, § 10302(a)(1), 116 Stat. 134, 491-92 (2002).

The amendments also make it a crime, subject to the same penalties, for "any person to knowingly sell, buy, transport, deliver, or receive for purposes of transportation, in interstate or foreign commerce, any other animal [including, pursuant to 7 U.S.C. sec. 2156(g)(5), "any live bird"] for purposes of having the ... other animal participate in an animal fighting venture." 7 U.S.C. § 2156(b), Farm Security and Rural Investment Act of 2002, Pub. L. No. 107-171, § 10302(a)(2), 116 Stat. 134, 491-92 (2002).

"Interstate and foreign commerce" is expanded to include not only interstate movement or movement from a foreign country into a state, but also "from any state into any foreign country." 7 U.S.C. § 2156(g)(2)(b), Farm Security and Rural Investment Act of 2002, Pub. L. No. 107-171, § 10303(a)(2), 116 Stat. 134, 491-92 (2002).

Finally, the amendments remove the prior exemption, placed into 7 U.S.C. § 2156(a) in 1976, from prosecution for sponsoring or exhibiting live birds in a fighting venture and selling or

transporting live birds in interstate or foreign commerce to participate in a fighting venture if the fight was not to take place in a state where it would be in violation of the laws of that state, that is, Louisiana, New Mexico, and, at that time, Oklahoma, Puerto Rico, and three territories—American Samoa, Guam, and the Virgin Islands) (the territories). 7 U.S.C. § 2156(d), Farm Security and Rural Investment Act of 2002, Pub. L. No. 107-171 § 10302(a)(3) 116 Stat. 134, 492 (2002). That left the exemption applicable only to 7 U.S.C. Sec. 2156(c), the use of the Postal Service or interstate instrumentalities to promote animal fighting ventures.

## II.

## PARTIES

Plaintiff UGBA is a nonprofit corporation representing and defending the interests of the approximately 100,000 gamefowl breeders throughout the United States. It has approximately 15,000 members in 32 affiliated states, each paying dues of $10 through an affiliated state or $25 directly if from states that are not affiliated. UGBA has been in existence since March 1, 1976, when it was incorporated as a nonprofit corporation in Oklahoma, and has its headquarters in Albany, Ohio. The purposes of UGBA, as set forth in its Articles of Incorporation are "to bind breeders and farmers of gamefowl into an organization for the mutual benefit and exchange of better methods and ideas tending toward the perpetuation and improvement of the various breed of gamefowl and also to improve marketing methods and to cooperate with state universities and any other state agencies which seek to control diseases."

Sandy Johnson is the Director of Administration of UGBA, a position she has held since 1985. She is currently married to a gamefowl breeder. She is in charge of all the office work for UGBA, including communicating with its members, the leaders of its various state associations, other poultry organizations, and officials from the United States Department of Agriculture who implement the cockfighting laws and poultry disease control, and the United States Postal Service, with respect to the shipping of cocks. She attends cockfights in Louisiana from time to time.

Emanuel Massa is the President of the 8,357 member chapter of the United Gamefowl Breeders Association Louisiana Chapter and resides in River Ridge, Louisiana. He has helped to raise gamefowl for 63 years and has attended cockfights all over Louisiana and Oklahoma and in Mexico as well. He has a farm in Amite, Louisiana where he has approximately 600 roosters and hens which he currently either ships to persons from foreign countries such as Mexico, the Philippines, and various South America locations or else sells to such persons who visit his farm. He also sells fowl for breeding purposes in Alaska, California, North Carolina, Oklahoma, Texas, Mexico, and the Philippines.

Mark Johnson is a third-generation breeder of gamefowl, who manages the Bayou Club in Vinton, Louisiana near the Texas border, which is the largest cockpit arena in Louisiana. He helped create it five years ago and runs competitions there three days a week, nine months of the year. The Club is financed through an entrance fee of $20 per spectator and sales from concessions. He does not participate in the prize money from the derbies. He resides in Starks, Louisiana and has a rooster farm in Ragley, Louisiana.

Don Perdue is the interim President of UGBA from January, 2003 to August, 2003. Raising game fowl has always been a hobby for him (for 43 years). He comes from three generations of people who raised fowl. He works during the day as a pharmacist. At his farm in Prichard, West Virginia, he raises brood fowl, a few of which he sells. Others he gives away.

Larry Romero raises gamefowl for sale overseas on his 30-acre farm in Abbeville, Louisiana. His farm holds about 1,200 roosters at one time. Buyers regularly visit or call him from Mexico and the Philippines and several other countries. His cocks are in demand because of their breeding qualities. Less than one percent of his customers come from Louisiana. He does not fight his roosters. His uncle started him working with fowl (watering and feeding them) 50 years ago.

Bruce Kinsinger is the Chair of UGBA's Executive Committee. He has been around gamefowl for 47 years with his stepfather who raised him. He has 150 cocks and stags on his farm, including a special strain of Pierce Shufflers bred since the 1930s. He sells his cocks, and has fought them in states in which it is legal, primarily Virginia.

Defendant Ann Veneman is the Secretary of Agriculture responsible for administering those provisions of the Act that are being challenged here, together with defendant Peter Fernandez, who is the Acting Administrator of the Animal and Plant Health Inspection Service, who is directly in charge of the Act within the Department. Both are being sued in their official capacity. Defendant John Ashcroft, who is also being sued in his official capacity, is the

Attorney General of the United States in charge of enforcing the criminal laws through the Department of Justice.

## III.

## JURISDICTION AND VENUE

The Court has subject matter jurisdiction under 28 U.S.C. Sections 1331 because this case arises under Article I, Section 8, Clause 3 of and the Due Process Clause of the Fifth Amendment to the Constitution of the United States and under the Animal Welfare Act. It also arises under 28 U.S.C. § 1337(a) the Act regulates interstate commerce.

Venue is proper in this District under 28 U.S.C. § 1391(e)(3) because plaintiffs Mark Johnson and Larry Romero reside in this District.

## IV.

## GENERAL ALLEGATIONS

1.      In 2002 Congress enacted a set of amendments to the Animal Welfare Act, as part of the farm bill. These amendments tightened the criminal provisions of the Act as described in I.

2.      The amendments were made part of the bill on the floor of both the House (October 4, 2001) and the Senate (July 31, 2001) during the course of the debate without being considered, during the 107th Congress, in any hearings or reports. The amendments were discussed briefly

on the floor of both chambers without any consideration of their likely effects and, thereafter, approved by voice vote, with no member's position on them being recorded.

3.     This procedural approach, with very little attention being paid to the federal criminalization of various activities associated with cockfighting, was consistent with Congress' previous action in 1976 in revising the Act to incorporate a new section prohibiting animal fighting ventures, including live birds.  Congress then imposed penalties of up to $5,000 or 1 year or both for (1) knowingly sponsoring or exhibiting live birds in an animal fighting venture if such bird had moved in interstate or foreign commerce, (2) knowingly selling, buying, or transporting, in interstate or foreign commerce, any live bird for the purpose of having that bird participate in a fight, but (3) making these activities unlawful only if the fight in question was to take place in a state that had not legalized cockfighting.

4.     In 1975-1976, Congress approved these amendments applied to cockfighting on the last day of the markup in the House on January, 1976, with no action at all in the Senate in 1975, followed by overwhelming support (289 to 76 in the House), despite solid opposition from the Executive branch, and no vote at all in the Senate until the conference report on the Act was approved.  Debate did occur in the House, but not in the Senate.  The conference deleted, without any explanation whatever, a version of (3) that the House had adopted that would have accomplished what the 2002 amendment to 7 U.S.C. § 2156(a)(1) and (2) did, making knowingly sponsoring or exhibiting a bird in a fight criminal if the bird was moved in commerce from any state into any other state in the nation, legal or not legal.  At no time in the 94th Congress, did any proponent or opponent, including the state, federal agencies, or interested parties, get an

opportunity to comment or explore the meaning and application of this initial restriction of gamecock fighting.

5.     When Congress passed the 1976 amendments, 47 states had already passed state laws making cockfighting criminal.  Louisiana, New Mexico, and Oklahoma stood out against the crowd, as did Puerto Rico and the territories.  Nowhere in the 1975-76 legislative record was a case made for the federal government's taking over the criminal enforcement of a cockfighting ban in terms other than those duplicating the moral judgments already made by 47 states. Federal agency officials who would have had to administer the law uniformly opposed having the federal government assume jurisdiction in place of the states.   Neither they nor any Congressperson (the Senate was totally silent) offered any justification for federal control overriding the few outliers.  In fact, the Congress undid that very override in conference, leaving the three states and four territories free to continue on their independent path.  This was also the case 16 years later in 2002.

6.     In 1976, and 2002 as well, Congress formally proposed no reasons at all for a federal takeover, let alone overlapping administration, essentially of the same rule in 47 states.  There was no suggestion anywhere that state enforcement was weak or ineffective or that the states required federal backup.  Federal intervention was not, as in most other commerce clause cases through 1995, undertaken in support of prior state action against cockfighting, but, in connection with the three non-conforming states, Puerto Rico, and three disagreeing territories, to suppress and supplant them.   There was no assertion that cockfighting needed to be regulated as a commercial transaction consisting of the buying and selling of goods and services or as an

economic activity.  The emphasis at the federal level was always on cockfighting as a brutal or barbaric sport, an entertainment whose spectacle value heavily depended on cruelty and spectators' lust for blood.  There was no reasonable foundation laid for obliterating the state police power.

7.      Nor was Congress able, anywhere in the 1976 or 2002 legislative record, to identify a spillover effect from the three states, Puerto Rico and the three territories into their neighbors that only the federal government could guard against.  There were no complaints recorded from citizens in Mississippi, Arkansas, or Texas that cockfighting in Louisiana was adversely affecting them.  Rather, citizens from those states willing crossed into Louisiana to see the fights and brought their birds with them or shipped them in so that they could fight.

8.      The ultimate reason for both laws seems to have been a simple power calculation.  Those who disliked cockfighting, for whatever reasons, could freely exercise their majority to impose their views of the moral wrongness of the behavior, even if it was considered culturally and traditionally acceptable in some states given the ethnic or national origins of the persons in those states.

9.      The lack of any rational basis for a federal takeover of the criminality of cockfighting that had previously been left to the police power of the states was highlighted by the non-formal statement of reasons that could (in the absence of concurrent hearings or reports or floor debates) be pieced together from comments contained in an out-of-date, 106th Congress Senate report and House hearing two years prior to the farm bill and terse floor statements of introduction by the

sponsors of the amendments.  The bottom line federal interest seems to have been acute distaste for cockfighting (and activities that enable it) in any form, much like the hatred of hippies, homosexuals, and the mentally retarded that the Court has already condemned as an illegitimate interest or purpose, if not brigaded with other acceptable reasons, in three relatively recent cases construing the right not to be denied equal protection of the laws.

10.     The potential reasons, massaged from this mound of relatively indirect evidence in the so-called legislative "record," are several, but none with any surviving weight after their analysis in terms of rational basis-plus scrutiny, which means none that go beyond the bare—and illegitimate—desire to harm spectators, breeders and cockfighters in legal states by denying them access to cockfighting or to shipping their cocks in interstate or foreign commerce.

11.     Another possible reason for the 2002 amendments is the desire of federal legislators to pass legislation that the strong majority of voters would approve, without being held accountable for their non-votes, particularly in an election year.

12.     A second potential reason for the amendments is the desire to impose a national moral judgment on every state, pursuant to a drive for national conformity and homogenization, obliterating the traditional state police power, as well as to effectuate moral imperialism by virtue of the same imposition on foreign countries whose traditions, culture, history, and values are not the same as those obtaining in the majority of our states.  For that there is no precedential support.

13.     Another justification, voiced by one state law enforcement officer on behalf of others, is the need to make enforcement more convenient by not requiring arresting officers and prosecutors to gather evidence of actual fighting before being able to make their case.  Providing law personnel who demand a shortcut to necessary proof to, instead, apply some, if not significant, effort of their own should need be treated as sufficient to support the legitimacy of the amendments.  Some minor investigation of a defendant's denials of the reasons he possess gamecocks might be necessary in order to achieve a conviction, but it is hardly meaningful enough to justify the negative impact these amendments will have on the gamecock fighting, spectating, and breeding engaged in by individuals in Louisiana.

14.     The state liberty interest in participating in various ways in gamecock fighting that is still protected by state law, together with the minority nature of the populations most significantly affected by the amended law, make it vulnerable to rational basis-plus equal protection scrutiny.

15.     Gamefowl that are raised to become fighting fowl tend to be born in incubators and raised in barns or open spaces on farms until they become mature enough (at or around nine months) to tangle with one another with intent to maim and their heel spurs harden sufficiently to enable them to be tied to a tether at their personal teepees with a cord that gives them considerable leeway to roam, but not to come into contact with other cocks.  They are fed and watered daily, and nurtured by their owners and given access to free-roaming hens until they become two years old.  At that point, they are prepared to fight, after some training and conditioning, with their weight, feed, and water carefully monitored so that they meet the weight standard at the arena or pit at which they are scheduled to fight.  Right before the fight they are

purged of all food residues and as much water as possible.  During the fights, some, but by no means all, of them are killed.  The rest are returned to their owners and generally maintained as pets until they die a natural death.

16.     Gamefowl that are not raised to be fighting fowl are raised as brood fowl to breed and perpetuate the traits and characteristics of the line or strain that their breeders or ultimate owners desire to maintain.  Other gamefowl may be exhibited in poultry shows and exhibitions because of their looks and quality, although not their "gameness."

17.     Broiler chickens, on the other hand, are mass slaughtered after six to seven weeks of life by being taken to a plant where they are hung upside down and have their heads cut off.  After that, they are processed into poultry products for dinner/picnic tables or lunch boxes or wherever chicken is sold.  They are also hatched in incubators, but they are confined in very tight cages (50 chickens per cage) for the rest of their lives, with little or no room in which to turn about, no light, little air, and no access to grass or the outdoors.  They live short, nasty, and brutish lives.

## V.

## COUNT ONE—LACK OF AUTHORITY UNDER THE

## INTERSTATE COMMERCE CLAUSE

18.     All of the foregoing allegations are incorporated by reference.

19.     Plaintiffs contend that the criminal amendments violate the Interstate Commerce Clause of the Constitution of the United States, Article I, Section 8, Clause 3, by overextending the authority of Congress to impose national moral judgments on two outlier states (Louisiana and New Mexico), Puerto Rico, and three territories that have determined to permit cockfighting to continue.  The amendments aggrandize federal power by obliterating the states' traditional police power.  This is particularly the case here because, unlike in earlier cases involving lottery tickets, prostitution, polygamy, liquor distribution, racial discrimination, the return of fugitive slaves, and other recent Commerce Clause cases, the federal criminal law is not directed at punishing commercial transactions or economic activity, is not designed to support or supplement state law expressing disapproval of the same activity, and is not intended to deal with any spillover effects upon neighboring states.  There does not appear to be any unique federal interest providing a rational basis for federal intrusion into state regulation of this sport or entertainment.  To allow federal criminal intervention in cockfighting is to work counter to the values of federalism of encouraging experimentation, (not homogenized uniformity), and of limiting tyranny where a state-protected liberty interest is at risk.

## COUNT TWO—DEPRIVATION OF DUE PROCESS

20.     All of the foregoing allegations are incorporated by reference.

21.     Plaintiffs further claim that there is no rational basis for the assertion of federal authority because there is no legislative record behind the amendments that a court can use for the purposes of judicial review, even low-level rational basis scrutiny.  While the Supreme Court, in

recent cases under the Commerce Clause and the Fourteenth Amendment, has acknowledged the usefulness of Congressional findings, it has gone beyond this to stress the essential need for a documented legislative record containing evidence that demonstrates Congress' thoroughness in considering the constitutional issues at stake, if the Court is to support these judgments.  This evolving requirement of "legislative due process" has resulted in the invalidation of several statutes for not meeting constitutional standards of legislative justification.  The exact procedural conditions that Congress must fulfill in order to satisfy the Court that a statute is legitimate are not yet fully developed, but the Court seems to call for some sort of record, some sort of factual inquiry, some sort of collection of evidence, some sort of hearings, whatever form they may take.

22.     The Act's coverage of animal fighting ventures involving live birds was first established in 1976 and significantly revised in 2002.  At neither point in its legislative evolution was an acceptable record adequately built.  The Senate never considered the matter in 1975 or 1976 until the conference.   The House Committee first confronted the ban on certain animal fighting ventures involving birds on the last day of the bill's markup.  There were no hearings.  There was some discussion of the committee amendment on the House floor, but its consequences were not entirely clear because the critical provision exempting fights in Louisiana from the coverage of most of the provisions in the law was added only in conference.

23.     In the 2000-2002 legislative cycle, there were several attempts to end the so-called legal states' exemption.  These changes were the product of a major lobbying campaign that produced an overwhelming legislative majority in favor of expanding the scope of federal criminal law (with the exception of Southern legislators), but no record detailing or explaining the

15

justifications for that expansion.  No hearings were held, except for one day in September 2000 in a different Congress than the one ultimately responsible for passing the legislation (the 106th, not the 107th).  There were no Committee reports arguing for the amendments as voted in 2001. There was only one hastily prepared report in the Senate in the spring of 2000 (again, the 106th Congress, not the 107th) for a bill that was never brought up.  That report did not involve any serious estimate of the costs that game breeders and associated enterprises in Louisiana, New Mexico, and, at the time, Oklahoma, Puerto Rico and the three territories would suffer if the mandate were to be imposed upon the private sector and end both the selling and transmitting of gamecocks across state lines into those states and the shipping of live birds from any state to foreign countries, the major market for brood cocks raised in the United States.  The amendments were offered on the floor of both the House and the Senate, with little more than one page of discussion in each chamber and no meaningful debate between proponents and the silent opposition, who knew how hopeless it would be to argue or protest.  The changes in the law were immediately confirmed by unrecorded voice votes in both bodies.  The language of the amendments was further altered, without reasons being offered, in the final law that emerged from conference.

## COUNT THREE—DENIAL OF EQUAL PROTECTION

24.    All of the foregoing allegations are incorporated by reference.

25.    Plaintiffs also assert that they have been denied their right to equal protection of the laws, applied through the Due Process Clause of the Fifth Amendment, because there is no legitimate

basis for the amendments.  The only government end that emerges from minimal scrutiny is the illegitimate purpose of a bare desire to harm a politically unpopular and powerless (on the national scene) group of cockfight spectators, breeders, and cockfighters.

26.    The type of scrutiny that is to be applied is rational basis-plus, not because there is a fundamental interest at stake or because the affected group represents a suspect class, but because cockfighting is a state-protected liberty interest and because the primary customers for the fights in Louisiana and for the birds shipped from Louisiana to foreign countries are either people from Mexico, the Philippines, Japan, and Central and South America, or Americans of Cajun, Hispanic, or Puerto Rican descent.  These groups have often been treated either as suspect or the subject of intermediate scrutiny under equal protection law, in part, because of their national or ethnic origin and, in part, because they are treated by with disrespect by the majority in Congress (and nearly all of the states) because they are quit vulnerable when it comes to deciding whether or not they should be denied access (enforced by criminal penalties) to activities they uniquely and traditionally enjoy as part of their cultural heritage.  The "plus" aspect of the scrutiny, previously applied in equal protection cases involving hippies, homosexuals, and the mentally retarded, means that the reviewing courts will not invent hypothetical, unasserted reasons for state action in the "might have" or "could have" vein, but will look at the legislative record to ascertain whether there is any evidence sufficient to constitute a legitimate justification for acting against the particular minority.  If all that remains, after exploring each claimed interest, is an irrational prejudice against the group concerned or mere negative attitudes or fears not substantiated by any grounds in the record, then equal protection has been denied.

27.     The legislative record in this case is sparse and barren, given the lack of legislative due process surrounding the majoritarian rush to judgment in 2001 and 2002, which avoided all roll call votes and, thus, guaranteed that no Congressperson or Senator could be held accountable for the position he or she took on the legislation.  The only extant arguments on behalf of the law that can be tweaked out of this record are the unacceptable refusal to cater to certain minorities, the useless, and, again, unacceptable, even in a minimal review context, desire to assure legislators' popularity and electability by attaching criminal sanctions to behavior opposed by the public; the need to halt animal cruelty, which has already been outlawed in 48 states without any federal dictation or takeover; the dubious and unprecedented drive to impose American moral values on countries not subject to our government and contrary to their entrenched traditions (e.g. Mexico and the Philippines); the need to close a so-called "loophole" that merely makes it less convenient for prosecutions to be brought, rather than impossible (there is no evidence that state prosecutions have been halted in their tracks); and assertion of an unproven by any acceptable evidence other than conclusory statements and anecdotes, of cockfighting's guilt by its alleged association with illegal drug use, violence, and gambling.  That the legislative record provides no clear, supportable reason for throwing a criminal <u>cordon sanitaire</u> around Louisiana (and the other locations) is attested by various members of Congress who claimed on the floor not to understand the basis for the broad sweep of the amendments or to be certain that there would be no unintended consequences flowing from them.

28.     Although under generally accepted equal protection doctrine, the government is entitled to act to prohibit activities claimed to violate the purpose of a law one at a time, instead all at

once, there remains undispelled concern, derived from the anti-majoritatian values implicit in equal protection doctrine, that Congress should penalize persons involved with cockfighting in which thousands or tens of thousands of roosters may be killed each year (although not every fight results in death), while leaving unaffected in any way the commercial breeding and slaughter of billions of chickens a year.  8 billion-plus broilers are killed annually to guarantee most inhabitants of the United States access to a cheap supply of poultry for eating.  The contrast is too stark not to wonder about the justification for dealing with cockfighting first and leaving commercial production alone, rather than taking the first step in regulation against the activity responsible for multiple acts of animal cruelty, compared with the minor impact of cockfighting. Nurturing cocks on tethers until they become two years old, with unrestricted access to constant supplies of air, grass, water, food, and hens and seven-feet in radius room to wander about next to their teepees is by no means equivalent to being kept locked up in cages with no room in which to move, no grass to walk on, no hens to enjoy, and limited food and water, before being killed by a mechanized method at 42 to 49 days of age.  There is no apparent justification for making this choice other than political deference to the demand of the majority of consumers and disregard for the interest of ethnic and national minorities with no clout whatever at the national legislative level.

## VI.

## THE IMPACT UPON PLAINTIFFS

29.    The 2002 amendments can be enforced by federal law enforcement officials, in cooperation with the Federal Bureau of Investigation, the Department of the Treasury, other

federal law enforcement agencies, and state and local governmental agencies under special agreements.  7 U.S.C. § 2156(f).

30.     If the law is enforced, as it surely will be, attendance at cockfights in Louisiana, including those at the Bayou Club, administered by plaintiff Mark Johnson, will drop precipitously because of the chilling fear of arrest and prosecution should a single fowl appear at the club's fights who is found (out of as many as 2,000 or more birds in a weekend meet) that was brought into Louisiana from out-of-state purposefully in order to fight and spectators can be determined to have understood that this would occur.  The lack of customers will cause attendance fees to plummet and destroy the economic ability of both Johnson and Lawson to afford to keep their arenas open for cockfighting.  When that occurs, spectators like plaintiffs Massa, Sandy Johnson, and Perdue, will not longer feel free to come to the arenas to enjoy their sport as spectators. They will legitimately fear (and do now) being charged with violating same provision as plaintiffs Johnson and Lawson, including aiding and abetting under federal law.  Even if they are not jailed or fined, they will be put to the stress of having to defend themselves in court as well as their reputation in public, with the aid of a costly criminal attorney.

31.     When the law is enforced, as surely it will be, plaintiffs who are breeders, even if of brood fowl rather than fighting cocks, such as plaintiffs Massa, Romero, and Perdue, will be out of business with flocks of cocks on their hands that they cannot dispose of in foreign countries (their normal sales destination) or legal states or, indeed, anywhere.  They will either lose all of their current investment and stock, or, if they should try to get rid of their birds in other ways,

will be liable to be arrested for selling, shipping, or transporting live birds in interstate or foreign commerce.

32.     When the law is enforced, cockfighters such as plaintiff Kinsinger, will not be able to fight with their birds because they will not be permitted knowingly to move the birds into legal states across state lines in order to fight.

33.     UGBA will, as a consequence of this chilling effect upon the activities of its members, lose most of its fiscal support as well as its reason for existing.

34.     Plaintiffs will be irreparably injured by this group of recently effective amendments because they will be subject to arrest and prosecution.  They have been and would like to continue to be view cockfights in Louisiana, to breed cocks in other states to sell or bring into Louisiana, to breed birds in Louisiana or elsewhere to sell and ship to foreign countries like Mexico and the Philippines, and to sponsor cockfights in Louisiana.  They are chilled from continuing any of these activities under the realistic threat of being charged with being criminals for violating the revised Act.

35.     In addition, plaintiffs will lose access to what has been a hobby to which they have been devoted most of their lives and, in some cases, lose the jobs they now hold because even cockfighting in Louisiana will be shut down through the impact upon out-of-state attendance at cockfights in Louisiana and the substantial reduction in birds available to fight, both out-of-state,

where the supply will be eliminated, and in-state, where it will steadily decrease, again because of the criminalization of what had, until now, been legal conduct.

36.     If interim relief is not granted by this Court, either in the form of a temporary restraining order or a preliminary injunction, UGBA will have to shut down its operations as quickly as it can.  The other plaintiffs will immediately have either to terminate their activities as spectators or breeders or fighters or administrators of cockfighting arenas or to risk debilitating criminal charges.  Each of the individual plaintiffs will lose his or her state liberty to enjoy cockfighting as a sport and entertainment, his or her hobby as raisers of roosters, and, for some, the investments they have made in their farms and their jobs.

## VII.

## INJUNCTIVE RELIEF – TEMPORARY RESTRAINING ORDER, PRELIMINARY AND PERMANENT INJUNCTIONS

38.     All of the foregoing allegations of the Complaint are incorporated by reference.

39.     Pursuant to Federal Rule of Civil Procedure 65(b), a temporary restraining order may be granted to prevent irreparable harm, pursuant to certain procedural requirements.

40.     Irreparable harm has already begun to occur to plaintiffs as described more fully in Section VI and further irreparable harm will continue to beset them, if interim relief is not granted.

41.    Plaintiffs seek preliminary and permanent injunctive relief for the same reasons.


## VIII.

## DECLARATORY JUDGMENT


42.    All of the foregoing allegations of the Complaint are incorporated by reference.


43.    An actual controversy exists between plaintiffs and the Secretary, Acting Administrator, and the Attorney General about the constitutional validity of the 2002 amendments to the Act they are charged with enforcing.  Plaintiffs contend that the 2002 amendments are invalid in light of the Commerce Clause and the Due Process Clause of the Fifth Amendment, both in its due process wording and its incorporation of equal protection.   Defendants claim that the amendments to the Act are in concert with the Constitution and intend to keep administering them and treating as criminal conduct that runs afoul of them.


44.    This Court should enter a declaratory judgment that the amendments to 7 U.S.C. Sec. 1256 of the Animal Welfare Act, enacted in 2002 as part of the farm bill in Pub. L. No. 107-171, are invalid and cannot be enforced.


## **PRAYER**

**WHEREFORE**, Plaintiffs respectfully pray that, after all due proceedings, judgment be entered in its favor and against defendants for the following relief:

(A)     a temporary restraining order enjoining defendants, as well as their agents, servants, employees, representatives, attorneys, and any person(s) in active concert with them, from taking any action to enforce the 2002 amendments to 7 U.S.C. § 2156 in the Animal Welfare Act, which amendments were enacted in §§ 10302(a)(2) and (3) and (b) and § 10303(a)(1) and (2) and (b) of the Farm Security and Rural Investment Act of 2002, Pub. L. No. 107-171, 116 Stat. 134, 491-92 (2002), until a time fixed by this Court in accordance with Rule 65(b) of the Federal Rules of Civil Procedure;

(B)     for a preliminary and permanent injunction prohibiting and restraining the defendants from engaging in the very same conduct as the temporary restraining order seeks to halt;

(C)     for a declaratory judgment that defendants have no authority to implement the amendments set forth above because they are constitutionally invalid; and

(D)     for all the costs of these proceedings, and attorneys' fees under the Equal Justice to Access Act, as well as all other legal or equitable relief to which plaintiff may be entitled.

Respectfully submitted this 23rd day of May, 2003,

COUNSEL FOR PLAINTIFFS:


OLIVIER AND BRINKHAUS

BY: _____
        ARMAND J. BRINKHAUS
        LA BAR ROLL NO. 3469
        957 NAPOLEON AVENUE
        P. O. DRAWER E
        SUNSET, LA 70584
        337/662-5242–Tel.
        337/662-5813–Fax

JOHN R. KRAMER
6329 FRERET STREET
NEW ORLEANS, LA 70118
504/862-8828–Tel.

## ADDENDUM

The 2002 additions are underlined.
The 2002 excisions are crossed out.

### UNITED STATES CODE ANNOTATED
### TITLE 7. AGRICULTURE
### CHAPTER 54—TRANSPORTATION, SALE, AND HANDLING
### OF CERTAIN ANIMALS

§2156.  Animal fighting venture prohibition

(a)  Sponsoring or exhibiting an animal in an animal fighting venture

(1)  In general

Except as provided in paragraph (2), it shall be unlawful for any person to knowingly sponsor or exhibit an animal in an animal fighting venture, to which if, any animal, in the venture, was moved in interstate or foreign commerce.

§ 10302(a)(1)

(2)  Special rule for certain States

With respect to fighting ventures involving live birds in a State where it would not be in violation of the law, it shall be unlawful under this subsection for a person to sponsor or exhibit a bird in the fighting venture only if the person knew that any bird in the fighting venture was knowingly bought, sold, delivered, transported, or received in interstate or foreign commerce for the purpose of participation in the fighting venture.

§ 10302(a)(1)

(b)  Buying, selling, delivering, or transporting animals for participation in animal fighting venture

1

It shall be unlawful for any person to knowingly sell, buy, transport, <u>deliver, or receive for purposes of transportation,</u> in interstate or foreign commerce, any dog or other animal for purposes of having the dog or other animal participate in an animal fighting venture.

§ 10302(a)(2)

(c)  Use of Postal Service or other interstate instrumentality for promoting or furthering animal fighting venture

It shall be unlawful for any person to knowingly use the mail service of the United States Postal Service or any interstate instrumentality for purposes of promoting or in any other manner furthering an animal fighting venture except as performed outside the limits of the States of the United States.

(d)  Violation of State law

Notwithstanding the provisions of subsection ~~(a), (b), or~~ (c) for this section, the activities prohibited by such subsections [sic] shall be unlawful with respect to fighting ventures involving live birds only if the fight is to take place in a State where it would be in violation of the laws thereof.

§ 10302(a)(3)

(e)  <u>Penalties</u>

Any person who violates subsection (a), (b), or (c) of this section shall be fined not more than ~~$5,000~~ <u>$15,000</u> or imprisoned for not more than 1 year, or both, for each such violation.

§ 10303(a)(1)

(f)  Investigation of violations by Secretary; assistance by other Federal agencies; issuance of search warrant; forfeiture; costs recoverable in forfeiture or civil action  [UNCHANGED]

(g)  Definitions

2

For purposes of this section—

(1)      the term "animal fighting venture" means any event which involves a fight between at least two animals and is conducted for purposes of sport, wagering, or entertainment except that the term "animal fighting venture" shall not be deemed to include any activity the primary purpose of which involves the use of one or more animals in hunting another animal or animals, such as waterfowl, bird, raccoon, or fox hunting;

(2)      the term "interstate or foreign commerce" means—

(A)      any movement between any place in a State to any place in another State or between places in the same State through another State; or

(B)      any movement from a foreign country into any State or <u>from any State into any foreign country</u>.

§ 10303(a)(2)

(3)      the term "interstate instrumentality" means telegraph, telephone, radio, or television operating in interstate or foreign commerce;

(4)      the term "State" means any State of the United States, the District of Columbia, and Commonwealth of Puerto Rico, and any territory or possession of the United States;

(5)      the term "animal" means any live bird, or any live dog or other mammal, except man; and

(6)      the conduct by any person of any activity prohibited by this section shall not render such person subject to the other sections of this chapter as a dealer, exhibitor, or otherwise.

(h)      Conflict with State law

The provisions of this chapter shall not supersede or otherwise invalidate any such State, local, or municipal legislation or ordinance relating to animal fighting ventures except in case of

3

a direct and irreconcilable conflict between any requirements thereunder and this chapter or any rule, regulation, or standard hereunder.

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE-OPELOUSAS DIVISION

| | |
|---|---|
| UNITED GAMEFOWL | * |
| BREEDERS ASSOCIATION, INC., | * |
| SANDY JOHNSON, | * |
| EMANUEL MASSA, | * |
| MARK JOHNSON, | * |
| DON PERDUE, | * |
| LARRY ROMERO, and | * |
| BRUCE KINSINGER | * |

**CV03-0970** L-O

       Plaintiffs,                         * CIVIL ACTION
                                             * No.

**JUDGE DOHERTY**

VERSUS                                       * SECTION
                                       *

| | |
|---|---|
| ANN VENEMAN, | * |
| Secretary, United States | * |
| Department of Agriculture, | * |
| PETER FERNANDEZ, | * |
| Acting Administrator, Animal and | * |
| Plant Health Inspection Service, | * |
| and | * |
| JOHN ASHCROFT, | * |
| Attorney General of the | * |
| United States | * |

MAG.  MAGISTRATE JUDGE HILL

       Defendants.                                *

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## VERIFICATION

STATE OF OHIO

COUNTY OF VINTON

    **BEFORE ME**, the undersigned authority, duly commissioned in and for the State and

Country aforesaid, personally came and appeared:

### SANDY JOHNSON

who, upon being duly sworn, did depose and state the following:

1

1.      I am the Director of Administration for the United Gamefowl Breeders Association, Inc., plaintiff in the above-captioned proceeding.

2.      I have conducted an investigation into the facts and circumstances surrounding the fact forming the basis of this Complaint, have read the Complaint, and can aver that all of the facts and circumstances alleged in the Complaint are true and correct.

SANDY JOHNSON

Sworn to before me and subscribed in my presence this 14th day of May, 2003.

Notary Public
My Commission Expires:  4.16.2007

3

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing pleading has been served upon all named defendants, or their counsel of record, via hand delivery to an assistant United States Attorney for the Western District of Louisiana and, by certified mail, to the Attorney General of the United States at Washington, D.C. and to the other officers at the Untied States Department of Agriculture in Washington, D.C. this 23___ day of May, 2003.

Sunset, Louisiana, this 23rd day of May, 2003.

ARMAND J. BRINKHAUS

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

UNITED GAMEFOWL                    *
BREEDERS ASSOCIATION, INC.,        *
SANDY JOHNSON,                     *
EMANUEL MASSA,                     *
MARK JOHNSON,                      *
DON PERDUE,                        *
LARRY ROMERO, and                  **CV03-0970**$^{L-O}$
BRUCE KINSINGER                    *
                                   * CIVIL ACTION
    Plaintiffs,              * No. **JUDGE DOHERTY**
                                   *
VERSUS                             * SECTION
                                   * **MAGISTRATE JUDGE HILL**
ANN VENEMAN,                       * MAG.
Secretary, United States           *
Department of Agriculture,         *
PETER FERNANDEZ,                   *
Acting Administrator, Animal and   *
Plant Health Inspection Service,   *
and                                *
JOHN ASHCROFT,                     *
Attorney General of the            *
United States                      *
                                   *
    Defendants.              *
* * * * * * * * * * * * * * * * * * * * * * * *

## DECLARATION OF MARK JOHNSON

In accordance with 28 U.S.C. § 1746, I, Mark Johnson, do hereby declare under penalty of perjury that the foregoing is true and correct.

1.    I am over twenty-one years of age and give this Declaration of my own free will.

2.    I am a third-generation breeder of cocks from South Carolina. I moved to Louisiana in 1991. In Louisiana, I would not be violating the law in the course of enjoying my hobby. I raised birds, primarily to keep my own

1

strains going, and even sold a few.  I used to fight them in Virginia, where it was legal, and in Louisiana, which was a much longer drive.

3.      When I moved to Louisiana, I ran a small construction company in Louisiana and Texas.  Five years ago, I met a businessman in Vinton, Louisiana, who owned a grocery store, a small casino, and some race horses.  He was interested in transforming a vacant night club that had flourished when crowds of drinkers came across the state border from Texas when Louisiana's drinking age was 18, but had to close when the cut-off was raised to 21.  He owned the Bayou Club and wanted it to become a cockfight arena, and hire me as its manager.  I agreed to fix it up to become a first-class enterprise, with what I believe to be the most modern and comfortable cockfighting arena in the United States.

4.      I was not at all pleased with some of the derogatory comments made in a recent (April 9) story in the first or national section of the <u>Times-Picayune</u> describing the Club.  For instance, we are housed in a much nicer place than "a corrugated metal building" and the so-called "shabby stretch of road" we are on is just off I-10, located on a good state highway.  But much of the description of what goes on in the Club is fairly accurate.  I ought to know because I run it.  The article correctly sets forth my views about the new law and the activities at the Club from the fights themselves to the drag pits to the concessions.  I have attached the article to my Declaration.

5.      The Club has derbies every weekend of each month from the beginning of November until the third week of August.  We usually start with a five-

cock derby that attracts anywhere from 150 to 200 separate entries—as many as 1,000 birds—and then move on to 11 cock derbies, often with 100 entries or another 1,000 birds. The birds are matched for weight within three ounces and monitored and banded with a number to avoid the insertion of "ringer" chickens. We run a Club free of fraud and cheating. The fighters have to pay from $200 to over $1,000 in order to enter their roosters in the derbies, all of which goes to the winners. We do not get one penny from that pot. Our money comes from the $20 admission fee for spectators (the arena can sit over 800, when it is totally full) and the food and other concession stands that we are responsible for.

6.     The Club is always well attended with about 40 to 50 percent of the spectators, from my observations over five years, of Mexican or Hispanic ancestry, primarily from Texas. The rest come from around the United States and Louisiana (many people of Cajun ancestry), with a substantial number of families, including small children, traveling as units to the events. Cockfighting and cock raising has always been a family affair, as it has been with me. My father and I went to the World Championship in Oklahoma in early May with Emanuel Massa. That's my family. We need to stick together.

7.     On my farm in Ragley, Louisiana, I still raise 400 roosters, down from 1,000, but I do not fight any of them at the Club. When the new law takes hold, I will have to cut back on the number I raise and wait to see how

long it takes before the Club has to shut down for lack of business. The people will not be coming from Texas for fear of being subject to arrest and that is over half of our attendance. We would have to rely solely on Louisiana-bred roosters, but there are not enough of them to fill a weekly bill of 1,000 fighting cocks. The special customers we have, like Roy Jones, Jr., the world heavyweight champion from Pensacola, Florida, will not be back with his birds, although, from time to time, he sends his employed handlers with his birds. He has seven season seats at the Club and attends frequently. Certainly, he would not want to be charged with a conspiracy to violate or aid and abet violation of a federal law. His reputation could not afford that.

I HAVE READ THE ABOVE DECLARATION AND, UNDER PENALTY OF PERJURY, SWEAR THE STATEMENTS ARE TRUE AND CORRECT ACCORDING TO MY PERSONAL KNOWLEGDE. ANY STATEMENTS WHICH ARE TRUE TO THE BEST OF MY KNOWLEDGE, INFORMATION, AND BELIEF ARE SO INDICATED.

Starks, Louisiana, this the _15_ day of May 2003.

_5 / 15 / 2003_                    _Mark Johnson_
DATE                               MARK JOHNSON

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED GAMEFOWL BREEDERS ASSOCIATION, INC., SANDY JOHNSON, EMANUEL MASSA, MARK JOHNSON, DON PERDUE, LARRY ROMERO, and BRUCE KINSINGER | * * * * * * * |
| Plaintiffs, | * |
| VERSUS | * * |
| ANN VENEMAN, Secretary, United States Department of Agriculture, PETER FERNANDEZ, Acting Administrator, Animal and Plant Health Inspection Service, and JOHN ASHCROFT, Attorney General of the United States | * * * * * * * * * |
| Defendants. | * * |

CV03-0970 L-O

CIVIL ACTION
No. JUDGE DOHERTY

SECTION

MAG.  MAGISTRATE JUDGE HILL

* * * * * * * * * * * * * * * * * * * * * * * *

## DECLARATION OF SANDY JOHNSON

In accordance with 28 U.S.C. § 1746, I, Sandy Johnson, do hereby declare under penalty of perjury that the foregoing is true and correct.

1.  I am over twenty-one years of age and give this Declaration of my own free will.

2.  I am the Director of Administration of the United Gamefowl Breeders Association, Inc. (UGBA).  I have held this position for almost 19 years

1

since 1985.  I was first elected to the UGBA Board of Directors when I lived in North Carolina and was married to a man who raised 200 fighting cocks.  In 1988, I moved to Ohio and married my present husband, Ray, who had been a UGBA Director in Ohio.  My UGBA position followed me to Ohio.  My husband continues to raise fowl that he sells and fights, between 200 and 300 of them at any time.  He sells them for breeding purposes and also for fighting, primarily to Guam, Saipan, and Mexico. We have to have a private veterinarian test our birds before the state will give them a stamp and health certificate so that we can send them to our shipper who obtains an import permit from the buyer.  The birds are hardy and travel well, except in excessive heat.

3.     I run the UGBA office, working with an Executive Committee of three, including Don Perdue, the President from West Virginia, and two elected members of the Board, Mark Johnson of Louisiana (UGBA's Vice-President) and Bruce Kinsinger of Pennsylvania.  We conduct business through bimonthly conference calls, two formal meetings, one in January, the other (UGBA's annual meeting) every August.  During the rest of the year, I am in charge of the office, answering phone calls, e-mail, and faxes from many of our approximately 15,000 dues-paying members in 32 states that belong to the UGBA.   The number fluctuates depending on the political situation.   I also represent UGBA at the meetings of various national poultry organizations; with officials of the Animal Plant and Health Inspection Service (APHIS) of the United States Department of Agriculture (USDA) who administer the Animal Welfare Act (the Act)

and the National Poultry Improvement Plan, which, among other things, seeks, with our help, to prevent poultry diseases, such as Exotic Newcastle Disease, from spreading across the country; the United States Postal Service; and our state association leaders. I spend a considerable amount of time on the road talking to cockfighters and breeders throughout the country. From time to time, I conduct business in Louisiana and go to derbies to visit with our members and witness cockfights. My office has been particularly busy in recent weeks as our members call to inquire about the status of the federal law and to learn what we do not know— how and by whom it is to be enforced.

4.      In 2000-2002, I spent considerable time with our lobbyists in Washington, D.C., trying to avert the legislative disaster that took place. We (Don Perdue) testified in one House hearing and contacted many Senators and Congresspersons, all to no avail. The amendments to the Act that will be going into effect swept by us in a rush and with next-to-no dissent. UGBA is not a wealthy organization. Our income is not in the same ballpark as the $57 million the Humane Society of the United States announced it received in the form of income in fiscal year 2001 and listed on its income tax return. We have no political action committee. We raise funds from dues paid voluntarily by our members who enjoy cockfighting as a sport and a hobby. Very few of them earn a living from fighting their birds. Indeed, to my knowledge, most of them lose money or, at best, break even because of the stiff costs involved in breeding cocks. They have to have day jobs to keep their families going.

3

5.    Raising birds is an expensive proposition.  To survive and thrive the birds need feed; their quarters are built and furnished with lumber, tar paper, roost posts, teepees, fences, tie cords, and plumbing; their owners use tractors, bush hogs, trucks, and other equipment to prepare the land for their quarters; they need medical supplies in the form of vaccines, vitamins, and antibiotics to stay strong and healthy, with visits from veterinarians to safeguard and certify their health and protect them from worms and lice; incubators are crucial to their production, including costly heat and water; security in the form of electrical fences, vermin control, and guard dogs to keep them from predators; and many other items, such as the cost for brood stock, hens, keeps (pre-fight training), testing implements (muffs), and the usual operating expenses associated with running a farm (fertilizer, lime, grass seed, maintenance, etc.).  All of this does not take account of taxes, loans, insurance, and rent.  It gets even more expensive when you want to take your cocks to fight in derbies or to appear in poultry exhibitions.  You have to pay substantial costs to get to your destination by car or truck or plane, including lodging and meals.  Attending various meetings related to breeding cocks is another item.

6.    In 2000-2001, with the leadership of Frank Massa (Emanuel's younger brother) and the Louisiana association, we conducted a mail survey of variously sized game fowl farms in Louisiana (ranging from 20 to 1,820 game fowl.  The survey ended up covering 19,854 game fowl worth approximately $2.6 million.  The operating expenses connected with their raising, including business-related and fixed expenses, amounted to a total

4

of $1.326 million or approximately $63.67 average per bird annually. The value of each chicken worked out to $139.70, resulting in an average cost output and sale value per fowl of $203.37 or $74,840 per farm. Using a conservative estimate of the number of actual breeders in our Louisiana association (2,750), we arrived at a total of $205.8 million in economic impact in Louisiana alone, with an indirect economic impact several times greater.

7.   In 2001, we commissioned the International Foundation for the Conservation of Natural Resources (IFCNR) to undertake a survey to determine, as well as we possibly could, given the natural desire for privacy and the sense of being looked down upon by the general public and condemned by animal activists, the economic status of cockfighting. IFCNR received 607 survey questionnaires from breeders, UGBA state representatives, and businesses associated with raising game fowl, responding to questions relating to income and costs. IFCNR concluded that there was "a high degree of expenses and time associated with the raising of these fowl," with most of the individuals involved having generations of family ties to involvement with game fowl, either on the basis of "generational bloodlines" or marrying into a game fowl family. Most of those committed to raising game fowl, IFCNR reported, had outside sources of income to support this recreational activity, amounting to 85 to 90 percent of their income.

8.   Responses to this survey came from 27 states, heavily in the South, and Puerto Rico. The state estimates did not include the traditional sale of

trios or one game fowl and two hens, which range from $750 to $1,500 or more, rather than the $100 average per bird that was used to make the calculations, or the impact of competitions or of the costs of raising the fowl. IFCNR corrected some of these gaps, cutting by one-half UGBA's estimate of the number of game fowl farms in each state (Alabama, Arkansas, California, Florida, Georgia, Louisiana, Mississippi, North Carolina, New Mexico, Ohio, Oklahoma, South Carolina, Texas, Virginia, Washington, and Puerto Rico) and came up with their median estimate of game fowl operations and activities in those states at $1.2 billion. Louisiana alone accounted for $205 million of this sum. These analyses were produced in February and March 2002.

9.     Because of my efforts to coordinate with APHIS and USDA on coordinated ways to limit the spread of disease among eating chickens or broilers to avoid the inevitable destruction once they are exposed to disease like Exotic Newcastle. I am familiar with the dimension of the broiler industry in the country. In 2001, according to USDA's <u>Poultry Review</u> and the USDA's National Agricultural Statistical Service (NASS), broiler production in the United States reached 8.39 billion head amounting to 42.4 billion pounds of broilers worth $16.7 billion (cost at 39.3 cents per pound). Broilers are young chickens who are mature when they are six to seven weeks old and are raised for their meat, weighing anywhere from four to five pounds.

10.    Cockfighting and the administration of it nationwide are now the center of my life. That certainly will no longer be the case once the new law takes

effect.  We will be running a trade organization whose activities verge on aiding and abetting illegal behavior, which I do not want to do.  The funds to keep UGBA alive will dry up quickly.  Only Louisianans will attend cockfights in Louisiana, and, even then, they are likely to stay away under the threat of being prosecuted should an out-of-state bird appear in the derby they came to view.  Admission fees will not be worth collecting and will not be able to continue to underwrite UGBA's operations.  I will have to close the office I have been running for nearly 19 years and either retire or seek another job in a depressed economy.

11.     I will miss cockfighting and the cockfighters, most of whom are special characters.  They have always been that way, ever since the sport started in Southeast Asia and moved across the continents to India, Persia, the Middle East, Greece, and then Rome, where Caesar matched his cocks with Mark Antony's.  Pompeii's excavations revealed a mosaic of two cocks in combat.  The sport moved to England where King Henry VII constructed a new pit at Whitehall in 1536, although, after much popularity throughout the British Isles, cockfighting became illegal in 1849, primarily because the British favor horseracing.

12.     Cockfighting in the United States was widespread in the 18th and 19th centuries.  Known participants included Benjamin Franklin, George Washington, Thomas Jefferson, Andrew Jackson, and Abraham Lincoln (at one time a cockfighting referee).  Then, slowly and surely, states began to ban the sport, 28 of them pre-1900, the others—with the exception of Louisiana and New Mexico—since.  By as late as 1934, in the vote for a

7

national symbol, the eagle beat out the cock by only two votes.  Seventy years later cockfighting faces its own extinction, a very disturbing turn of events.

I HAVE READ THE ABOVE DECLARATION AND, UNDER PENALTY OF PERJURY, SWEAR THE STATEMENTS ARE TRUE AND CORRECT ACCORDING TO MY PERSONAL KNOWLEGDE.  ANY STATEMENTS WHICH ARE TRUE TO THE BEST OF MY KNOWLEDGE, INFORMATION, AND BELIEF ARE SO INDICATED.

Albany, Ohio, this the _12th_ day of May 2003.

_05-12-03_
DATE

_Sandy Johnson_
SANDY JOHNSON

Source: News & Business > News > US Newspapers ⓘ
Terms: **cockfighting /s louisiana** (Edit Search)

↶ Select for FOCUS™ or Delivery
⌐

*Times-Picayune (New Orleans, LA) April 9, 2003 WednesdayCorrection Appended*

Copyright 2003 The Times-Picayune Publishing Company
Times-Picayune (New Orleans, LA)

April 9, 2003 Wednesday
Correction Appended

**SECTION:** NATIONAL; Pg. 1

**LENGTH:** 2585 words

**HEADLINE:** Federal cockfight law angers state's devotees

**BYLINE:** By Steve Ritea; Staff writer

**BODY:**
VINTON -- John Cambre and his wife spent close to $1,000 last month to fly to Louisiana from their home in Hawaii. They shelled out another $1,400 in airfare for some unlikely traveling companions: 20 chickens.

Their destination was a corrugated metal building on a shabby stretch of road just across from the Lucky Longhorn truck stop in rural Vinton, just four miles from the Louisiana-Texas border.

On the Saturday the Cambres rolled up to The Bayou Club, as the place is known, they found a parking lot crowded with dusty trucks and old sedans, many bearing Texas plates.

Inside the club, it was all about the chicken. There were chicken T-shirts, chicken medicines, chicken jewelry, food made for chickens and food made from chickens. Closer to the center of the building, 800 stadium-style seats around a roughly 15-foot square pit began to fill with spectators who had flocked to the club to watch chickens die.

They came from all over the country, even from all over the world, to the last state in the nation where cockfighting remains entirely legal. But changes on the horizon could threaten a deep-rooted cultural tradition.

On May 14, a new federal law is scheduled to take effect that will make it a misdemeanor to transport roosters across state lines for the purpose of fighting. Bills wending their way through Congress seek to make it a felony and would ban the interstate transport of the blades or gaffs that are attached to roosters' talons during fights to make their kicking and clawing more lethal.

All sides agree it is too early to tell just how profound an impact the new ban will have on cockfighting. Some say the sport, and associated wagering, will live on but in greater secrecy. Others say the law will have a severe impact on pits near the state's borders, such as The Bayou Club, but change little at mid-state pits where the majority of fighting birds are local. Still, in Louisiana, a state where federal mandates rarely get a warm reception, cockfighters are outraged to have anyone telling them what they can and can't do with their chickens.

"They are property and, as such, a property owner should have the right to decide how he should use his property," said Jim Demoruelle, a former president of the Louisiana Gamefowl Breeders Association.

Cockfighters are considering a legal challenge to the new federal law and have hired a constitutional lawyer, Demoruelle said, declining to elaborate. The Louisiana Gamefowl Breeders Association represents 2,750 breeders who have 19,854 gamecocks in the state, some of which can sell for thousands of dollars. The United Gamefowl Breeders Association represents more than 100,000 breeders nationwide.

The debate

Cockfighters say it's a mystery to them why anyone would want to ban an activity that only harnesses a rooster's natural instinct. "I believe that if you want to be cruel to a gamecock, don't let him fight," Demoruelle said.

But Humane Society of the U.S. spokesman Wayne Pacelle, whose picture was posted alongside Adolf Hitler's in a recent e-mail put out by cockfighting proponents, believes differently.

"Cockfighters breed birds for the most aggressive characteristics. They say they love to fight, but of course they bred them for fighting," he said. "It's a self-fulfilling prophecy."

Pacelle added: "It's an embarrassment to Louisiana to be associated with this gruesome and often criminal activity."

**Cockfighting** might be criminal elsewhere, but **Louisiana's** animal cruelty law was amended in 1982 to exempt fowl, and the blood sport has remained legal despite multiple efforts by some members of the state Legislature.

Only two other states allow cockfighting: New Mexico, where it is legal in certain counties, and Oklahoma, where a temporary injunction allows cockfighting to continue in some counties while courts decide whether to uphold a statewide ban.

Meanwhile, the activity that enthusiasts call a sport and opponents brand an atrocity goes on at about 70 locations in Louisiana with ambiguous-sounding names that rarely betray what happens inside: The Sunset Recreation Club, The Milkdairy Game Club and The Bayou Club.

Cockfighters prefer to keep a low profile. Years of protests by animal-rights advocates have made them increasingly defensive.

Mark Johnson, who manages The Bayou Club, is one such defensive cockfighter. He moved to **Louisiana** from South Carolina 12 years ago -- specifically, he said, so he could legally engage in **cockfighting.** The looming federal law makes his blood boil.

"I shouldn't have to defend what I'm doing," he declared one Saturday last month as seats around his cock pit started to fill with spectators and participants.

Love it or loathe it, there is no denying that cockfighting has a long, rich history, one its proponents take pride in and don't hesitate to capitalize on.

A T-shirt for sale at The Bayou Club depicting Abraham Lincoln and George Washington accurately identifies them as cockfighters. Another shirt, depicting two roosters clawing at

one another, proclaims: "Carrying on an American Tradition."

The spectacle

At The Bayou Club, the day's proceedings began with Johnson ordering Ben Hebert, a burly 39-year-old in denim overalls and a camouflage cap, to run and fetch a rooster for the chicken drop.

For those so citified as to suppose that this warm-up ritual involves dropping a chicken, it is, in fact, just the opposite: The chicken does the dropping, while the audience places bets of $20 or more on just where the scat will fall.

"Give him a pinch of Ex-Lax!" someone in the crowd yelled.

"He's bashful!" another called out.

Hebert whistled and snapped his fingers as the rooster in a green cage shuffled about atop a numbered grid somewhat like a bingo card and finally relieved itself.

"Number one!" Johnson yelled into the microphone, identifying the bingo card's besmirched square.

After the excitement died down, the pit was cleared and Hebert returned wielding an American flag. The audience rose to its feet and cowboy hats were held over hearts as loudspeakers blared the national anthem.

It was time for the main event.

As cocktail waitresses in tight T-shirts restocked their trays with cans of Bud Light and packs of Marlboros, a pair of roosters -- each with steel blades attached to its talons -- was carried into the ring, cradled under the arms of their owners. It was the beginning of the first of more than 100 fights that would take place that day.

The handlers began a dance calculated to make their birds fighting mad. Standing a foot or so apart, they held the birds face to face, until their agitation was visible and wings started to flap. Returning the birds to the shelter of their arms, the men bumped hips a few times, so the roosters' beaks met yet again. Then, at a signal from a referee in a black-and-white striped shirt, the birds were let loose.

Wings flapped maniacally and blades glinted as the two birds merged into a ball of feathers and caromed frenziedly around the glass-walled pit.

The action can be hard for a newcomer to follow.

"When most people first see it, they see a blur," said Demoruelle, who raises roosters in Ville Platte. "I see a ballet."

And indeed the spectacle can prove addicting.

"My first impression was that it's bloody and it's nasty," said Stella Kingrey, a ticket-taker at The Bayou Club. "But I don't feel that way anymore. It's a sport a lot of people have been born into."

The aftermath

Demoruelle and others have spent years breeding roosters with prized bloodlines, sometimes carried down from birds that belonged to their grandfathers. Watching one of those birds fight, he said, is poetry in motion.

"When he pops his wings closed, the tail flies backward and that's like a rudder: It guides it sideways or forward or whatever way he wants to go when he strikes," Demoruelle said. "This is what puts the power in the strike."

The fight continued for several minutes, then both roosters, visibly wearying, were carried out of the main pit to make way for the next pair. A minute or so later, they reappeared with their owners on a video screen attached to the top of the pit.

There are four screens in all, each feeding images captured by cameras trained on four smaller pits in a side area.

It was there, in tiny patches of mud ringed by white cinder blocks, that things started getting bloody.

Some battles can rage for hours, with handlers periodically trying to revive their birds by breathing on their wounds or open beaks to resuscitate them.

One man set up a makeshift operating table a few feet from the pit and used a needle and thread to suture his rooster's wounds.

But almost every fight ends in death, said Johnson, who claims that the losers are placed in boxes and returned to their owners.

Out in back of the club, large blue trash cans overflowing with dead chickens by late in the day told a different story.

Not all birds meet a trash can grave, however. Some go into a boiling pot.

"You make a gumbo with a gamecock or gamehen, it's so much richer," Demoruelle said.

The defense

While hundreds or even thousands of dollars ride on every fight, Johnson said he has nothing to do with the wagering, relying instead on admission for his profit. Instead, spectators pair off and bet with each other from their seats.

From a loft overheard, Johnson's wife, Mary, uses a computer to keep track of winners and losers, results that his 16-year-old nephew posts on an opposite wall.

Johnson's stepdaughter, Stevie Glasspool, a sprightly blond 20-year-old who twirls flags at Louisiana State University football games, said friends at LSU are surprised to hear she spends many of her off-season Saturdays helping her mother tally cockfight scores, driving two hours each way.

"I've brought some out here before," she said. "My boyfriend loves it. But I also had one friend come here and he didn't like it."

Many of the regulars are farmers and country people, but there are also doctors, lawyers and preachers in the crowd, and Jaguars sometimes slide in among the pickups that dominate The Bayou Club's parking lot.

"Some of these people, they treat their roosters better than their families," Glasspool said.

It outrages her mother when animal-rights advocates say cockfighters don't care about animals.

"I love animals," Mary Johnson said. "If one gets hurt, I'll bandage him up and just let him live in my bathtub till it's better."

And when it comes to roosters, what else could anyone expect them to do but fight?

"This is what God made them for," she said. "You can't eat them," she said, evidently unacquainted with Demoruelle's gumbo recipe. "You can't play with them."

As for the blades or gaffs attached to their legs, Johnson said roosters would peck and claw one another to death anyway, so "this just speeds the process up to where it is more humane."

Pacelle, of the Humane Society, disagrees.

"Rarely in the wild would you ever see combat between members of the same group end in death," he said. "There's submissive behavior where one animal stops or runs away."

Still, cockfighters argue that their birds have far better lives than the chickens raised for slaughter or egg production in factory farms.

Gamecocks are treated like royalty, many owners say, describing private pens for each rooster and countless thousands of dollars spent each year on food, medicine and care for their birds.

It can be an emotional moment, Johnson said, when an owner brings his bird into the pit for the first time.

"You are fixing to walk into that pit with a bird you spent two years raising, that you gave your full pride," he said. "Your heart and soul is there in that pit, and you're waiting to be judged."

Nothing unnatural is fed to gamecocks, Johnson and others argued -- it's all healthy. Names of fowl food for sale at The Bayou Club might sound like the products are designed to make roosters more aggressive -- "Kickin' Chicken" and "Eliminator" were available -- but they do no more to a chicken, Johnson said, than a sports drink does for a thirsty athlete.

"It's all marketing," he said.

Again, Pacelle begged to differ.

All you have to do is look at any of the major cockfighting magazines -- Grit and Steel, or Feathered Warrior -- "and they have page after page of ads for stimulants, blood-clotting drugs and other substances that are designed to enhance performance or prevent birds from hemorrhaging too quickly," he said.

The money

The ban on interstate travel with gamecocks was part of an omnibus farm bill that was supported by most of Louisiana's congressional delegation, and they have taken a hands-off approach since the bill's passage.

U.S. Rep. Chris John, D-Crowley is an exception. Although unavailable for an interview for this article, he has previously said cockfighting has a "multimillion-dollar" impact on the state. He also has said it is a "social and cultural event" whose regulation federal lawmakers should leave to the state.

Joe Massa, president of the **Louisiana** Gamefowl Breeders Association, supported John's assessment and said **cockfighting** pumps $205 million into **Louisiana's** economy each year, a number state officials said they could not corroborate because they have not studied the activity's impact on tourism.

**Cockfighting** enthusiasts say that when a fight is scheduled, it's tough to find a motel room or get seated in a restaurant around many of the larger pits in **Louisiana.**

Martha Johns, a manager of the Lucky Longhorn motel, across the street from The Bayou Club, said her rooms are booked months in advance of cockfights.

Putting additional restrictions on cockfighting will make it harder to control, some say.

"People will not get rid of their birds or stop the activity when the law goes into effect," said Sandy Johnson, executive director of the United Gamefowl Breeders Association.

"These gamefowl breeders will only go underground, and that will make it more difficult for us to work with them in terms of good poultry health," she said, referring to efforts to prevent diseases that could spread to commercial chickens sold for food.

Ken Johnson, a spokesman for U.S. Rep. Billy Tauzin, R-Chackbay, echoed that sentiment.

"It's going to be very difficult to police, and people who want to participate in the sport are clearly going to find ways around the law," he said. "It always happens."

Who will be responsible for enforcing the federal ban on interstate transportation of gamecocks is unclear to acting U.S. Attorney Jim Letten, whose jurisdiction includes the New Orleans area, and several state agencies contacted recently, though it is assumed state or parish officials will be asked to help.

Ironically, some say the federal law may boost the economics of **Louisiana's cockfighting** culture.

"We see people from other states who are buying property in Louisiana now or have other breeders contracting" to care for their gamecocks, Demoruelle said. "I just sold property to people from Oregon and Texas."

But for Cambre, the cockfighting enthusiast who traveled from Hawaii bearing fresh pineapples for Johnson, the new restrictions are a disaster. They'll also cripple his $40,000-a-year business breeding gamecocks for worldwide export.

"It makes me very angry," he said. "It's like some of my rights are being taken away."

. . . . . . .

Steve Ritea can be reached at sritea@timespicayune.com or (504) 826-3396.

**CORRECTION-DATE:** April 10, 2003 Thursday

**CORRECTION:**

Cockfighting town misnamed: A photo caption accompanying Wednesday's article on cockfighting misstated the name of the town where The Bayou Club is located. It is in Vinton.

**LOAD-DATE:** April 9, 2003

Source:  News & Business > News > US Newspapers ⓘ
Terms:  **cockfighting /s louisiana**  (Edit Search)
View:  Full
Date/Time:  Tuesday, May 6, 2003 - 3:38 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2003 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

UNITED GAMEFOWL      *
BREEDERS ASSOCIATION, INC.,   *
SANDY JOHNSON,       *
EMANUEL MASSA,       *
MARK JOHNSON,       *
DON PERDUE,        *
LARRY ROMERO, and     
BRUCE KINSINGER

  Plaintiffs,

VERSUS

ANN VENEMAN,        *
Secretary, United States     *
Department of Agriculture,    *
PETER FERNANDEZ,      *
Acting Administrator, Animal and  *
Plant Health Inspection Service,   *
and            *
JOHN ASHCROFT,       *
Attorney General of the     *
United States        *
              *
  Defendants.        *
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

CV03-0970   L-O

CIVIL ACTION
No. JUDGE DOHERTY

SECTION
MAG. MAGISTRATE JUDGE HILL

## DECLARATION OF EMANUEL MASSA

In accordance with 28 U.S.C. § 1746, I, Emanuel Massa, do hereby declare under penalty of perjury that the foregoing is true and correct.

1.   I am over twenty-one years of age and give this Declaration of my own free will.

2.   I am 73 and currently President of the Louisiana Game Breeders Association, which has 8,357-plus members, about ten percent of whom are residents of Louisiana. I have been involved with cocks since I was

10, when I saw some in cages in the French Market. I had a newspaper delivery route in the Lakeview area with my brother Frank, and, one day, I met an old man who showed me a damaged rooster. Frank and I kept that rooster in a box and took good care of him. That started our love affair with gamecocks.

3.   As I grew older, I started to attend cockfights all over the city from the West End to City Park to Gentilly to a club in Little Woods to LaPlace to St. Bernard's under some trees, to Christy Smith's service station. No one ever bothered us. I started to go further afield to pits in Biloxi, Mississippi, and elsewhere on the Gulf Coast where tournaments were conducted. I went every two weeks to see cockfights, and Frank would go with me. We went to a racetrack in South Kenner and hitchhiked over the Huey Long Bridge to the West Bank to attend the fights. I go often to the Sunset Club in Sunset and have continued going there for years on the weekends when fights are held. I used to fight roosters there as well, but now I fight them mainly at the Bayou Club in Vinton.

4.   Until I retired, I was a general contractor to earn my livelihood and raised chickens as a sideline. Currently, I own an 80-acre farm in Amite, Louisiana, where I raise mainly brood fowl and some gamecocks. I have about 600 roosters in residence now, down from about 1,000 last year. People constantly visit my farm from Central and South American countries, Mexico, the Philippines, and North Carolina (brood fowl only) and pick up roosters to take back with them. I ship some brood fowl to Alaska, Texas, and California. Raising roosters was a hobby that just

grew and grew, although now I am cutting back both on account of my age and limits of the law.  When the new law takes effect, I will have to give up the hobby and end the practice of shipping brood fowl and fighting cocks around the world, because I do not want to risk criminal liability.  Though I like to think I am selling my birds for breeding purposes, I am sure that some of my customers will fight them.

5.    My gamecocks, like all gamecocks, are born natural predators who will try to destroy one another as they grow older.  I hatch them in incubators in a garage in River Ridge over a two-week period and then transfer them to a brood house for two more weeks.  Then I hold them in biddy houses containing 50 cocks per house.  Somewhere in their fifth to seventh month of life, as they mature, I have to put them in separate living quarters (pens) on my farm or they will go after one another.  They stay in the pens until their heel spurs set and are hard enough to take a rope without breaking, which is usually by ten months.  Then I put a rope around their spurs tethered to a cock keeper (two pieces of metal connected by a 2' by 4') so that they can move about in a fixed radius to increase their strength and eat the grass in the yard. I go out to the farm on Saturday and/or Sunday to work with my two hired hands (one of whom lives on the farm) watering and feeding the chickens. Breeding generally occurs from the end of March until the end of May when it becomes too hot and the chicks get smaller.

6.    Last month I was invited by a Mexico City lawyer-friend to attend a big tournament (palenque) in Toluca just outside of Mexico City.   The Mexicans' attachment to the sport far exceeds ours.  They furnish cages to

everyone who brings chickens to fight and show and advertise their chickens for sale at the fights. Their crowds are quite large, with arenas holding up to 5,000 fans and hours of variety entertainment provided, together with the fights. The Mexicans fight their birds with a short knife, unlike our general use of gaffs. The knife tends to assure that one of the fighting birds will die from blows delivered to the neck and head instead of the body, as here, and that the fights will be over relatively quickly. Puerto Rican cock fighters, unlike either Americans or Mexicans, use "pastizas" or natural heels with an attached spur as their weapon.

7.      If the new law accomplishes what Congress wanted it to and prevents my shipping and delivering any birds out-of-state or to a foreign country in order to participate in an animal fighting venture, I will have to terminate my business, perhaps maintaining a few brood fowl to remind me of all the happy days working with cocks as a child, a young man, and a mature adult. But my flock will not be 1,000 or 600. It will be miniscule. Much of the pleasure I used to get from raising fowl will be gone forever. The people who work with my gamefowl on my farms (one man who lives on the property and a man and his wife who come daily to help with watering and feeding) will be out of work.

I HAVE READ THE ABOVE DECLARATION AND, UNDER PENALTY OF PERJURY, SWEAR THE STATEMENTS ARE TRUE AND CORRECT ACCORDING TO MY PERSONAL KNOWLEGDE. ANY STATEMENTS WHICH ARE TRUE TO THE BEST OF MY KNOWLEDGE, INFORMATION, AND BELIEF ARE SO INDICATED.

4

THE BEST OF MY KNOWLEDGE, INFORMATION, AND BELIEF ARE SO INDICATED.

River Ridge, Louisiana, this the _15_ day of May 2003.

_5/15-03_

DATE

_Emanuel D Massa_

EMANUEL MASSA

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

UNITED GAMEFOWL                  *
BREEDERS ASSOCIATION, INC.,      *
SANDY JOHNSON,                   *
EMANUEL MASSA,                   *
MARK JOHNSON,                    *
DON PERDUE,                      *
LARRY ROMERO, and                *   CV03-0970 L-O
BRUCE KINSINGER                  *   CIVIL ACTION

    Plaintiffs,               *   No.  JUDGE DOHERTY
                                 *
VERSUS                           *   SECTION
                                 *
ANN VENEMAN,                     *   MAG. MAGISTRATE JUDGE HILL
Secretary, United States         *
Department of Agriculture,       *
PETER FERNANDEZ,                 *
Acting Administrator, Animal and *
Plant Health Inspection Service, *
and                              *
JOHN ASHCROFT,                   *
Attorney General of the          *
United States                    *
                                 *
    Defendants.               *
* * * * * * * * * * * * * * * * * * * * * * * *

## DECLARATION OF DON PERDUE

In accordance with 28 U.S.C. § 1746, I, Don Perdue, do hereby declare under penalty of perjury that the foregoing is true and correct.

1.     I am over twenty-one years of age and give this Declaration of my own free will.

2.     I am a pharmacist by profession and have practiced for nearly 30 years in West Virginia, Kentucky, and Ohio.  I reside in Prichard, West Virginia, in the county in which I was born 53 years ago.

1

3.      Since this past January, I have returned as Acting President of the United Gamefowl Association, Inc. (UGBA) because the President at that time stepped down for personal reasons.  I will continue to serve until our annual meeting in Jekyll Island, South Carolina (the Gamecock State) in August.

4.      I began breeding and working with game fowl when I was 10 years old. Both my father and grandfather kept game fowl.  I assisted my father from that time until I went away to college, and on my return continued helping both him and my brother (now both deceased).  At my father's death I inherited all his remaining fowl, of which there are now some 35 individuals.  In 1963 my father began breeding his own strain of Frost Greys.  These are what I have left.  During my years at home, we could not afford the expense to fight any game fowl, yet we continued to raise them every year, giving some away to friends for both breeding and (legal) fighting purposes (it was legal to compete with game fowl in our neighboring state of Kentucky until 1999 and, some fowl were sent to Louisiana either sold or given as gifts).  Some of our fowl were shipped to Guam.   We would receive reports later on how they had faired in competition.

5. I was the President of UGBA in 1986 and 1987, after I had been with the Ohio Game Breeders Association from 1978 until 1987, many of those years as its President.

6. When the new law goes into effect, we will be committing the federal offense of being a cultural anachronism. I will be forced to destroy any excess fowl that I raise (in order to maintain my father's strain of Greys I must raise 10-20 young birds, pullets and stags each year), rather than sell or give them to people. In memory of my father and the life we shared, I would like to keep his specially developed Greys. If this law goes into effect I will be faced with the choice of keeping only the barest minimum of fowl (and, thus, risking extinction of the strain) or with killing a number of otherwise valuable brood fowl every year. At the extinction of this strain, 43 plus years of my life and the decades spend with my father and brother to create these exceptional birds, will become only memory.

I HAVE READ THE ABOVE DECLARATION AND, UNDER PENALTY OF PERJURY, SWEAR THE STATEMENTS ARE TRUE AND CORRECT ACCORDING TO MY PERSONAL KNOWLEGDE. ANY STATEMENTS WHICH ARE TRUE TO THE BEST OF MY KNOWLEDGE, INFORMATION, AND BELIEF ARE SO INDICATED.

Pritchard, West Virginia, this the _____ day of May 2003.

5/12/03
DATE

DON PERDUE

3

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **UNITED GAMEFOWL** | * | |
| **BREEDERS ASSOCIATION, INC.,** | * | |
| **SANDY JOHNSON,** | * | |
| **EMANUEL MASSA,** | * | |
| **MARK JOHNSON,** | * | |
| **DON PERDUE,** | * | |
| **LARRY ROMERO, and** | * | |
| **BRUCE KINSINGER** | * | |
| | | * **CIVIL ACTION** |
| **Plaintiffs,** | | * **No.** |
| | | * |
| **VERSUS** | | * **SECTION** |
| | | * |
| **ANN VENEMAN,** | * | **MAG.** |
| **Secretary, United States** | * | |
| **Department of Agriculture,** | * | |
| **PETER FERNANDEZ,** | * | |
| **Acting Administrator, Animal and** | * | |
| **Plant Health Inspection Service,** | * | |
| **and** | * | |
| **JOHN ASHCROFT,** | * | |
| **Attorney General of the** | * | |
| **United States** | * | |
| | | * |
| **Defendants.** | | * |

* * * * * * * * * * * * * * * * * * * * * * * *

## DECLARATION OF LARRY ROMERO

In accordance with 28 U.S.C. § 1746, I, Larry Romero, do hereby declare under penalty of perjury that the foregoing is true and correct.

1.  I am over twenty-one years of age and give this Declaration of my own free will.

2.  I am a breeder of gamecocks who, over the course of my life, has run two rooster farms, first in New Iberia, Louisiana, for 15 years and then a much larger 30-acre farm with 1,200 teepees in Abbeville where I reside. My

1

teepees are usually full of roosters.  I sell a constant flow of brood fowl to customers who are invariably from out of state and predominantly from foreign countries, especially Mexico and the Philippines.  Less than one percent of my customers are from Louisiana.  That has been the same ever since I started to raise gamecocks.

3.     I began working with gamecocks on my uncle's farm in Lafayette when I was five years old.  I would water and feed perhaps 75 to 100 of them on weekends.  When I was 12, my uncle gave me my own cock.  My father built pens to hold one gamecock and two hens each.

4.     When I married at the age of 20 in 1967, I worked a farm on five acres that I bought.  My regular job was working for Trans Louisiana Gas Company, as a construction supervisor.  Over time, I needed a much larger space.  I sold my house and farm and moved to 30 acres in Abbeville.  Here I hatch my chicks in incubators, primarily during the winter months.  Then, I put them in small groups in small barns for a month or less.  Thereafter, the chickens are left free in a field where they can roam, with feeders and water, 50 chickens to a group.  When they arrive at six months of age, they start to get cocky and chase the hens that are nearby.  Then I pick up stags to place in stall pens four feet by six feet on grass.  They remain there for approximately three more months until they are anywhere from nine to eleven months old and their spurs have hardened sufficiently so that I can put them on a tie cord that will not harm the strip between their spur and their joint and will prevent them from fighting with other cocks.

5.      When they become stags (12 to 24 months of age), I start to sell some, together with pullets and hens.  I check their condition every day and, if they start to get too heavy, I move their watering bowl to one side of their teepee so that they will be fed only a half-ration.  My customers who call me from the Philippines tend to be regular customers.  They often come to look at my farm.  I box them so that each cock is separate and send them to a broker in California, who ships the fowl I send him (with the proper papers and permits) by Philippines Airlines to my customers.  They tell me they are looking for the best brood fowl to reproduce on their farms.  But I cannot control the uses to which they put the cocks I ship them.  With the coming new law, I have been producing as many birds as I can before my ability to deliver them ends.  Recently, I sold 250 birds, which have not all been shipped because I could not get the permits before May 13.  After May 13 arrives, I will probably raise some brood fowl, no more than 400, which will barely enable me to make a living.  I will no longer be able to ship any of my non-brood flock to out-of-state customers.  That business will be over.  I console myself by attending cockfights (I was at the Sunset Club in January), but they may not be available.  I do not fight my own roosters, although I occasionally handle gamecocks in the pits.

6.      In 1998, after 37 years, I made a decision to take early retirement at the age of 53 from the Gas Company knowing that I could fall back on income from the breeding of fowl.  Had I known then what I know, I would never have retired.

I HAVE READ THE ABOVE DECLARATION AND, UNDER PENALTY OF PERJURY, SWEAR THE STATEMENTS ARE TRUE AND CORRECT ACCORDING TO MY

3

PERSONAL KNOWLEGDE.  ANY STATEMENTS WHICH ARE TRUE TO THE BEST OF MY KNOWLEDGE, INFORMATION, AND BELIEF ARE SO INDICATED.

Abbeville, Louisiana, this the ___14__ day of May 2003.

_____5-04-03_____
DATE

LARRY ROMERO