RECEIVED

DEC 2 3 2003

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

FILED
USDC, WESTERN DISTRICT OF LA
ROBERT H. SHEMWELL, CLERK
DATE _1_6_2004_
BY _____

| | | |
|---|---|---|
| UNITED GAMEFOWL | * | |
| BREEDERS ASSOCIATION, INC., | * | |
| SANDY JOHNSON, | * | |
| EMANUEL MASSA, | * | |
| MARK JOHNSON, | * | |
| DON PERDUE, | * | |
| LARRY ROMERO, and | * | |
| BRUCE KINSINGER | * | |
| | * | CIVIL ACTION |
| Plaintiffs, | * | No. 03-CV-970 |
| | * | |
| VERSUS | * | |
| | * | JUDGE DOHERTY |
| ANN VENEMAN, | * | |
| Secretary, United States | * | MAGISTRATE JUDGE HILL |
| Department of Agriculture, | * | |
| PETER FERNANDEZ, | * | |
| Acting Administrator, Animal and | * | |
| Plant Health Inspection Service, | * | |
| and | * | |
| JOHN ASHCROFT, | * | |
| Attorney General of the | * | |
| United States | * | |
| | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM IN SUPPORT OF MOTION
FOR DECLARATORY JUDGMENT**



i

**TABLE OF CONTENTS**

I.    **THE STATUTORY PROVISIONS THAT ARE CONSTITUTIONALLY CHALLENGED** ............................................................................... 1

II.    **SUMMARY OF ARGUMENT** ........................................................... 3
     (A)   Lack of Federal Jurisdiction Under the Interstate Commerce Power ...................3
     (B)   Denial of Fifth Amendment Equal Protection .............................................7
     (C)   Deprivation of Legislative Due Process ................................................12

III.    **THE APPLICABLE LEGISLATIVE HISTORY** ................................ 16
     (A)   The First Efforts—House and Senate in 1976 ........................................16
     (B)   The Original Bill in Conference in 1976 ................................................22
     (C)   The New Provisions as 2002 Amendments to the Farm Bill........................24

IV.    **INFRINGING ON FEDERALISM AND EXCEEDING CONSTITUTIONAL AUTHORITY UNDER THE COMMERCE CLAUSE** ............................ 31
     (A)   Supreme Court Case Law ....................................................................31
         1)    Diseased livestock................................................................32
         2)    Lottery tickets .....................................................................33
         3)    Injurious products................................................................34
         4)    Moving women across state lines ............................................34
         5)    Polygamy ..........................................................................36
         6)    Transportation of liquor ........................................................39
         7)    Convict-made goods .............................................................42
         8)    The protective principle .........................................................42
         9)    Civil rights .........................................................................44
         10)   Other economic laws.............................................................45
         11)   Lopez................................................................................46
         12)   Morrison............................................................................47
         13)   Fugitive slaves ....................................................................48
         14)   New factors ........................................................................49
     (B)   Application to the New Provisions .........................................................52
         1)    Non-commercial, non-economic...............................................52
         2)    The lack of moral community consensus.....................................55
         3)    No spillover effects ..............................................................61
         4)    An essential part of a larger regulatory scheme............................62
         5)    Lack of any significant federal interest......................................64
         6)    A state liberty is at stake .......................................................65
         7)    Further federalism concerns....................................................68
         8)    More recent instances of federal horizontal aggrandizement of moral matters at state expense....................................................................70
             (a)   Assisted suicide................................................71
             (b)   Medical use of marijuana.....................................72
             (c)   Partial-birth abortion .........................................73
             (d)   Same-sex marriage............................................75
     (C)   Foreign Commerce Is Treated the Same as Interstate Commerce........................77

V.    **DENIAL OF EQUAL PROTECTION** ............................................... 78

VI.    **THE FAILURE OF LEGISLATIVE DUE PROCESS** ....................... 91
     (A)   NAFTA ..........................................................................................100
     (B)   Unfunded Mandates ..........................................................................101

## Table of Cases

Baehr v. Lewin, 852 P.2d 44 (1993) ................................................................. 76

Barnes v. Glen Theatre, Inc., 501 U.S. 560 (1991) ....................................... 59

Beal v. Doe, 432 U.S. 438 (1977) ..................................................................... 75

Board of Trustees of the University of Alabama v. Garrett,
    531 U.S. 356 (2001) ................................................................................ 93, 96

Boerne v. Flores, 521 U.S. 507 (1997) ............................................................ 95

Bolling v. Sharpe, 347 U.S. 497 (1954) ............................................................. 7

Brooks v. United States, 267 U.S. 432 (1925) ............................................... 43

Caminetti v. United States, 242 U.S. 470 (1917) ................... 35, 36, 38, 61

Champion v. Ames, 188 U.S. 321 (1903) ................................................... 6, 33

City of Cleburne, Texas v. Cleburne Living Center, 473 U.S. 432 (1985) ...... 7, 78, 79, 81, 82, 92

Clark Distilling Co. v. Western Maryland R. Co., 242 U.S. 311 (1917) ..................................... 40

Cleveland v. United States, 329 U.S. 14 (1946) ........................................ 38, 39

Florida Prepaid Postsecondary Education Expense Board v. College Savings
    Bank, 527 U.S. 627 (1999) .................................................................... 95

Fullilove v. Klutznick, 448 U.S. 448 (1980) .................................................. 94

Glucksberg v. Washington, 521 U.S. 702 (1997) .......................................... 71

Goodridge v. Dept. of Public Health, 798 N.E. 2d 941 (2003) .............. 76, 77

Harris v. McRae, 448 U.S. 297 (1980) ........................................................... 75

Health v. Alabama, 474 U.S. 82 (1985) .......................................................... 55

Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241 (1964) ........... 15, 44, 45, 46

Hipolite Egg Co. v. United States, 220 U.S. 45 (1911) ...................... 34, 43, 61

Hoke v. United States, 227 U.S. 308 (1913) .............................................. 34, 35

Jones v. United States, 529 U.S. 848 (2000) ................................................. 53

Katzenbach v. McClung, 379 U.S. 294 (1964) ............................................. 14

Kentucky Whip & Collar Co. v. Illinois Cent. R. Co., 299 U.S. 334 (1937) .............. 42

Kimel v. Florida Board of Regents, 528 U.S. 62 (2000) ............................. 96

Lawrence v. Texas, 123 S. Ct. 2472 (2003) ................................................... 60

McDermott v. Wisconsin, 228 U.S. 115 (1913) ........................................... 64

Moher v. Roe, 432 U.S. 464 (1977) ................................................................ 75

New York v. United States, 505 U.S. 144 (1992) ........................................ 69

Oregon v. Ashcroft, 192 F. Supp. 2d 1077 (2002) ...................................... 71

Paul v. Duke, 424 U.S. 693 (1976) ................................................................ 68

Pegram v. Herdrich, 530 U.S. 211 (2000) ..................................................... 74

Perez v. United States, 402 U.S. 146 (1971) ......................................... 14, 52, 62

Petite v. United States, 361 U.S. 529 (1960) ............................................... 66

Posadas de Puerto Rico Associates v. Tourism Company of Puerto Rico, 478 U.S.
    328 (1986) ................................................................................................ 82

Prigg v. Pennsylvania, 41 U.S. (16 Pet.) 539 (1842) .................................. 48

Printz v. United States, 521 U.S. 898 (1997) ............................................... 70

Reid v. Colorado, 187 U.S. 137 (1902) ................................................. 32, 43, 61

Reynolds v. United States, 98 U.S. 145 (Oct. Term 1878) ...................... 37, 38

Roe v. Wade 410 U.S. 113 (1973) .................................................................. 74

Romer v. Evans, 517 U.S. 620 (1996) ......................... 7, 10, 38, 78, 80, 81, 82, 92

Rostker v. Goldberg, 453 U.S. 57 (1981) ..................................................... 93

Solid Waste Agency v. Army Corps of Engineers, 531 U.S. 159 (2001) ........ 71

Stenberg v. Carhart, 530 U.S. 914 (2000) ............................................... 74, 75

Stirone v. United States, 361 U.S. 212 (1960) ................................................................ 53
Thornton v. United States, 271 U.S. 414 (1926) ........................................................... 32
United States Department of Agriculture v. Moreno,
    413 U.S. 528 (1973) ............................................... 7, 78, 79, 80, 81, 82, 92
United States v. Collins, 40 F.3d 95 (1994) ................................................................. 53
United States v. Darby, 312 U.S. 100, 115 (1942) ........................................... 43, 45, 46
United States v. Emmons, 410 U.S. 396 (1973) ............................................................ 47
United States v. Hawkins, 104 F.3d 437 (D.C. Cir. 1997) .......................................... 63
United States v. Hill, 248 U.S. 420 (1919) .......................................................... 40, 41
United States v. Lopez, 514 U.S. 549 (1995) ............................... 6, 7, 14, 42, 46, 47, 49,
    ......................................................................... 50, 51, 62, 65, 70, 74, 95
United States v. Luna, 165 F.3d 316 (5th Cir. 1999) .................................................. 63
United States v. Morrison, 529 U.S. 598 (2000) ................. 6, 8, 14, 15, 47, 50, 51, 62, 65, 95
United States v. Oakland Cannabis Buyer's Cooperative,
    532 U.S. 483 (2001) ................................................................................... 72
United States v. Simpson, 252 U.S. 465 (1920) .......................................................... 41
United States v. Stillo, 57 F.3d 553 (7th Cir. 1995) .................................................. 53
Weber v. Freed, 239 U.S. 325 (1915) ........................................................................ 43
Wickard v. Filburn, 317 U.S. 111 (1942) .......................................................... 62, 74
Williamson v. Lee Optical, 348 U.S. 483 (1955) ................................................... 83, 90

## Statutes

1 U.S.C. § 7 ....................................................................................................... 76
18 U.S.C. § 1025 ............................................................................................... 55
18 U.S.C. § 1082 ............................................................................................... 55
18 U.S.C. § 113 ................................................................................................. 55
18 U.S.C. § 114 ................................................................................................. 55
18 U.S.C. § 1262 .......................................................................................... 42, 58
18 U.S.C. § 1301 .......................................................................................... 34, 58
18 U.S.C. § 1302 ............................................................................................... 58
18 U.S.C. § 1307 ............................................................................................... 58
18 U.S.C. § 1363 ............................................................................................... 55
18 U.S.C. § 1460 ............................................................................................... 56
18 U.S.C. § 1531 .......................................................................................... 73, 74
18 U.S.C. § 1951 ............................................................................................... 53
18 U.S.C. § 1952 ............................................................................................... 57
18 U.S.C. § 1959 ............................................................................................... 59
18 U.S.C. § 1961 ............................................................................................... 59
18 U.S.C. § 1995 ............................................................................................... 59
18 U.S.C. § 201 ................................................................................................. 56
18 U.S.C. § 205 ................................................................................................. 56
18 U.S.C. § 207 ................................................................................................. 56
18 U.S.C. § 2111 ............................................................................................... 56
18 U.S.C. § 224 ................................................................................................. 57
18 U.S.C. § 2261A ....................................................................................... 55, 57
18 U.S.C. § 228 ........................................................................................... 57, 61
18 U.S.C. § 231 ........................................................................................... 56, 57
18 U.S.C. § 2421 ....................................................................................... 34, 36, 59

18 U.S.C. § 2425 ............................................................................................ 36, 55, 59
18 U.S.C. § 344 ........................................................................................................ 40
18 U.S.C. § 432 ........................................................................................................ 56
18 U.S.C. § 521 ........................................................................................................ 57
18 U.S.C. § 661 ........................................................................................................ 55
18 U.S.C. § 662 ........................................................................................................ 55
18 U.S.C. § 81 .......................................................................................................... 55
18 U.S.C. § 836 ........................................................................................................ 58
18 U.S.C. § 844 ........................................................................................................ 53
18 U.S.C. § 872 ........................................................................................................ 56
18 U.S.C. § 878 ........................................................................................................ 56
18 U.S.C. § 922 .................................................................................................... 47, 63
18 U.S.C. §§ 111-112 ............................................................................................... 56
18 U.S.C. §§ 212-213 ............................................................................................... 56
18 U.S.C. §§ 435-443 ............................................................................................... 56
18 U.S.C. §§ 646-656 ............................................................................................... 56
19 U.S.C. §§ 3301-3473 ......................................................................................... 100
2 U.S.C. § 1501 ...................................................................................................... 101
2 U.S.C. § 1515 ...................................................................................................... 104
2 U.S.C. § 1571 ................................................................................................ 101, 104
2 U.S.C. § 658 .................................................................................................. 101, 102
2 U.S.C. § 659 ........................................................................................................ 101
21 C.F.R. § 1306.04 ................................................................................................. 71
21 U.S.C. § 801 .................................................................................................... 64, 71
27 U.S.C. § 121 ........................................................................................................ 39
27 U.S.C. § 122 ........................................................................................................ 40
28 U.S.C. § 7386 ...................................................................................................... 75
42 U.S.C. § 13981 .................................................................................................... 47
49 U.S.C. §§ 61-64 ................................................................................................... 42
7 U.S.C. § 2131 ........................................................................................................ 16
7 U.S.C. § 2132 ........................................................................................................ 16
7 U.S.C. § 2156 ............................................................................... 1, 2, 31, 44, 100
71 U.S.C. § 801 ........................................................................................................ 63
Act of May 29, 1884, 23 Stat. 31 ............................................................................ 32
Age Discrimination in Employment Act .................................................................. 88
Agriculture, Conservation, and Rural Enhancement Act of 2001 ............................ 26
Americans with Disabilities Act of 1990 .................................................................. 96
Animal Welfare Act Amendment of 1975 ................................................................ 18
Civil Rights Act of 1964, 42 U.S.C. §§ 2000a-2000a-6, §§ 201-207, 78 Stat. 241 .............. 44, 45
Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub. L. 91-513,
     Title II, § 101, Oct. 27, 1970, 84 Stat. 1241 .................................................... 64
Crime Control Act of 1990 ...................................................................................... 47
Edmunds-Tucker Act ............................................................................................... 37
Emergency Agricultural Assistance Act of 2001 ...................................................... 25
Fair Labor Standards Act of 1938, § 15, 29 U.S.C.A. § 215(a), 52 Stat. 100 .............. 45
Federal Laboratory Animal Welfare Act, 7 U.S.C. § 2131 ...................................... 16
Mann Act of June 25, 1910 (White Slave Traffic Act) ........................... 34, 36, 38, 39
Morrill Anti-Bigamy Act ......................................................................................... 37

Morrill Anti-Bigamy Act, ch. 125, 12 Stat. 501 (1862) .................................................... 37
North American Free Trade Agreement Implementation Act, Pub. L. No. 103, 107
    Stat. 2037 (1993)............................................................................................ 100
Patent Remedy Act ............................................................................................... 88
Post Office Appropriation Act, § 5, March 3, 1917, 30 Stat. 1058, 1069, c. 162........................ 40
Unfunded Mandate Reform Act.................................................................................. 101
Unfunded Mandates Reform Act of 1995, Pub. L. No. 104-4, 109 Stat. 48.............................. 101
Violence Against Women Act ............................................................................... 47, 95
Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322,
    108 Stat. 1796, 2125-26 ..................................................................................... 95
Voting Rights Act of 1965 ....................................................................................... 96
Webb-Kenyon Act of March 1, 1913, c. 90, 37 Stat. 699 ................................................... 40
Wilson Act of Aug. 8, c. 728, 26 Stat. 313 ............................................................... 39, 40

## Opinions

74 Op. Atty. Gen. 74-172 (Apr. 9, 1974)........................................................................ 4

## Constitutional Provisions

Article I, Section 8, Clause 18 .................................................................................. 55
Article III, Section 2, Clause I ................................................................................. 55
Article IV, Section 3, Clause 2 ................................................................................. 55
Due Process Clause of the Fifth Amendment .............................................................. 7, 90
Equal Protection Clause.......................................................................................... 79
Fugitive Slave Clause, Article IV, Section 2, Clause 3 ...................................................... 48
Interstate Commerce Clause, Article I, Section 8, Clause 3 .......... 3, 14, 15, 31, 33, 35, 36, 44, 45,
    .................................................................................... 46, 48, 49, 50, 51, 52, 55, 95, 104
Spending Clause, Article I, Section 3, Clause 1 ............................................................. 74

## Bills

H.R. 1155, 107th Cong. (2001)................................................................................. 26
H.R. 1275, 106th Cong. (2000)............................................................................. 25, 89
H.R. 15843, 93rd Cong. (1974) ................................................................................ 17
H.R. 16738, 93rd Cong. (1974) ................................................................................ 17
H.R. 2646, 107th Cong. (2001)................................................................................. 26
H.R. 5808, 94th Cong. (1975) .............................................................................. 17, 18
S. 1731, 107th Cong. (2002) ................................................................................... 30
S. 1941, 94th Cong. (1975) ..................................................................................... 17
S. 345, 106th Cong. (2000)....................................................................... 24, 25, 26, 102

## Legislative Materials

121 CONG. REC. S. 18857-58 (daily ed. June 13, 1975) ..................................................... 17
121 CONG. REC. S. 41623 ....................................................................................... 17
122 CONG. REC. H. 2863 ........................................................................................ 18
122 CONG. REC. H. 2864 .................................................................................... 18, 19
122 CONG. REC. H. 2865 ........................................................................................ 19
122 CONG. REC. H. 2873 (daily ed. Feb. 9, 1976) ........................................................... 18
122 CONG. REC. H. 2876-77 (daily ed. Feb. 9, 1976)............................................ 9, 18, 20, 21

122 CONG. REC. H. 2877 (daily ed. Feb. 9, 1976) ...................................................... 82
122 CONG. REC. H. 2879 ............................................................................................ 21
122 CONG. REC. H. 2882 ............................................................................................ 22
122 CONG. REC. H. 2884 (daily ed. Feb. 9, 1976) ...................................................... 10
122 CONG. REC. H. 9560-97 ....................................................................................... 23
122 CONG. REC. H. 9562 ............................................................................................ 23
122 CONG. REC. H. 9563 ............................................................................................ 24
142 CONG. REC. S. 10,068 (daily ed. Sept. 9, 1996) .................................................. 76
147 CONG. REC. H. 6276 (daily ed. Oct. 4, 2001) ......................................... 10, 29, 90
147 CONG. REC. S. 8433 (daily ed. July 31, 2001) ............................................ 26, 98
147 CONG. REC. S. 8434 (daily ed. July 31, 2001) ............................................ 10, 26
148 CONG. REC. at S. 1006-1135 ............................................................................... 30
H.R. REP. NO. 107-424 ............................................................................................. 30
H.R. REP. NO. 94-81 .................................................................................................. 18
H.R. REP. NO. 94-976 (1976) ............................................................................. 22, 23
S. REP. NO. 106-297, 106th Cong., 2d Sess. at 2 (2000) .............................. 24, 25, 102
S. REP. NO. 94-580 (1975) ........................................................................................ 17
S. REP. NO. 94-727 (1976) ................................................................................. 22, 23

## Articles

Allan Ides, The Partial-Birth Abortion Ban Act of 2003 and the Commerce Clause
    (Loyola, Los Angeles Public Law and Legal Theory Research Paper No.
    2003-31 (Nov. 2003) (SSRN Abstract No. 471441) ....................................... 75
Andrew Koppleman, Dumb and DOMA Why the Defense of Marriage Act Is
    Unconstitutional, 83 IOWA L. REV. 1 (1997) .................................................. 76
Andrew Koppleman, Same-Sex Marriage, Choice of Law, and Public Policy, 76
    TEX. L. REV. 921 (1998) ................................................................................. 76
Barbara Holden-Smith, Lords of Lash, Loom, and Law:  Justice Story, Slavery,
    and Prigg v. Pennsylvania, 78 CORNELL L. REV. 1086 (1993) ....................... 48
Barry Friedman, Legislative Findings and Judicial Signals:  A Positive Political
    Reading of United States v. Lopez, 46 CASE. W. RES. L. REV. 757 (1996) ...... 94
Charles Tiebout, A Pure Theory of Local Expenditures, 64 J. POL. ECON. 416
    (1956) .............................................................................................................. 69
Dan Coenen, A Constitution of Collaboration:  Protecting Fundamental Values
    with Second-Look Rules of Interbranch Dialogue, 42 WM. & MARY L.
    REV. 1575 (2001) ...................................................................................... 14, 94
Donald Regan, How to Think About the Federal Commerce Power and
    Incidentally Rewrite United States v. Lopez, 94 MICH. L. REV. 554 (1995) ..... 40
Hans Linde, Due Process of Lawmaking, 55 NEB. L. REV. 197 (1976) ................ 12, 92
Henry M. Hart, Jr., The Aims of the Criminal Law, 23 LAW & CONTEMP. PROBS.
    401 (1958) ....................................................................................................... 59
Jennifer Brown, Competitive Federalism and the Legislative Incentives to
    Recognize Same Sex Marriage, 68 S. CAL. L. REV. 745 (1995) ...................... 70
Lynn A. Baker & Ernest A. Young, Federalism and the Double Standard of
    Judicial Review, 51 DUKE L.J. 75 (2001) ........................................................ 68
Lynn A. Baker, Should Liberals Fear Federalism, 70 U. CIN. L. REV. 433 (2002) ....... 68, 70
Michael McConnell, Federalism:  Evaluating the Founders' Design, 54 U. CHI. L.
    REV. 1484 (1982) ............................................................................................. 69

Neal Devins, Congressional Fact Finding and the Scope of Judicial Review, 50 Duke L.J. 1169 (2001) ............................................................................. 94

Philip Frickey & Steven Smith, Judicial Review, Congressional Process, and the Federalism Cases:  An Interdisciplinary Critique, 111 Yale L.J. 1707 (2002) ................................................................................................................ 14

Philip Frickey, The Fool on the Hill:  Congressional Findings, Constitutional Adjudication, and United States v. Lopez, 46 Case W. Res. L. Rev. 695 (1996) ................................................................................................................ 14

Randy Barnett, The Original Meaning of the Commerce Clause, U. Chi. L. Rev. 101 (2001) ............................................................................................... 44

Richard Epstein, Exit Rights Under Federalism, 55 Law & Contemp. Probs. 147 (Winter 1992) ..................................................................................... 70

Sara Sun Beale, Too Many and Yet Too Few:  New Principles to Define the Proper Limits for Federal Criminal Jurisdiction, 47 Hastings L.J. 979 (1995) ................................................................................................................ 68

Sara Sun Beale, What's Law Got to Do With It?  The Political, Social, Psychological and Other Non-Legal Factors Influencing the Development of (Federal) Criminal Law, 1 Buff. Crim. L. Rev. 23 (1997) ........................ 83

Seth Kreimer, Federalism and Freedom, 574 Annals. Am. Acad. Pol. & Soc. Sci. 66 (2001) ...................................................................................... 70

Stephen Gardbaum, Rethinking Constitutional Federalism, 74 Tex. L. Rev. 795 (1996) ................................................................................................. 92

Steven D. Clymer, Unequal Justice:  The Federalization of Criminal Law, 70 S. Cal. L. Rev. 643 (1997) ......................................................................... 68

Susan Klein, Independent-Norm Idealism in Criminal Law, 90 Cal. L. Rev. 1541 (2002) ................................................................................................ 68

Sylvia Law, In the Name of Federalism:  The Supreme Court's Assault on Democracy and Civil Rights, 70 U. Cin. L. Rev. 367 (2002) .................... 72, 73

William Eskridge & Philip Frickey, The Supreme Court 1993 Term—Foreword: The Law as Equilibrium, 108 Harv. L. Rev. 26 (1994) ........................... 67, 83

## Books

Albert Hirschman, Exit, Voice, and Loyalty:  Response to Decline in Firms, Organizations, and States 106-12 (1970) ........................................ 70

American Bar Association Task Force on the Federalization of Criminal Law (1997) ................................................................................................... 67

David Langum, Crossing Over the Line 237-38 (1994) ........................................ 36

Gustive Larson, The "Americanization" of Utah for Statehood 37-38 (1971) ................................................................................................................ 37

Henry Friendly, Federal Jurisdiction, A General View 58 (1973) .................... 61

Nancy Marion, A History of Federal Crime Control Initiatives 13 (1994) .............. 82, 83

U.S. Department of Justice, U.S. Attorney's Manual § 9-2.142 ......................... 66

## Hearings

Hearing on H.R. 3396 Before the Subcomm. on the Constitution of the House Comm. on the Judiciary, 104th Cong. 133 (1996) ................................... 76

Prohibition of Interstate Movement of Live Birds for Animal Fighting:  Hearing
    Before the House Committee on Agriculture 39 (106th Cong. 2d Sess.)
    (2000)............................................................................ 25, 83, 85, 86, 87, 88, 89, 103
S. Hearing on S. 1740 Before the Sen. Common Judiciary 104th Cong. 22 (1996) ..................... 76

# I.

## THE STATUTORY PROVISIONS THAT ARE
## CONSTITUTIONALLY CHALLENGED

With standing granted to all of the plaintiffs with the exception of Bruce Kinsinger, plaintiffs pursue this action to declare unconstitutional the operation and enforcement of the amendments Congress made in 2002 to the provisions dealing with cockfighting in the Animal Welfare Act (the Act), 7 U.S.C. § 2156.  This cluster of amendments was part of the Farm Security and Rural Investment Act of 2002 (the farm bill), Pub. L. No. 107-171, particularly §§ 10302(a)(1)-(3), and (b) and 10303(a)(1)-(2), and (b), 116 Stat. 134, 491-92 (2002), collectively "the new provisions."

The new provisions made it a crime, punishable by one year in jail or a fine of $15,000 or both for any person in a state where it is not in violation of state law "to sponsor or exhibit a [live] bird in [an] animal fighting venture only if the person knew that any bird [emphasis supplied] in the fighting venture was knowingly bought, sold, delivered, transported, or received in interstate or foreign commerce for the purpose of participation in the fighting venture."  7 U.S.C. § 2156(a)(2).  Louisiana is such a state in which cockfighting remains legal.  This new rule, the "handcuff" provision, was aimed at transforming cockfights conducted in Louisiana, New Mexico, Puerto Rico, and three territories (American Samoa, Guam, and the Virgin Islands ("the territories") that had been legal until May, 2003 into criminal activities, as long as one out-of-state bird was involved.  Such fights had been permitted by Federal law from 1976 to 2003 under a specific exemption contained in the Animal Welfare Act, 7 U.S.C. § 2156 (d). Oklahoma had been within the purview of that exemption, but decided on its own, by virtue of an initiative petition adopted on November 5, 2002 (State Question No. 687, Initiative Petition

1

No. 365 § 2) to ban cockfighting.  OK ST. T. 21 § 1692.2 et seq.  As of 1976, and continuing in 2003, every other state (47 and the District of Columbia) had made cockfighting within its jurisdiction a criminal offense.

The 2002 (effective in May 2003) amendments also made it a crime, subject to identical increased penalties (jail time plus a fine up to $15,000 for each violation), for "any person to knowingly sell, buy, transport, deliver [new], or receive [new] for purposes of transportation, in interstate or foreign commerce any … [live bird] for purposes of having the … [live bird] participate in an animal fighting venture."  7 U.S.C. 2156 (b).  The coverage of commerce was expanded in 2002 to apply not only to interstate movement, including movement in and out of Louisiana, which had previously been exempt, but also to foreign movement "from any state [including Louisiana] into any foreign country [for example, Mexico or the Philippines]."  This change is termed the "no shipping" provision.

All that remains possible for any person to do in Louisiana in connection with cockfighting, without being subject to criminal penalties under federal law, is to conduct cockfights without the presence of an out-of-state or, as the statute expressly provides, to "knowingly use the mail service of the United States Postal Service or any interstate instrumentality for purposes of promoting or in any other manner furthering" that cockfighting. 7 U.S.C. § 2156.

## II.

## SUMMARY OF ARGUMENT

**(A)    Lack of Federal Jurisdiction Under the Interstate Commerce Power**

The criminal amendments of 2002 (2003) do not fall within the power conferred upon Congress by the Interstate Commerce Clause of the Constitution of the United States, Article I, Section 8, Clause 3.   They overextend the authority of Congress beyond its constitutionally-conferred jurisdictional base by seeking to impose a national moral judgment on outlier states and areas, Louisiana and New Mexico, Puerto Rico, and the three territories, that do not agree with that judgment and wish to allow cockfighting within their boundaries without being subject to criminal consequences.   The amendments aggrandize federal power by overriding the states' traditional police power over behavior that is (a) a state-protected liberty interest; (b) is not essentially economic or commercial in character; (c) is not condemned by a country-wide moral consensus; (d) imposes no economic or physical spillover effects on other states; (e) is not a crucial part of a broader federal regulatory scheme; (f) does not constitute a unique or significant federal interest in any other way; and (g) undermines the fundamental values undergirding federalism, including nurturing diversity, limiting federal tyranny, and bestowing upon citizens the ability to choose to live in a regime that reflects their preferred lifestyle, being burdened by criminal laws that seem to originate from state authority, but are really created and enforced by the federal government.

Louisiana has exercised its police power to recognize and protect the freedom to participate in cockfighting.   The state has determined that cockfighting does not constitute cruelty to animals in Louisiana (or, indeed any crime) pursuant to the Attorney General's ruling

3

in 74 Op. Atty. Gen. 74-172 (Apr. 9, 1974) that game birds are not covered.  This ruling is now enshrined in the state cruelty to animals statute, LA. REV. STAT. ANN. Tit. 14, § 102.10, which specifically excludes "fowl" from the definition of "animals."  Louisiana cockfighters and supporters of this legal sport should not have to fear federal prosecution overriding Louisiana's policies.

When a federal criminal statute specifically negates a state's permission to engage in certain conduct that a state deems to be legitimate, no case upholds such a statute where the banned behavior is not "commercial" in the sense of involving any purchase, sale, or exchange of property or services in a market setting, but consists, rather, of a sport or hobby indulged in for competitive pleasure.  If the activity is not primarily undertaken for economic return and is not an essential part of any broader regulated economic activity, it has been consistently and traditionally left for the states to police.  Cockfighting in Louisiana does not impact other states by way of externalities.  Congress has never specified any perceived effect of that conduct on interstate commerce nor articulated any other distinct federal interest that is threatened by the behavior.  This federal criminal law has no basis whatever in any constitutional power that Congress may exercise.  The mere reference to sending a bird across a state line may be necessary to authorize the reach of Federal power to control that state-sanctioned conduct, but it is not sufficient to do so.  That is the thrust of the recent Commerce Clause cases. See pp. 46-47.

The federal criminal law at issue here aggrandizes federal power at the expense of the states' traditional police power.  While plaintiffs are perfectly willing to submit the future of cockfighting in Louisiana and the use of Louisiana game fowl to the judgment of the legislature of Louisiana, they do not wish to be labeled as "criminals" because Congress wants effectively to

4

regulate cockfighting out of existence by ignoring the state's substantive choice to the contrary. Where the sole basis for the exercise of federal power is the bringing of one gamecock into Louisiana to participate in a fight that may involve well over 1,000 birds, Congress has overplayed its hand and usurped power. This amounts to moral imperialism.

The federal government was not imbued with the power to use its various enumerated powers, and particularly the Commerce Clause, to encroach upon and effectively obliterate state permission to engage sport-related activity on the basis of a federal judgment about the morality of that activity. Applying federal legal force to quash the expression of non-complying preferences by one or more outlying jurisdictions directly contravenes the essence of federalism. Federalism as a constitutional structure places limits on such tyranny and enhances, not cabins, the liberty of state citizens. It encourages, not steam rollers, diversity in lifestyle choice. Independent states with differing views on moral policy, such as Louisiana, prevent the capture of the federal government by powerful interest groups (e.g., animal rights), as well as the tendency of a central government with more and more power to become increasingly authoritarian. There exist 100 years of cases, see pp. 31-52, in which the reach of federal authority under the Commerce Clause was expanded and then, more recently, contracted where the federal law was directed to punishing non-commercial transactions because of a federal assertion of public morality that sought to deny a state the ability to make its own moral decision. There is no justification whatever simply to coerce an outlier state like Louisiana to conform to the moral judgment of a majority of the states. That promotes "horizontal aggrandizement" by the federal government.

The Commerce Clause tug-of-war between state and federal law enforcement began with the federal government using the Commerce Clause power to extend its domain into areas of traditional state police power. Champion v. Ames, 188 U.S. 321 (1903). Over 100 years later, it has entered a phase in which the Supreme Court is increasingly skeptical of federal intrusion in areas such as "criminal law enforcement ... where states historically have been sovereign," United States v. Lopez, 514 U.S. 549, 564 (1995), and of federal exercise of "the police power, which the Founders had denied the National Government and reposed in the States" as part of a constitutionally required "distinction between what is truly national and what is truly local." United States v. Morrison, 529 U.S. 598, 617-18 (2000).

The more appropriate constitutional federal role with respect to criminal law embodying moral values is supporting state norms, not pre-empting them. The federal government should permit and protect diverse policy approaches, and not prohibit the freedom to make a wrong choice from the viewpoint of Washington, D.C. Homogenization of regulation is hardly the signature of federalism. The mere crossing of a state line that does not adversely affect the state entered into or entered from should not become a magical moment allowing Congress to exercise its Commerce Clause authority to regulate absent any other federal interest and the presence of considerable weight on the side of state independence.

This is the case here. Unlike in earlier cases that focused upon the distribution of lottery tickets, prostitution, polygamy, liquor distribution, racial discrimination, and the return of fugitive slaves, among other activities, the federal criminal law at stake in this matter is not directed at punishing commercial transactions or economic activity. It does not support or supplement state law expressing disapproval of the same activity. There does not appear to be

6

any unique federal interest providing a basis for federal intrusion into state regulation of this sport or entertainment.   To allow federal criminal intervention in cockfighting would be to undermine the values of federalism expressed as encouraging experimentation (not uniformity) and limiting tyranny where a state-protected liberty interest is concerned.   There is no comparable provision of federal criminal law that imposes a federal moral determination in place of a state's decision to the contrary, particularly when none of the factors relied upon to justify federal intervention are present.

**(B)      Denial of Fifth Amendment Equal Protection**

Plaintiffs have been denied their right to equal protection of the laws, applied through the Due Process Clause of the Fifth Amendment to the federal government pursuant to <u>Bolling v. Sharpe</u>, 347 U.S. 497 (1954).   The new provisions do not provide sufficient evidence of their goals and purposes to justify them as legitimate public policy reviewed under stiff or "with bite" rational basis scrutiny.   The only government end that appears to undergird the law is the illegitimate purpose of a bare desire to harm a politically unpopular and powerless (on the national scene) group of cockfight spectators, breeders, and cockfighters.   <u>United States Department of Agriculture v. Moreno</u>, 413 U.S. 528 (1973), <u>Romer v. Evans</u>, 517 U.S. 620 (1996), and <u>City of Cleburne, Texas v. Cleburne Living Center</u>, 473 U.S. 432 (1985).

The type of scrutiny that is to be applied in these circumstances is a rational basis-plus level of review of the type the Supreme Court applied in the three cases above and in <u>United States v. Lopez</u>, 514 U.S. 549, 557, 583 (Kennedy, J., concurring, looking to "a stronger connection"), 607, (Souter J. dissenting, "Court treats deference under the rationality rule as subject to gradation," "the Court's qualification of rational basis review," "further glosses on

rationality review ... may be in the offing," 612, "less exacting scrutiny" (1995) and United States v. Morrison, 529 U.S. 598, 638 (2000), with Souter, J., in dissenting suggesting that the Court has supplanted "ration basis scrutiny with a new criterion of review"). That is not because there is a fundamental interest at stake or because the affected group represents a suspect class. The reason for a beyond minimal close look is that cockfighting is a state-protected liberty interest in Louisiana and the primary customers for the fights in Louisiana and for the birds shipped from Louisiana to foreign countries are either people from Mexico, the Philippines, Japan, and Central and South America, or Americans of Cajun, Hispanic, or Puerto Rican descent. These groups have often been treated either as suspect or the subject of intermediate scrutiny under equal protection law, in part, because of their national or ethnic origin and, in part, because they are treated by with disrespect by the majority in Congress (and nearly all of the states). They are vulnerable when it comes to deciding whether or not they should be denied access (enforced by criminal penalties) to activities they uniquely and traditionally enjoy as part of their cultural heritage. The "plus" aspect of the scrutiny, previously applied in equal protection cases involving "hippies," homosexuals, and the mentally retarded, means that the reviewing courts will not be able to invent hypothetical, unasserted reasons for state action in the "might have" or "could have" vein. Instead, they will be required to look more intensely at the legislative record to ascertain whether there is any evidence sufficient to constitute a legitimate justification for acting against the particular interest or minority. If all that remains, after exploring each claimed governmental objective is an irrational prejudice against the group concerned or mere negative attitudes or fears not substantiated by any grounds in the record, then equal protection has been denied.

There must be a legitimate basis, seriously considered and adopted by Congress, for the Congress to justify overriding Louisiana's decision to permit cockfighting. The overwhelming majority of House members (and Senators) ignored the interests of two states, Puerto Rico, and three territories and thousands of cockfighters, as well as those associated with them, and refused to acknowledge, let alone respect, cultural traditions supporting cockfighting shared by Cajuns, Hispanics, Philippinos, Puerto Ricans, and Mexicans, among others. Their interests were not given short shrift. They were given no shrift at all. The sponsor of the original anti-cockfighting amendment in 1976 mockingly rejected any claim that cockfights should be permitted for tradition, ethnic, or religious reasons, asserting that "I really do not think that the majority of the United States, in which this activity is outright illegal, should be guided by what may be a condoned activity in a certain part of these United States. Moreover, I do not think that this Congress is going to let itself be governed by what may be considered a proper activity or a condoned activity in Puerto Rico." 122 CONG. REC. H. 2876-77 (daily ed. Feb. 9, 1976). So much for tolerance of differences.

Majorities of the size of those determined to end cockfighting have no need to tolerate any differences in assessing the morality of a particular activity. If they have the votes, they can simply crush it and label it a misdemeanor or a felony. Indeed, the more isolated the minorities that support the activity, the easier it is to use the vote to suppress it. There are no political safeguards whatever to protect activities disliked by most of the people and engaged in by increasingly few, unless they can exercise their "liberty" to engage in the activity in a smaller protective forum, such as Louisiana. They certainly cannot turn for defense to the floors of the House and Senate. In 1976, inclusion of live birds in animal fighting ventures was approved in the House by a floor vote of 289 to 76 or almost 4 to 1, with 80 percent of the Southern state

9

representatives voting against. 122 CONG. REC. H. 2884 (daily ed. Feb. 9, 1976). It was simply accepted without any vote in the Senate during the course of approving the Conference Report. The tide was even more overwhelming in 2002, because the farm bill was viewed by the President and the Republican Party as "must" legislation for the election. In the Senate, Sen. Allard, R.-Colo.'s amendment limiting cockfighting was agreed to without dissent, 147 CONG. REC. S. 8434 (daily ed. July 31, 2001), while, in the House, the parallel Rep. Blumenauer, R.-Or. amendment (and his later one halting interstate and foreign traffic in gamecocks) were both disposed of by voice vote. 147 CONG. REC. H. 6276 (daily ed. Oct. 4, 2001). No one was recorded for or against any of these amendments or wanted to be. They reshaped the law in silence. No Senator or Representative could be held accountable by his or her electorate for curtailing cockfighting.

That is precisely how the political system works—to deny any voice to individuals supporting minority positions on moral issues. As Justice Scalia noted in his dissent in Romer, supra, 517 U.S. at 646-47 (1996), in which an amendment to the Colorado Constitution prohibiting any and all government action to protect homosexual persons from discrimination was found by a six-person majority to violate equal protection, ordinances providing some rights for homosexuals were already in place in New York, Los Angeles, San Francisco, Key West, Aspen, Boulder, and Denver. That meant that a statewide amendment was necessary to counter the disproportionally concentrated political power of homosexuals in cities by forcing the issue one step up to be decided on a statewide level, where, presumably, the homosexual vote would be diluted and overwhelmed. The very same process took place here. If devotees of cockfighting were strong on a state level, as they were in two states, it was essential to propel the

10

issue up one governmental level to the Congress, where their state political strength could be trumped by a contrary "national consensus."

The legislative record in this case is sparse and barren, given the lack of legislative due process surrounding the majoritarian rush to judgment in 2001 and 2002, explored pp. 91-104, infra. The only extant arguments or behalf of the law that can be tweaked out of this record are, first, the per se unacceptable refusal to cater to certain minorities; second, the equally unacceptable (under federalism see pp. 31-77, infra); deceive to assure legislators' popularity and reelectability by attaching criminal sanctions to behavior licensed in some states, but opposed by a majority of the nationwide public; third, the need to halt animal cruelty where gamecocks are concerned, which is already the case in 48 states without resort to any federal dictation; fourth, the dubious, unprecedented drive to impose American moral values on countries not subject to our governmental system whose entrenched traditions are to the contrary, (e.g., Mexico and the Philippines); fifth, the need to close a so-called "loophole" that merely makes it less convenient for prosecutions to be brought, rather than impossible (there is no evidence whatever that state prosecutions have been derailed); and last, the mere assertion, without acceptable evidence other than conclusory statements and anecdotes, of cockfighting's guilt by its alleged association with certain criminal activities such as illegal drug use, violence, and unlawful gambling. The legislative record provides no clear, supportable reason for throwing a criminal cordon sanitaire around Louisiana (and the other locations). Many members of Congress claimed on the floor that they did not understand the basis for the broad sweep of the amendments or comprehend the consequences flowing from them. They were right.

11

**(C)**     **Deprivation of Legislative Due Process**

There is no rational basis set forth in the law for the assertion of federal authority effectively to ban cockfighting in unwilling states by placing fight administrators and spectators in serous criminal jeopardy should one bird prove to have been brought across state lines in order to fight and shackling the previously thriving sale of brood fowl in foreign (or interstate) commerce.   There is no legislative record behind the amendments that can facilitate judicial review, even at the level of rational basis plus scrutiny.   While the Supreme Court, in recent cases under the Commerce Clause and the Fourteenth Amendment, has acknowledged the usefulness of Congressional findings, it has gone well beyond this to stress the need for a documented legislative record containing evidence that demonstrates Congress' thoroughness in considering the constitutional issues at stake, if these Congressional judgments are to survive. This evolving requirement of what has been deemed "legislative due process," Hans Linde, <u>Due Process of Lawmaking</u>, 55 NEB. L. REV. 197, 235-55 (1976), has resulted in the invalidation of several statutes for not meeting constitutional standards of legislative justification.   The exact procedural conditions that Congress must fulfill in order to satisfy the Court that a statute is legitimate are not yet fully developed, but the Court seeks some sort of record, some sort of factual inquiry, some sort of collection of evidence, some sort of hearings, whatever form they may take.   None of these bases for review are available in this case.   Accordingly, all of the new provisions violate Fifth Amendment legislative due process.

The Act's first coverage of animal fighting ventures involving live birds occurred in 1976.   At that stage, there was no meaningful record of how it evolved.   The Senate never considered the matter in 1975 or 1976 either in committee or on the floor until the final conference.   The House Agriculture Committee first dealt with the ban on animal fighting

ventures involving birds on the very last day of the bill's markup.   There were no hearings.
There was some discussion of the committee amendment on the House floor.    But its
consequences were not clear, since the critical provision, exempting fights in Louisiana from the
coverage of most of the provisions in the law, was added, without any explanation, only at the
last moment in conference.

During the 2000-2002 legislative cycle, there were several attempts to end the legal
states' exemption.  These changes were the product of a major lobbying campaign that produced
a strong legislative majority (with the exception of Southern legislators) in favor of expanding
the scope of federal criminal law, but no record detailing or explaining the justifications for that
expansion.   No hearings were held, except for one day in September 2000, in a different
Congress from the one responsible for passing the legislation (the 106th, not the 107th).   There
were no Committee reports arguing for the amendments as voted in 2001.   There was only one
hastily prepared report in the Senate in the spring of 2000 (again, the 106th Congress, not the
107th) for a bill that was never brought to the floor.   That report did not involve any serious
estimate of the costs that gamecock breeders and associated enterprises in Louisiana, New
Mexico, and, at the time, Oklahoma, Puerto Rico and the three territories would suffer if the
mandate were to be imposed upon the private sector and end both the selling and transmitting of
gamecocks across state lines into those states and the shipping of live birds from any state to
foreign countries, the major market for brood cocks raised in the United States.    The
amendments were offered on the floor of both the House and the Senate, with little more than
one page of discussion in each chamber and no meaningful debate between proponents and the
silent opposition.   The changes in the law were immediately confirmed by unrecorded voice

votes in both bodies.  The language of the amendments was further altered, without any reasons offered, in the final law that emerged from conference.

This nonprocess produced federal criminal legislation trumping state law and denying equal protection.  What form of due deliberative legislative process was behind the federal creation of the anti-cockfighting criminal laws?  Were there hearings or reports or findings or amendments carefully considered in floor debate?  Was there what has been labeled "legislative due process"?  See Philip Frickey & Steven Smith, Judicial Review, Congressional Process, and the Federalism Cases:  An Interdisciplinary Critique, 111 YALE L.J. 1707 (2002), Philip Frickey, The Fool on the Hill:  Congressional Findings, Constitutional Adjudication, and United States v. Lopez, 46 CASE W. RES. L. REV. 695 (1996); Dan Coenen, A Constitution of Collaboration: Protecting Fundamental Values with Second-Look Rules of Interbranch Dialogue, 42 WM. & MARY L. REV. 1575, 1655-89 (2001).

When the Supreme Court reviews difficult cases involving the authority of Congress to exercise its Commerce Clause powers, the Court takes account of the thoroughness with which Congress has considered the federalism issue.  See Lopez, 514 U.S. at 562-63.  If there are questions as to whether Congress has come close to trespassing upon state power, the Court requires evidence of Congress' attentiveness to policymaking, some sense that the legislative process has meaningfully studied and dealt with key constitutional concerns.  Congress need not "make particularized findings in order to legislate," Perez v. United States, 402 U.S. 146, 156 (1971) or "formal findings," Katzenbach v. McClung, 379 U.S. 294, 299 (1964).  But there has to be some indicia of attention being paid.  As Justice Souter indicated in dissent in United States v. Morrison, 529 U.S. at 634-35, the data amassed (a "voluminous" legislative record) with

14

respect to crimes of violence motivated by gender provided a rational basis for Congress' exercise of its Commerce Clause power but, even then, the majority of the Court was not satisfied. In Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 246, 250 (1964), where, the Civil Rights Act of 1964 survived judicial review because, even in the absence of a conference report, the record disclosed ample evidence of the disruptive effect on interstate commerce of racial discrimination against interstate travelers and was "replete" with testimony showing the adverse impact of discrimination leading professionals and industries to be reluctant to settle in discriminating states where they could not buy interstate goods.

In his dissent in Morrison, 529 U.S. at 662, Justice Breyer emphasized that the Court had "on occasion" "pointed to the importance of procedural limitations in keeping the power of Congress in check." He relied on "[c]ommentators" who had "suggested that" the thoroughness of legislative procedures—e.g., whether Congress look a "hard look"—could sometimes make a determinative difference, particularly when Congress legislates in an area of "traditional state regulation." Morrison, 529 U.S. at 663. Breyer scrutinized the application of the "rational basis" approach and indicated, although he thought it was "sufficient," given the instability of the law in this area and what might prove, over time and with experience, to be the unworkability of the majority's commercial economic activity rules, "and the superiority of Congress' own procedural approach," that "the law may evolve toward a rule that, in certain difficult Commerce Clause cases, take[s] account of the thoroughness with which Congress has considered the federalism issue." Morrison, 529 U.S. at 663-64.

In each case, Congress had done its homework carefully and done it with reasonable thoroughness sufficient to fortify its legal conclusions to withstand constitutional assault. That is

not what occurred in this instance.  As is demonstrated by the legislative evolution of the current § 2516 of the Animal Welfare Act governing animal fighting ventures, see pp. 16-30. infra, the ban has always been a legislative afterthought, treated as a stepchild in connection with major, significant legislation (animal welfare in 1976 and the farm bill in 2002).

## III.

## THE APPLICABLE LEGISLATIVE HISTORY

To understand the provenance and impact of the "illegal in Louisiana" provisions, combined with the "no shipping" provisions passed in 2002 and effective as of May, 2003, it is instructive to review the legislative history of the federal ban on cockfighting:

**(A)**  **The First Efforts—House and Senate in 1976**

In 1966 and 1970, the Congress enacted and thereafter amended the Federal Laboratory Animal Welfare Act, 7 U.S.C. § 2131 et seq.  That Act did not contain any provisions limiting so-called "animal fighting ventures."  That Act was premised upon the regulation of animals and activities "either in interstate or foreign commerce or [that] substantially affect such commerce," 7 U.S.C. § 2131, sought to insure the humane treatment of animals intended to be used in research, exhibition, or as pets and while they were transported in commerce, as well as preventing the sale of stolen animals.  7 U.S.C. § 2131(1), (2), and (3).  The term "animal" as defined in 7 U.S.C. § 2132(g) specifically excluded "farm animals, such as . . . poultry . . . intended for use for improving animal nutrition, breeding, management, or production efficiency."

16

On June 13, 1975, Sen. Weicker, R.—Conn., on behalf of himself and Sen. Magnuson, D.-Wash., introduced S. 1941, 94th Cong., 1st Sess. (1975), a bill to increase the protection and humane treatment of animals in transit.  See 121 CONG. REC. S. 18857-58 (daily ed. June 13, 1975).  This amendment contained no reference whatever to controlling animal fighting.

The 1966 and 1970 Acts "for the first time made the Federal Government the primary vehicle for providing for the humane treatment of research animals and pets," S. REP. NO. 94-580 (1975) at 2.  The Acts brought about licensing by the Department of Agriculture of approximately 3,000 research facilities, 4,000 animal breeders and 500 exhibitors.  But neither Act gave the Secretary of Agriculture authority to regulate the treatment of animals shipped in commerce by common carriers, especially by air.  After a subcommittee hearing on November 21, 1975, the Committee on Commerce reported S. 1941 favorably.  See S. REP. NO. 94-580 (1975).  There was no provision in that bill referring to animal fighting.  The proposed Act ended at § 26, the appropriations provision.  S. REP. NO. 94-580 at 17.  S. 1941 passed the Senate on December 18, 1975 (121 CONG. REC. S. 41623).

The measure was referred to the House Committee on Agriculture.  A similar bill had already been introduced in the House by Rep. Foley, D.-Wash. (Chairman) on April 9, 1975 (H.R. 5808).  The House had held nine days of hearings over a two-month period in 1974 (the second session of the 93rd Congress) on two bills previously introduced by Rep. Foley, H.R. 15843 and H.R. 16738, both of which focused only upon the treatment of animals by carriers.  The second, introduced on September 17, 1974, banned animal fighting ventures involving dogs.  But it was too late in that session for any bill to be enacted.

17

H.R. 5808, the successor bill, was given two days of hearings on September 9 and 10, 1975.  The full Agriculture Committee reported the bill to the House floor on January 29, 1976, after two days of voting on amendments.  When the bill went before the full committee, animal fighting ventures were covered for the first time.  Since the record developed during the hearings concentrated upon the spread of organized dog fighting throughout the United States, the coverage of "animal" was then limited to live dogs or other mammals, except man.  The Animal Welfare Act Amendment of 1975, § 16(a), adding new § 26(f)(5).  122 CONG. REC. H. 2873 (daily ed. Feb. 9, 1976).

When this provision was placed before the full Committee on January 21-22, 1976, an amendment was offered by Rep. Krebs, D-Cal. to add the words "any live bird" immediately before "any live dog."  The amendment passed 20 to 16.  H.R. REP. NO. 94-81 at 14; 122 CONG. REC., supra, at H. 2876.  Both the Chairman (Rep. Foley) and the Vice Chairman of the Committee (Rep. Poage, D-Tex.) opposed the amendment, primarily because they felt that cockfighting, unlike dog fighting, had existed "for centuries in some parts of the American jurisdiction; and some people, conditioned by culture and tradition, regard it to be in a different category," presenting different "practical problems" of enforcement.  Id.  Their point of view was seconded by the U.S. Postal Service, 122 CONG. REC., supra, at H. 2863-64, (letter from Assistant General Counsel Sanders raising the issue of the proper expenditure of the finite resources for Federal law enforcement agencies); the Department of Justice, 122 CONG. REC., supra at H. 2864 (view of Assistant Attorney General Michael Uhlmann stating that "the Department strongly feels that prohibitions against . . . animal fighting ventures should be a matter of state rather than federal law," and "traditionally the responsibility for the maintenance of law and order has been lodged with state and local authorities" while "federal jurisdiction has

been for the most part restricted to matters directly involving a function of the federal government or otherwise beyond the normal enforcement capabilities of state and local authorities"); and the Department of Agriculture, 122 CONG. REC., supra at H. 2864 (Deputy Assistant Secretary John Damgard II indicating that the Department notes "its strong opposition to the holding of animal fighting events. However, the Department does not have the trained manpower and other resources necessary to investigate and to police such events. In our view, this is a proper responsibility of State and local law enforcements agencies and, with few exceptions, laws exist at that level which would permit effective dealings with this problem").

The Department of Agriculture even produced an estimated cost of implementing the prohibition of animal fighting ventures that reflected a potential outlay of $19,767,000 to handle cockfighting alone, representing 936 man years covering $1.5 million for surveillance, $3.3 million for supervision and investigation (undercover), $2.2 million for overtime, $3.5 million for travel, and $3.3 million for overhead, with the rest required for such items as coordination between the states (the Department admitted that "cooperation for other Federal, State, and local law enforcement agencies" was "uncertain"), training, clerical support, special equipment, field station costs, headquarters staff and informant fees. Two of the factors cited by the Department as responsible for the unusual size of the cost estimates were the "[p]otential cultural impact in those states and areas where ethnic background accepts cockfighting" and the "[d]ifficulty in determining animal movement in interstate and foreign commerce." 122 CONG. REC., supra at H. 2865.

In the part of the debate leading up to the vote to approve the Committee amendment on including live birds (122 CONG. REC. supra, H. 2876) Chairman Foley, explaining why he had voted against the amendment, stated:

> Very frankly, speaking personally, I oppose, as an individual member of the committee, reaching in this bill the problem of the so-called cockfighting or live fowl fights. While fights between live fowl are arguably indistinguishable from dog or other animal fights in terms of their brutality or distastefulness, the fact remains that in some parts of the world the fighting of live cocks has become an activity regarded as culturally sanctioned by tradition. However, in the case of dogfighting, I do not think there is anybody who could maintain that this is anything but a totally dehumanizing activity. . . .
>
> Rightly or wrongly, whatever individual Members think about it, the fighting of live fowl has existed for centuries in some parts of the American jurisdiction; and some people, conditioned by culture and tradition, regard it to be in a different category than the fighting of other animals. It certainly presents a different enforcement problem. Whether or not one regards the morality or dehumanizing influence of cockfighting to be indistinguishable from that involved in dogfighting, it will be more difficult for the Federal Government to reach the fighting of live fowl than to strike down the practice of dogfighting. Dogfighting has no claim to tradition and is more of a growing problem which we seek to intercept and interdict.

In response, the amendment's author, Rep. Krebs, claimed that he found no difference between dogfights and cockfights and rejected the argument that tradition or ethnic or religious reasons should be an acceptable argument on behalf of cockfights:

> Mr. Chairman, I think the only argument that has been advanced here is that there is some tradition in a certain part of these United States, where this brutal activity is still condoned, for some ethnic or religious reasons.
>
> I really do not think that the majority of the United States in which this activity is outright illegal, should be guided by what may be a condoned activity in a certain part of these United States. Moreover, I do not think that this Congress is going to let itself be governed by what may be considered a proper activity or a condoned activity in Puerto Rico.

He continued:

I hope, Members of the Committee, that each Member is going to let his conscience be his guide, rather than possibly catering to certain constituents representing a small minority which is obviously engaging in an outright illegal activity.

122 CONG. REC., supra at H. 2876-77.

The amendment was agreed to by voice vote.  122 CONG. REC., supra at H. 2879.

Toward the close of the debate, Rep. Wiggins, R-Cal. raised the issue of federalism one more time.  He underscored that the bill's creation of three new federal crimes (to fight a fowl transported in interstate commerce, to transport fowl for the purpose of fighting them, and to advertise the fights).  While Rep. Wiggins admitted that cockfighting was "bad," he cautioned his colleagues:

Bear in mind, that the activities which we here condemn are already illegal in nearly every State in the Union.  I understand something on the order of 46 or 47 States now prohibit cock fighting and dog fighting.  What then do we accomplish if we make this a new Federal crime?  Well, politically, we can all go on record as being against this activity; but there are some adverse consequences which we should keep in mind.  One is that when we make an activity a Federal crime which is already a State crime, we discourage local law enforcement efforts.  By making this a Federal crime, county prosecutors and district attorneys around the country are not going to prosecute.  They are going to point to the U.S. attorney and say, "You do it, you take the political heat for prosecuting this activity."

On the other hand, the U.S. attorneys around the country all will be pointing at the county attorneys and saying, 'You do it.'  The consequence of this finger pointing is going to be that the whole level of enforcement is discouraged.

Another consequence is the penalty which the entire system pays.  We are adding new responsibilities to the U.S. district court.  We are saying that a U.S. district court is the proper forum to try a cockfighting case.  Well, if the Federal judges, if grand juries, if U.S. attorneys are going to devote their energies to the trial of a cockfighting case, then those energies cannot be devoted to the other, more serious problems.  Of course, we might augment their strength and build new courthouses and hire new judges, but I see no disposition in this House to do so.

Members of the committee, the best way to deal with this problem is to come to grips with it frontally. I ask my colleagues: "Is it necessary to create a new Federal crime to punish this activity which is already subject to punishment" by the States?"

122 CONG. REC., supra, at H. 2881.

While Rep. Wiggins acknowledged that Title 18 of the United States Code contained many federal crimes that were also state crimes, he did "not believe that a further proliferation of the statutes of [this] type served the national interest. We either believe in the federalism or we do not." 122 CONG. REC., supra, at H. 2881.

Rep. Wiggins' amendment to strike the new crimes was defeated by a division of 22 ayes, 28 nays and a recorded vote of 56 to 312. 122 CONG. REC., supra, at H. 2882. Rep. de la Garza, D-Tex., requested a separate vote in the House (not the Committee of the Whole House on the State of the Union) on the inclusion of live birds and the amendment carried, 289 to 76. Among the 76 were 5 Congress Members from Louisiana, 3 from Mississippi, 16 from Texas, 3 from Arkansas, and 4 from Alabama or 31 as opposed to 1, 1, 4, 0, and 2, from the same states, respectively, who voted for the amendment. The overall disapproval rate in these five Southern states was 80% (31 of 39, with 8 not voting) as contrasted with 4% disapproval in the rest of the nation (281 of 326, with 59 not voting).

**(B)**     **The Original Bill in Conference in 1976**

The Conference Committee submitted its report to the House on March 19, 1976 (H.R. REP. NO. 94-976 (1976)) and to the Senate on March 30 (S. REP. NO. 94-727 (1976)). The Conference substitute adopted the House provision, but modified it to limit the illegality of

animal fighting ventures to those States "where it would be in violation of the laws thereof" without any explanation of why.  The new § 26 also excluded application to the export of live birds to foreign countries, to interstate shipment of the birds for breeding purposes, and to the advertising of fights in lawful states or territories.  H.R. REP. NO. 94-976 at 23, S. REP. NO. 94-727 at 23 (1976).  When the Conference Report was debated on the House floor on April 6, 122 CONG. REC. at H. 9560-97, Chairman Foley, responding to a question from Rep. Montgomery, D-Miss. intended "for purposes of legislative history," confirmed that there would be no violation of the law if gamecocks were shipped to a state where fighting was legal, regardless of the status of cockfighting in the state of origin.  The state of destination's law controlled.  122 CONG. REC., supra, at H. 9561.

Rep. Wampler, R-Va., expressing his antagonism to § 26, but not to the remainder of the bill, asserted that:

> I am greatly disturbed that the conferees retained the cockfighting prohibition in this bill inasmuch as no hearings have been held on that subject and both the proponents and opponents of such a provision should have an opportunity to have this matter thoroughly examined by way of a hearing.
>
> My principal opposition to the conference report goes to the provision that would prohibit gamecock fighting and certain activities—transportation and publicizing—related thereto.  Id.

He repeated that no hearings had been held on the prohibition against gamecock fighting, with neither the states nor federal agencies nor any interested parties (either breeders of gamecocks or their opponents) allowed to comment on the amendment, which he found particularly unfair "to those who seek enforcement of such laws or those who may run afoul of such laws," given the severe and heavy penalties for each violation.  122 CONG. REC., supra at H. 9562.  He spoke out in favor of state law enforcement with respect to such ventures rather than

further federal intervention.  His concerns for the need for hearings focused upon the difficulty in knowing the extent of gamecock fighting; how to respond to letters from gamecock breeders that "fighting is natural and inherent"  in the disposition of the cocks, who would kill one another if not separated by pens or fences once they became a few weeks old; and the social and cultural nature of the event, viewed as a traditional "sport" in Puerto Rico and in some states.  He carefully distinguished the inclusion of dogfighting, which had "no redeeming social or cultural value."  122 CONG. REC., supra at H. 9563.

Although Rep. Wampler quoted from a Christian Science Monitor article dated March 17, 1976, reporting that there were rumors that President Ford would veto the legislation because of his strong opposition to federal police force enforcement which raised "constitutional problems," no veto ensued, and the President signed the bill into law on April 22, 1976.  Pub. L. No. 94-279, § 17, 90 Stat. 421.

**(C)**    **The New Provisions as 2002 Amendments to the Farm Bill**

Gamecock fighting lay dormant as a Congressional issue for 23 years until 1999, when the Humane Society of the United States began its legislative campaign to ban interstate shipment of birds for fighting by turning to Sen. Allard, R-Colo., and Rep. Peterson, D-Minn. to introduce their bill and secure co-sponsors.  On February 3, Sen. Allard's S. 345 was referred to the Senate Committee on Agriculture, Nutrition, and Forestry where, without conducting any hearing, the Committee marked up the bill and reported it out by voice vote on March 2, 2000. S. REP. NO. 106-297, 106th Cong., 2d Sess. at 2 (2000).  By eliminating Subsection (d) of old § 26, the bill was designed to "close a loophole" in the Act and prevent any interstate transport of birds for fighting purposes, whether or not cockfighting was legal in the state to which the bird

was transported.   As the Congressional Budget Office's Cost Estimate noted, since "the possession of gamecocks with the intent to fight is legal in 21 states [,].   S. 345 would prohibit the gamefowl breeders in those 21 states from transporting their birds with the intent to fight to the three states where such fighting is legal." S. REP. NO. 106-297 at 3 (at that time, Louisiana, New Mexico, and Oklahoma).   This, it was claimed, would enable state and local law officers to enforce their state bans against raising fighting birds.   The bill never reached the floor, although it was placed on the Senate Legislative Calendar.

On September 13, 2000, the House Committee on Agriculture conducted a hearing on H.R. 1275, introduced by Rep. Petersen, D.-Minn., on March 24, 1999, and reported out of subcommittee on April 13.   The hearings held by the full Committee were intended to shed light on the bill's issues and allow the Committee members "to make an informed and rational decision about this bill."   Hearing, supra.   There were statements from seven members of Congress or delegates and five public witnesses, including leading officers of the American Poultry Association, the Oklahoma Animal Husbandry Coalition, the Humane Society of the United States, and UGBA as well as a criminal investigator from the Broward County's Sheriff's Department in Ft. Lauderdale, Florida.   No further action was taken on the bill during the 106th Congress.

In the 107th Congress, there were no hearings of any kind on cockfighting legislation in either chamber.   On the Senate side, S. 345 of the 107th Congress was introduced under the sponsorship of Sen. Allard, R.-Colo. on February 15, with what ultimately proved to be 56 co-sponsors.   The bill never surfaced again under that number, but, on July 31, 2001, while the Emergency Agricultural Assistance Act of 2001 (the forerunner of the farm bill) was on the

Senate floor, Senator Allard offered the same amendment to the Act to remove what he deemed the "crafty" loophole that S. 345 had dealt with.  147 CONG. REC. S. 8433 (daily ed. July 31, 2001).  Senator Allard pointed out that, as a veterinarian, he had been working on the bill "for over 3 years."  He emphasized his strong support for states rights and noted that his bill "clearly protects the rights of States [all three in which it was still legal] to make or keep cockfighting legal if they choose," but asserted that his bill would stop the undermining of the ability of the other states to enforce their own laws.  Senator Byrd endorsed the legislation in light of the increasingly inhumane treatment of animals, especially in "institutionalized agriculture," with egg-laying hens crammed into battery cages and also deliberately starved in order to induce a molt so they will produce bigger eggs."  147 CONG. REC., supra, at S. 8434.  At that point, with no further discussion by any of the other 98 Senators, the Allard amendment was agreed to and included in the omnibus farm bill.

On the House side, Rep. Peterson had proffered an identical bill, H.R. 1155, on March 21, 2001, with 214 co-sponsors.  This bill was never handled in committee.  Instead, it was offered on the House floor as an amendment to H.R. 2646, the Farm Aid bill sponsored by Agriculture Committee Chairman Combest, R.-Tex., technically labeled the Agriculture, Conservation, and Rural Enhancement Act of 2001.  On October 4, 2001, Rep. Blumenauer, R-Or. and Tancredo, R.-Colo. rose in support of the amendment that would not apply the prohibition on interstate movement of animals to "selling, buying, transporting, or delivery of an animal in interstate or foreign commerce for any purpose so long as the purpose does not include participation of the animal in an animal fighting venture."  The noose was drawn tighter around the only remaining "permissive" legislatures—Louisiana, New Mexico, and Oklahoma.

Rep. Blumenauer made his ban as widespread as he could, in light of "the overwhelming consensus on the part of the American public . . . for the protection of animals" and the "almost universal aversion to barbaric sports like dog fighting and cockfighting." He warned the members of Congress that "[t]he majority of the American public overwhelmingly opposes it, and this House voted to ban its use 25 years ago. Yet it still lingers on." 147 Cong. Rec. H. 6274 (daily ed. Oct. 4, 2001). He proceeded to describe the almost 200 years of "struggle to eliminate" cockfighting and how, while [m]uch progress has in fact been made, "that was not true" here in Congress, but at the state level, where, as of "[T]oday, 47 states have outlawed the practice, and there is strong evidence that the citizens of the three remaining States are likewise strongly opposed. In all likelihood, there will be another one or two states that will outlaw this through their legislatures, and, if not, then by the people themselves." Rep. Blumenauer's solution, of course, was not to allow these state developments to continue on their own course and pace, but to short circuit any state decision to the contrary. The federal moral judgment had to sweep all before it. Accordingly, the lack of any kind of Committee hearings on cockfighting legislation in the 107th Congress was not considered a barrier to passage of a bill further restricting cockfighting. Rather, it speeded up the process. Nor was the lack of any serious floor discussion of the matter a concern as Sen. Allard told the Senate, with an imaginative use of terms, that his amendments protected "States rights to keep cockfighting legal (no challenge to this statement occurred, of course) and Rep. Blumenauer, referenced the consensus on his side to halt cockfighting.

Representative Blumenauer elaborated on the purpose of his amendment. It is, he told his colleagues:

27

to make sure that the Federal Government is not complicit in aiding and abetting this barbaric practice.  The Federal Government has no business undermining the laws in the 47 States by permitting the transfer of these birds across State lines.

There are a couple of problems with the situation that we face right now. In the States where the practice is legal, just the three of them, the cockfighting activities, the arenas, the pits, have developed around the borders of the State. So like in Texas, people come across the border into Oklahoma and engage in the practice.  It makes it easy for people to undermine the activities in a State like Texas by going to Louisiana or to Oklahoma.

The practice of moving these birds across lines raises another difficult problem, because law enforcement officials have to deal with the consequences of what is happening in the other 47 States where it is not legal.  People who are involved, they claim they are just raising and training the birds, not involved in actual cockfighting activities itself.  But time and time and time again, the practice activities degenerate into actual illegal cockfighting activities, and I will not take the time now to enter into the RECORD example after example where these activities are taking place.  And it is not just the barbaric act on the animals themselves that has been outlawed, but there is a great deal of illegal gambling; and there are time and time again violent acts that are associated with these clandestine activities.  That is why over 100 law enforcement agencies have urged the enactment of this legislation.

147 CONG. REC., supra, at H. 6274.


Chairman Combest, R.-Tex., brought out the "unintended consequences" of the proposed amendment, including its chilling effect on breeders and exhibitors of fancy birds as well as 4-H club members who would not be able to ship their birds because airlines and shipping companies were not "willing or able" to distinguish between live birds for fighting and those for exhibition. He was troubled that the criminalization of interstate shipment of game birds might dissuade game breeders from voluntarily participating in the National Poultry Improvement Program to eliminate hatchery and egg dissemination diseases.  147 CONG. REC., supra, at H. 6274-75.  He distinguished dogs from game birds on the ground that "it is much more identifiable which dogs potentially are going to be used for fighting purposes than there are for game birds."  Two other

28

representatives (Tancredo, R.-Colo., and Morella, R.-Md.) spoke briefly in favor of the Blumenauer amendment.

When Rep. Stenholm, D.-Tex. inquired of Rep. Blumenauer whether, in a situation in which a state had legalized cockfighting, the amendment would prohibit shipment by a raiser of fighting chickens in such a state into a foreign country where cockfighting was also legal, Rep. Blumenauer indicated it would not, but immediately pointed out that he had another amendment ready to achieve that.  147 CONG. REC., supra, at H. 6275-76.  Rep. Stenholm underscored his trouble that "we here are about to supersede [sic] our wisdom on another State's interpretation of what is legal and illegal.  As I said, in Texas, we made the decision.  But I think we are trying to make a decision for a few other States in which I question whether that is something we want to do."  147 CONG. REC., supra, at 6276.

Rep. Blumenauer then offered his second amendment that not only banned the shipment of live birds (and dogs) from any state, legal or otherwise, into any foreign country, legal or otherwise, but also raised the federal penalties for violating the law from a maximum of $5,000 to $15,000 and one year to two years, or both.  He wondered if the United States' allowing the export of animals for fighting might "well violate international trade rules."  147 CONG. REC., supra, at 6276.   The amendment was agreed to by voice vote immediately after Rep. Blumenauer's speech.  His earlier amendment, on which he had demanded a recorded vote after it appeared preliminarily that the noes had it, was postponed until later in the afternoon, when he vacated his request for a recorded vote.  That amendment, too, was agreed to by voice vote. There was no advance notice of these last amendments, no discussion about their meaning on the floor.  Instead, they were simply incorporated into a very detailed farm bill.

The House subsequently (on October 5) passed the omnibus farm bill, of which the Animal Welfare Act amendments were an insignificant portion (one-twentieth of a Congressional Record page in a 30-page bill), on a vote of 291 yeas to 120 nays. The bill was sent over to the Senate, which on February 13, 2002, substituted the language of S. 1731 and passed it on a 58-40 record vote. 148 CONG. REC. at S. 1006-1135, esp. 1124 (daily ed., Feb. 13, 2002).

Because of concern about the costs of the farm subsidy provisions, the conference went on until May 1, 2002, when H.R. REP. NO. 107-424 was filed. The Conference report, although the Senate and House provisions had been identical with respect to penalties and transportation of animals for fighting purposes from any state into any foreign country, eliminated the increase in maximum prison terms, while maintaining the maximum fine per violation at $15,000 (H.R. REP. NO. 107-424 at 364; Joint Explanatory Statement of the Committee on Conference at 651, No. 23 in Title X, Miscellaneous Provisions). The Conference substitute for the underlying provisions "made technical changes to make it illegal [sic] ship a bird in interstate commerce for the purpose of engaging in an animal fight and further, makes it illegal to fight a bird in a fight in which any bird in the fight was transported illegally." Joint Explanatory Statement, supra, No. 24.

On May 13, 2002, President Bush signed the bill into law as Pub. L. No. 107-171, 116 Stat. 134.

**IV.**

**INFRINGING ON FEDERALISM AND EXCEEDING**

**CONSTITUTIONAL AUTHORITY UNDER THE COMMERCE CLAUSE**

What constitutional power justifies Congress' determination to place a "wall" around Louisiana (and New Mexico, Puerto Rico and the three territories) that functions to deter out-of-staters from coming into Louisiana to see a cockfight and in-staters from traveling within Louisiana in order to attend one because of the fear of prosecution as well as to deny breeders from outside Louisiana the opportunity to send their game cocks into the state or Louisiana breeders to ship home grown birds out-of-state or out of the United States given the threat of a misdemeanor conviction.  That is the critical "chilling" effect of the language of § 2156 of the Animal Welfare Act.  Where does Congress derive the authority to assert itself in this fashion?

**(A)**     **Supreme Court Case Law**

The answer to these questions requires an overview of the history of the Commerce Clause as applied to issues of public morality accompanied by a survey of the various instances of federal criminal law and their application of the factors that have served to validate federal intrusion.  It is sufficient for Congress to predicate its power to regulate commerce, including the power to repress and prohibit acts for moral reasons, even if some states disagree with Congress' moral judgment, on the plain fact that, at some point, something connected with the acts at stake entail crossing state borders or employing interstate transportation?  Ironically, that has rarely been a problem, since the states normally do not rebuff the federal attempt to criminalize certain behavior, and rather seem to welcome it as supplementing and reinforcing their own ban of the

very same conduct. But only if-unlike the situation here the states have evidenced their desire to stop that conduct.

1)      Diseased livestock

The first instance in which the Congress' exercise of Commerce Clause authority to prohibit taking a commodity across state lines involved diseased livestock pursuant to the Act of May 29, 1884, 23 Stat. 31, whose use was approved as applied to diseased livestock in Reid v. Colorado, 187 U.S. 132 (1902). The 1884 Act created a Bureau of Animal Industry in the Department of Agriculture designed to authorize the Commissioner (not Secretary until 1889) of Agriculture to work in cooperation with various state governors to make "such disinfection and quarantine measures as may be necessary to prevent the spread of the disease from one territory or state into another. Thornton v. United States, 271 U.S. 414, 419 (1926). The Secretary, in 1916, issued a regulation forbidding the interstate movement of livestock from a quarantined area where cattle were exposed to or infected with ticks unless they were dipped twice in a particular solution. Thornton, 271 U.S. at 420. A defendant who had not dipped his cattle in the proper fashion before he allowed them to range over the line between Georgia and Florida and had, with others, assaulted and killed Bureau employees and dynamited the spray pens and dipping vets, was convicted for those acts. His challenge to Congress' authority to regulate his conduit was rejected because of the impact upon interstate commerce and the reasonable adaptation of the measure of quarantine and the Bureau employees' duties to prevent the spread of contagious disease from one state to another, thereby burdening interstate commerce. 271 U.S. 418, 422, 424. Georgia had specifically expressed its desire to have diseased cattle brought into the state dipped in accordance with state law. The federal government was acting to enable the state to suppress tick disease.

2)      Lottery tickets

In the first case to test this use of the Commerce Clause power in the Supreme Court, the Lottery Case, 188 U.S. 321 (1903) (better known as Champion v. Ames), the Court upheld a 1895 Federal law prohibiting the distribution of lottery tickets through interstate commerce. The Court dismissed a writ of habeas corpus sought by Champion, who had been arrested in Chicago for conspiring with others in Dallas to bring a package of lottery tickets from Dallas to Fresno, California. The Court, in a 5 to 4 decision, found that commerce was at stake in moving lottery tickets from one state to another and that Congress' intervention to protect commerce from the "widespread pestilence of lotteries" was only supporting "the action of those states—perhaps all of them—which, for the protection of the public morals, had prohibited the drawing of lotteries, as well as the sale or circulation of lottery tickets within their respective limits." Champion, 188 U.S. at 357. Congress did not want "an evil of such appalling character" to be "overthrown or disregarded by the agency of interstate commerce." Id. The Court emphasized that Congress' action was in aid of, not contrary to, California's view of the nefariousness of a lottery. Thus, the statute was "appropriate and necessary to protect the country at large against a species of interstate commerce" which "has grown into disrepute, and has become offensive to the entire people of the nation." Champion, 188 U.S. at 328.

But, that is not true of cockfighting in Louisiana (or New Mexico). Congress is clearly thwarting, not supporting, Louisiana's determination to permit cockfighting. Champion involved limiting (indeed, prohibiting) the commercial sale of a good to protect the efficacy of pre-existing state moral decisions against such traffic, not overriding a particular state's judgment. There was a distinct federal interest in assuming that the universal disapproval of lotteries was

effectively implemented that justified federal action to halt distribution.  The spillover effects of ticket distribution were so patent hat Congress needed to intervene to put and end to this "game of chance" with a heavy commercial cost.  The same law is still in existence unless the business of procuring a ticket for a person in one state in an enterprise conducted in another state is permitted by those states.  18 U.S.C. § 1301.

3)      <u>Injurious products</u>

        Nor was there are any "conflict of national and state jurisdiction" over adulterated eggs as articles of trade in <u>Hipolite Egg Co. v. United States</u>, 220 U.S. 45, 58 (1911), where the eggs were deemed to be "outlaws of commerce" that could be seized whenever they might be found and barred from interstate commerce before they harmed any state into which they were sent. Gamecocks are not harmful <u>per se</u>.

4)      <u>Moving women across state lines</u>

        Chronologically, the next series of cases reflecting Congressional action on morality were embodied in the White Slave Traffic Act or Mann Act of June 25, 1910, §2, 36 Stat. 825 (18 U.S.C. § 2421), which made it a criminal offense to transport any woman or girl under the age of 18 in interstate commerce "for the purpose of prostitution or debauchery, or for any other immoral purpose..." with intent that the woman should engage in the practice of prostitution. Basil Economides and Effie Hoke were charged with violating the law by enticing a woman to go from New Orleans to Beaumont, Texas for the purpose of prostitution.  The conviction was affirmed, despite appellant Hoke's "insistence" that states were the proper party to "control the immoralities of its citizens," <u>Hoke v. United States</u>, 227 U.S. 308, 321 (1913) and that the Federal government should not "encroach upon the jurisdiction of the states" or invade their

"reserved powers." Id.  The Court upheld the statute because we are one people "with powers in the states and in the nation" to be exercised, whether independently or concurrently, to promote the general welfare, material and moral.   Hoke, 227 U.S. at 322.   The Court underscored Congress' complete Commerce Clause power over transportation among the several States, even if "the means may have the quality of police regulations." Hoke, 227 U.S. at 323.  The actus reus of transportation in commerce for the purpose of prostitution clearly involved an economic activity in the form of the sale of services and, therefore, constituted "commerce."  Enforcement at the federal level was bound to be more efficacious.   There was a national consensus condemning white slavery.

The second case, however, Caminetti v. United States, 242 U.S. 470 (1917), dealt with a conviction under the White Slave Traffic Act for transporting a woman from Sacramento to Reno, Nevada, not for any commercial purpose (no money changed hands in return for access to the woman), but to become Caminetti's mistress and concubine, an "immoral purpose" 242 U.S. at 482.  While it was claimed that the Act was intended to reach only "commercialized vice," the Court read the plain language as covering any offense against morals, even if defendant would have been more culpable had he taken her into Nevada "with the expectation of pecuniary gain." Id. at 486.  The life of a concubine, offering her body to "indiscriminate intercourse with men," even if money was not involved, was "in hostility to the idea of the family,'" "'the union for life of one man and one woman in the holy estate of matrimony,'" that was "the sure foundation of all that is stable and noble in our civilization; the best guarantee of that reverent morality which is the source of all beneficent progress in social and political improvement.'"  Caminetti, 242 U.S. at 486-87.  His conviction was affirmed.

On the face of it, Caminetti had nothing to do with commerce and everything to do with transportation across state lines, triggering Commerce Clause coverage. Not every state was as ready as the federal government to condemn an unmarried man and woman who took a trip. As time passed, Congress thought better of this use of the criminal law to condemn illicit sex where no profit was at stake, even if a state line was crossed. In 1962, the Department of Justice prohibited U.S. Attorneys from prosecuting noncommercial Mann Act cases unless the Criminal Division gave its express approval. The FBI decided to focus exclusively on "organized commercial prostitution." See DAVID LANGUM, CROSSING OVER THE LINE 237-38 (1994). Finally, in 1986, Congress amended the so-called White Slave Act, 18 U.S.C. § 2421, to read:

> Whoever knowingly transports any individual in interstate or foreign commerce, or in any Territory or Possession of the United States, with intent that such individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title or imprisoned not more than 10 years, or both. Pub. L. No. 99-628.

Under this law, Caminetti could not be charged with any crime because voluntary cohabitation does not constitute "a sexual activity for which any person can be charged with a criminal offense." The new version of the statute does specify a federal offense involving commercial activity in the form of the sale of prostitution services, but it also requires that such activity constitute a state criminal offense. This represents a use of interstate commerce power to enforce state law, rather than bypass or ignore it. See 18 U.S.C. § 2425.

5)   Polygamy

In a similar fashion, the treatment of polygamy at the end of the 19th Century, and today, reflects an evolution from total federal denunciation of the immorality of multiple marriages (men marrying more than one woman) to a situation in which the federal government has

retreated from being the sole enforcer of morality and allows states to handle the matter. That was not, however, the case when concern about polygamy arose. After the Church of Jesus Christ of Latter-Day Saints (the Mormon Church) moved into Utah, Church leaders, in 1852, formally declared polygamy to be ordained by God. GUSTIVE LARSON, THE "AMERICANIZATION" OF UTAH FOR STATEHOOD 37-38 (1971). This was a significant part of their sexual moral code, which labeled as sinful any sexual relationships outside of marriage, whether by married men or women. The Mormons, exercising their political power in the Utah Territorial Legislature, never got polygamy declared legal, but did manage to secure laws that accommodated the practice. Congress, at the behest of threatened mainstream Protestants, reacted by passing increasingly severe laws against polygamy targeted at the Mormon Church, including banning polygamy in the territories—the Morrill Anti-Bigamy Act, ch. 125, 12 Stat. 501 (1862); requiring men to take an oath that they were not cohabiting with more than one woman, the Edmunds-Tucker Act, ch. 397, § 21, 24 Stat. 635, 639-40 (1887) (repealed 1978); and, in the same Act, ch. 397 § 17, invalidating the incorporation of the Mormon Church.

In 1878, in Reynolds v. United States, 98 U.S. 145 (Oct. Term 1878), the conviction of a Mormon for bigamy was upheld under the so-called Poland Bill, Rev. Stat. § 5352, making it a crime for a person to marry another in a territory, or other place over which the United States has exclusive jurisdiction, if the person already had a living husband or wife. This law was held to be constitutional under the Territorial Clause, Article IV, § 3 in the face of a First Amendment Free Exercise challenge because, while Congress had no "power over mere opinion," it was "free to reach actions which were in violation of social duties or subversive of good order," Reynolds, 98 U.S. at 164, and "there never has been time in any State of the Union when polygamy has not been an offense against society...." Reynolds, 98 U.S. at 165. Since Utah had not legally

authorized polygamy, this is another example of federal power aligned with the states, not opposed to their view of morality.  Finally, when Congress admitted Utah into the Union as a state in 1896, Utah was made to include a provision in its constitution forever banning plural marriages.  Utah Enabling Act ch. 138 § 28 Stat. 107, 108 (1894), now contained in Utah Constitution Art. III Section I.  The same was done with Arizona, Arizona Enabling Act, ch. 310, 36 Stat. 557, 569 (1910), now in Arizona Constitution Art. XX, para. 2; New Mexico, New Mexico Enabling Act, ch. 310, 36 Stat. 557, 558 (1910), now in New Mexico Constitution, Art XXI, § 1 (1910); and Oklahoma, Oklahoma Enabling Act, ch. 3335, 34 Stat. 267, 269 (1906), now in Oklahoma, Art. 1 § 2.

The main criminal case on polygamy was directed at a group of fundamentalist Mormons who practiced polygamy and transported at least one plural wife across state lines in order to cohabit with her.  Cleveland v. United States, 329 U.S. 14 (1946).  The Court upheld the Mann Act convictions in light of Caminetti, finding that the lack of "sex commercialism" or any "profit motive" was not "a sine qua non" to application of the Mann Act.  The language, according to the Court, covered actions "motivated solely by lust" as well as those involving sexual relations for hire.  Cleveland, 329 U.S. at 17.  The Court relied on the plenary power of Congress over the instrumentalities of interstate commerce and found "not consequential" that "the means used may have 'the quality of police regulations.'"  Cleveland, 329 U.S. at 16.  Both Justice Black and Jackson would have reversed the case, given the "dubious" correctness of Caminetti.  Reynolds, 329 U.S. at 20-21.  Justice Murphy would have overruled Caminetti as a misinterpretation of the Mann Act.  Reynolds, 329 U.S. at 24-29.  Justice Rutledge wanted to restrict Caminetti. Reynolds, 329 U.S. at 21-24.  In dissent in Romer, 517 U.S. at 648, Justice Scalia characterized approvingly the prohibition of polygamy in the four state constitutions as an "effort by the

majority of citizens to preserve its view of sexual morality ... against the efforts of a geographically concentrated and politically powerful minority to undermine it."

After Cleveland, polygamy remained a Mann Act crime on the face of the law, but the amended statute excludes voluntary cohabitation because it does not meet the test of "a sexual activity for which any person can be charged with a criminal offense." Cleveland himself would also be effectively immunized from the application of federal law because the Justice Department only deals with "commercialized prostitution." But, and this is the point, while polygamy may no longer be the target of federal criminal charges alleging immorality, it is still a separate state crime (at least, in the four most concerned states) and, thus, would be a sexual activity for which a polygamist could be charged with a criminal offense. Not, however, at the federal level; only as a target of the restored state police power. A century after it all started, the national moral offensive against polygamy has been displaced, with the federal government allowing the states who desire to administer criminal punishment for this offense against morality, and federal law operating only to undergird and implement state moral condemnation.

6)    Transportation of liquor

The next stage in the battle for control of morality occurred in connection with the transportation of liquor across state lines. Congress took the lead in enacting legislation limiting the movement of intoxicating liquor in interstate commerce in 1890 with the passage of the Wilson Act of Aug. 8, c. 728, 26 Stat. 313 (27 U.S.C. § 121). The Wilson Act made such liquor, subject, upon its arrival into any state or territory, to the operation of the laws of the state or territory that had been enacted in the exercise of the state's police power. There was no effort to impose a separate federal rule. The proposed commercial use of the liquor in the destination

state was not crucial. Everything depended on the liquor's being transported from one state to another, which bestowed interstate commerce power. This has been characterized by Professor Regan as "a fetishism of state-line crossings." Donald Regan, How to Think About the Federal Commerce Power and Incidentally Rewrite United States v. Lopez, 94 MICH. L. REV. 554, 578 (1995).

Neither the Wilson Act nor its successor, the Webb-Kenyon Act of March 1, 1913, c. 90, 37 Stat. 699 (27 U.S.C. § 122), emphasized the commercial use of the liquor. What mattered was its shipment from one state into another in violation of the law of the receiving state. See Clark Distilling Co. v. Western Maryland R. Co., 242 U.S. 311 (1917). The Reed Amendment was passed as part of the Post Office Appropriation Act, § 5, March 3, 1917, 30 Stat. 1058, 1069, c. 162 (18 U.S.C. § 344), condemning the purchase of "intoxicating liquors" to be transported in interstate commerce "into any state ... the laws of which ... prohibit the manufacturer or sale therein of intoxicating liquors for beverage purposes," with the proviso that "nothing herein shall authorize the shipment of liquor into any state contrary to the laws of such state." A district court quashed the indictment of an individual who bought one quart of liquor in Kentucky and proceeded to carry it upon his person aboard a trolley car into West Virginia. The theory was that Mr. Hill, the traveler, had no commercial use of the liquor in mind, only personal consumption. United States v. Hill, 248 U.S. 420, 424 (1919). West Virginia may have prohibited the manufacture and sale of intoxicating liquors, but not their consumption. The Court reversed, insisting that Congress' control over interstate commerce was "not to be limited by state laws," since the Congress, within its authority, can act "independently of the states ... without reference to the particular policy or law of any given state." Hill, 248 U.S. at 425. The Court permitted Congress to bypass the state's permission "to permit the introduction of liquor

for personal use in limited quantity" and substitute its own view of public policy to prohibit the minimal interstate shipment involved. Hill, 248 U.S. at 427.

This is the most extreme and, indeed, only statement upholding Congress' authority to rely upon transportation over a state line combined with its moral judgment about the injuriousness of a commodity to shut the modest "personal use" window that the state law determined to be acceptable. Federal morality took over from the state's partially contrary view, even in the absence of any commercial transaction. Justice McReynolds strongly dissented, finding that "the Reed Amendment in no proper sense regulates interstate commerce, but is a direct intermeddling with the state's internal affairs." Hill, 248 U.S. at 428. But this was a dissent. The Court quickly followed Hill with a ruling condemning the transportation of five quarts of whiskey in defendant's own automobile for his own use from Wyoming to Colorado, which forbade the manufacture or sale of all such liquors, even if for personal use, because the transportation in interstate commerce transferred control of the activity to the Congress. United States v. Simpson, 252 U.S. 465, 466 (1920).

Congress and circumstances altered Federal supremacy in determining the morality of liquor distribution and use. By 1919, the Federal government totally foreclosed the states' ability to have a contrary say with the ratification of the 18th Amendment. All manufacture, sale, or transportation of liquor within the United States and its territories (including importation and exportation) was prohibited, with enforcement power to be concurrently exercised by Congress and the states. It took only 14 years before this "federalism" experiment, pre-empting state law with a uniform federal ban imposing a federal moral judgment nationwide, proved to be disruptive and unworkable. In response, the country ratified the 21st Amendment, repealing the

18th and prohibiting the transportation or importation (but, note, not the export) of liquor "in violation of the laws" of any state, territory, or possession. Each state bore the responsibility for enacting and imposing its own limits on the delivery and use of liquor. It was no longer in the federal bailiwick. This represents a clear constitutional judgment by the Framers of the 21st Amendment that enforcing moral judgments should be left to the states and their police power and not placed in the lap of the federal government regardless of state value judgments, even if a state line was breached in moving the liquor. This judgment is reflected as well in 18 U.S.C. § 1262, which renders criminal importation into any state or territory (or transportation into or sales therein) if the state prohibits that or else requires an accompanying permit that is not there.

### 7)    Convict-made goods

The Supreme Court, in <u>Kentucky Whip & Collar Co. v. Illinois Cent. R. Co.</u>, 299 U.S. 334 (1937), upheld the constitutional validity of the Ashurt-Summers Act of July 24, 1935 (49 U.S.C. §§ 61-64) making it a crime to knowingly transport in interstate commerce goods made by convict labor into any state "in violation of any law of such State ...." The Court noted that there were fifteen states whose laws imposed no restriction upon sale or possession (including horse collars, harness, and strap goods made by convicts in Kentucky), but Ohio was not such a state and, therefore, Congress could prevent interstate commerce "from being used to impede the carrying out of the state policy." 299 U.S. at 351, and "aid the enforcement of valid state laws." <u>Id</u>. at 352.

### 8)    The protective principle

Federal power did displace the states' police power under the "channels of commerce" theory of interstate commerce. See <u>Lopez</u>, 514 U.S. at 558. Congress had acted to cleanse those

channels in a series of laws by blocking access to them by commodities deemed to be capable of causing injury either in the next state into which they might be carried (contrary to the wishes of that state, which was not legally capable of keeping them out) or to interstate commerce, in the sense of the free flow of goods, by distorting competition.  See United States v. Darby, 312 U.S. 100, 115 (1942).  All of those goods were intended to be part of a commercial transaction in the receiving state, to be exchanged for payment.  The items that Congress forbad to be placed into commerce to halt the spread of evil ranged from diseased livestock, Reid, 187 U.S. 137 (1902) to adulterated eggs, Hipolite Egg Co., 220 U.S. 45 to pictures of prize fights, Weber v. Freed, 239 U.S. 325 (1915) to stolen motor vehicles, Brooks v. United States, 267 U.S. 432, 439 (1925).

This is the "protective" principle of interstate commerce at work, with Congress acting to prevent injury to the states from entry by commodities that the same states have already determined will harm them.  Federal help is required to stop the channels from being exploited "to promote immorality, dishonesty, or the spread of any evil or harm to the peoples of other states as from the states of origin."  Brooks, 267 U.S. at 436.  This is classic cooperative federalism, with the state and federal governments united in the desired result.  It does not represent imperialist federalism, with the federal government seeking to impose its ends upon an unwilling, resisting state.  Where the state would welcome entry over its boundaries, and no harm to neighboring states is produced by virtue of that entry, federal action to block entry is not an appropriate use of the Commerce Power.  Here, Louisiana is clearly more than willing to have visitors attend its cockfights and bring their birds with them.  Louisianans anticipate only pleasure and not harm from people and fowl when they have crossed the state line.  What constitutional decision authorizes the federal government to curtail Louisiana's welcome and foreclose access by way of the channels of interstate commerce?

Arranging for and enabling commerce among the several states was the original reason behind the Commerce Clause and, indeed, the trigger for the convening of the Constitutional Convention itself in 1787.   See generally Randy Barnett, The Original Meaning of the Commerce Clause, U. CHI. L. REV. 101 (2001).   The founding fathers did not gather, first in Annapolis and then in Philadelphia, to foreclose commerce or to raise more barriers against movement from state to state of the type represented by 7 U.S.C. § 2156 in its present, amended form.   The people of the states assembled not to build more toll booths to restrict or even foreclose access to their next door neighbors, but to remove existing toll booths unless a state had already decided on its own to ban a particular activity or needed the federal government to protect its safety by halting the influx of dangerous substances across state lines.   Louisiana is not hurt by the entry of gamecocks and people.   Nor does such entrance adversely affect neighboring Texas or Arkansas or Mississippi.   Nowhere in the legislative history of the ban on cockfighting is any such effect mentioned, let alone demonstrated.   There is, therefore, no legitimate basis for Congress' superseding the judgment of the Louisiana legislature.

9)      Civil rights

One notable instance in which the Court permitted Congress' moral judgment condemning activity to override a state's decision to authorize it, was in the public accommodations provisions (Title II) of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000 a-2000 a-6, §§ 201-207, 78 Stat. 241.   Heart of Atlanta Motel, 379 U.S. 241 (1964).   The operator of the motel refused to provide lodging to transient African-Americans because of their race or color and claimed to be exercising his "right" as a private businessman under Georgia law to select his guests and deny service to customers he did not want to serve.   The Court determined that

Congress had the power to protect interstate commerce from the disruptive effect of racial discrimination interfering with and discouraging interstate travel by millions of African-Americans who would have no lodging (or food) available in decent places in many Southern states.  Although 32 states had legislation (or executive orders) comparable to this part of the Civil Rights Act on their books, Congress still had a rational basis for halting racial discrimination throughout the country and, especially, in resisting states.  Heart of Atlanta Motel, 379 U.S. at 259.  It did not matter that "Congress was also dealing with what it considered a moral problem," given the overwhelming evidence of a burden on interstate commerce with major economic effects.  Heart of Atlanta Motel, 379 U.S. at 257.  With that burden as the basis for Congress' exercise of the Commerce Clause power, Congress "was not restricted by the fact that the particular obstruction to interstate commerce with which it was dealing was also deemed a moral and social wrong."  Id.  Congress could impose its moral judgment on recalcitrant states, not because it had the inherent power to override their moral judgments to the contrary, but because of the record of negative impact on the interstate economy.

10)   Other economic laws

Congress' motive and purpose in regulating interstate commerce to make effective its conception of public policy were not judicially condemnable so long as the proper commercial predicate was there.  United States v. Darby, 312 U.S. 100, 115 (1941).  In Darby, Congress was acting "pursuant to a comprehensive legislative scheme" to protect commerce in lumber from being undercut by a Georgia finished lumber manufacturer's refusal to pay minimum wages to or set maximum weekly hours of labor for his workmen.  Congress accomplished this through the Fair Labor Standards Act of 1938, § 15, 29 U.S.C.A. § 215(a), 52 Stat. 100, by denying any lumber manufacturer who would not comply with the wage and hour rules access to interstate

shipment of goods so produced. <u>Darby</u>, 312 U.S. at 113. It did not matter that Congress' action was not in aid of state regulation or that it was acting contrary to the policy of a state like Georgia (and some others) that had left manufacturing wages and hours unregulated. <u>Darby</u>, 312 U.S. at 114. The reason that Congress was permitted, in this instance, to follow its own conception of what might be injurious to public morals or welfare regardless of the state's hands-off policy was that those wages-and-hours rules significantly affected interstate commerce. If substandard labor conditions were allowed to spread by letting goods so produced use the facilities of interstate commerce in competition with goods produced under the statutorily-prescribed conditions, the result would be "unfair competition." <u>Darby</u>, 310 U.S. at 114, 122. This combines the economic-commerce factor with the combating the spread of infection protective principle.

When an economic activity is being regulated in a minority of states to protect a congressional goal, it does not matter if one of the congressional aims partakes of federal morality trumping a state's moral judgment so long as the regulation itself is part of an overall regulation of economic activities. See <u>Heart of Atlanta Motel</u>, 379 U.S. at 258.

11)   <u>Lopez</u>

There is no problem with the Commerce Clause being used to support and enhance state moral judgments embodied in statutes agreed to by state legislatures. Those situations involve federal cooperation, not federal suppression. In some circumstances, the federal government's criminal condemnation of conduct is merely redundant, echoing the voices already raised at the state level. For example, prostitution is condoned nowhere, nor is polygamy. In 1902, the cry was universal to stop lotteries. The federal government only swelled the chorus backing the

states' expression of moral condemnation.  The same was true in <u>Lopez</u>, 514 U.S. 549, in which

Congress' action in 1990 in enacting the Gun-Free School Zones Act, 18 U.S.C. § 922(q)(1)(A),

and outlawing the possession of firearms on or near school grounds reflected what had already

been done in "over 40 states," <u>Lopez</u>, 514 U.S. at 568, 581 (Kennedy, J. concurring).  As Justice

Rehnquist pointed out, in a footnote to his majority opinion, "[w]hen Congress criminalizes

conduct already denounced as criminal by the States, it effects a change in the sensitive relations

between federal and state criminal jurisdiction," citing <u>United States v. Emmons</u>, 410 U.S. 396,

411-12 (1973) at <u>Lopez</u>, 514 U.S. at 561 n.3.  The Chief Justice went on to quote, with apparent

disapproval, the Government's admission in its brief that the federal law displaced "state policy

choices even in States that has chosen not to outlaw the conduct in question" and, with apparent

approval, former President George Bush's signing statement suggesting that, while the policies

reflected in this "new and unnecessary Federal law" "could legitimately be adopted by the States

… they should not be imposed upon the States by the Congress."  <u>Id</u>. (quoting President Bush's

Statement on Signing the Crime Control Act of 1990, 26 WEEKLY COMP. OF PRES. DOC. 1944,

1945 (Nov. 29, 1990).


12)    <u>Morrison</u>

    In <u>United States v. Morrison</u>, 529 U.S. 598 (2000) the Violence Against Women Act's

Federal civil remedy, 42 U.S.C. § 13981, was supported by the states.  Attorney Generals from

38 States urged Congress to enact the law, <u>Morrison</u>, 529 U.S. at 653 (Souter, J., dissenting),

because their own statutory systems for dealing with gender-based violence through generic state

causes of action were "inadequate" to stop the violence and required a federal forum to supply

punch to the women's cause, according to their "collective opinion," with only one state in

disagreement.  <u>Morrison</u>, 529 U.S. at 654.

13)    Fugitive slaves

Where there are overlapping, concurrent state and federal laws of equivalent efficacy criminally targeting the same or comparable behavior, there is no need for federal intervention. On one unfortunate occasion, an effective political coalition of many states, but by no means all, utilized now-dormant congressional power to enact legislation at the federal level that displaced the state police power and contrary state moral judgments, subjugating them to federal law. This did not occur in the context of the Commerce Clause, but as part of almost three-quarters of a century of implementation of the Fugitive Slave Clause, Article IV, Section 2, Clause 3. At the Constitutional Convention, Southern states were insistent that Northern states not destroy their state-endangered slavery regimes and strove to require the free states to return any and all escaped slaves to their masters in the South. From a matter of comity under the Articles, recapture and return of slaves became mandatory under the Constitution, with state laws providing for discharge from service being denied enforcement. As Justice Story stated in Prigg v. Pennsylvania, 41 U.S. (16 Pet.) 539, 611 (1842) "the object of [the Fugitive Slave] clause was to secure to the citizens of the slave holding states the complete right and title of ownership in their slaves, as property, in every state of the Union into which they might escape from the state where they were held in servitude." The moral judgments of the non-slave holding states were subordinated to those of the slave holding ones, revised to appear as if federally-dictated. In a series of federal acts pursuant to the Clause lasting until almost the onset of the Civil War, Northern protection of escapees was preempted. As a consequence, there was a wave of kidnapping to get hold of free black citizens and sell them into slavery in the South. Barbara Holden-Smith, Lords of Lash, Loom, and Law:   Justice Story, Slavery, and Prigg v. Pennsylvania, 78 CORNELL L. REV. 1086, 1087 (1993).   The irony was that in protecting

Southern states' rights (then under the banner of "federalism") by transforming them into federal moral laws sweeping other states' laws before them, a uniform proslavery system was created, curbing state police powers and sovereignty, imposed upon the country at large by force of the Fugitive Slave article of the Constitution and laws enacted on accordance with that provision. The drastic failure of this approach in controlling morality from the vantage point of the federal government overriding state law is hardly a model for the current federal law against cockfighting in Louisiana.

14)   <u>New factors</u>

The Supreme Court, starting in 1995 in <u>Lopez</u> and continuing to the present, has significantly altered its view of Commerce Clause power based upon the regulation of matters that substantially affect interstate commerce.  The object was to develop some defensible and sustainable limitation on "Federal power" that would prevent Congress from regulating almost any activity.  <u>Lopez</u>, 514 U.S. at 564.  Chief Justice Rehnquist decisively rejected Justice Breyer's "This is the house that Jack built" reasoning method of piling inference upon inference to link possession of a gun in a local school zone to decline in the quality of education and, ultimately, of economic productivity and well-being.  Chief Justice Rehnquist expressed his concern that such an approach would authorize the Congress to regulate any activity by any individual, leading to "a general [federal] police power" under the Commerce Clause "of the sort retained by the states," resulting in the addition to Congress' enumerated powers, of "something not enumerated."  <u>Lopez</u>, 514 U.S. at 567.  In other words, to uphold the Government's contention would be, in effect, to violate the Tenth Amendment and prevent any distinctions "between what is truly national and what is truly local." <u>Lopez</u>, 514 U.S. at 567-68.

The Chief Justice's solution to establishing limits was to impose a requirement that the law for which authority was sought under the Commerce Clause be one that was "an essential part of a larger regulation of economic activity." The no guns in the schoolyard rule "had nothing to do with "commerce or any sort of economic enterprise," Lopez, 514 U.S. at 561. The Court structured its constitutional review in terms of modified low-level scrutiny, "whether a rational basis existed for concluding that a regulated activity sufficiently affected interstate commerce," Lopez, 514 S. at 557. See Souter, J., dissenting in Lopez, 514 U.S. at 603, 607. Justice Souter indicated that the majority's consideration of whether the congressional statute dealt with a "subjects of traditional state regulation" and whether "explicit factual findings supported the otherwise implicit determination that the regulated activity substantially affects interstate commerce," could affect rational basis review, Id. at 608-09. Neither of those suggestions squared with traditional rational basis scrutiny. Justice Souter was uncertain that these new subjects might not require more exacting scrutiny, indicating that something other than rationality review might be taking place. Id. at 613-614.

In Morrison, employing analysis quite similar to that in Lopez, Chief Justice Rehnquist found that Congress' provision of a civil remedy for gender-based violence went beyond its legislative authority under the Commerce Clause. The Court specifically relied upon four factors that were the basis of its Lopez decisions. First, the conduct at stake non-economic, and did not involve building a stable national economy (gender-motivated crimes of violence were, the Court found, "not in any sense of the phase, economic activity," id. at 613). Second, there was no "express jurisdictional element" connecting the crime "with or effect on interstate commerce," (the crime was intrastate), Morrison, at 611-12, 613, Lopez, at 562. Third, there were no express findings in the bill's legislative history (or in the body of the statute itself) regarding the effects

of such crimes upon interstate commerce other than findings that were too weak and "unworkable," because premised on a "but for" causal chain, so that Congress "could" completely obliterate the Constitution's distinction between national and local authority." Morrison, at 612, 615 and act without any "visible, to the naked eye" substantial affect.  Finally, the attenuated link between the crime and the effect on interstate commerce could "be applied equally as well to family law and other areas of traditional state regulation," Morrison at 612-13, 615; Lopez at 564 (if the Court were to accept that government's "national productivity" arguments, it would be "hard pressed to posit any activity by an individual that Congress is without power to regulate").

Justice Souter's dissent, joined by three other justices, relied heavily on Congress' special "institutional capacity for gathering evidence and taking testimony," Morrison, at 630, and carefully rehearsed the "voluminous" mass of data gathered to provide a rational basis for the exercise of the Commerce Clause power.  Morrison, at 634.  Justice Souter's ultimate conclusion was that rational basis scrutiny had been substituted "with a new criterion of review, "dependent upon a uniquely judicial competence."  Morrison, at 637-38.  He did not define this new standard precisely except to suggest that the standard was applied by the majority because of the noncommercial effects of the subject at stake and the fact that the subject had been traditionally addressed by the States "in the exercise of their general police power."  Morrison, at 639.

The outcome of Lopez combined with Morrison is a creation of a somewhat more intense form of scrutiny of Congress' judgment that the Commerce Clause power may be exerted to enact a law, with emphasis on the character of the activity criminalized.  The cases support the following inquiries:  Was it commercial or economic activity?  Was it activity in one state that

could have a spillover effect upon a neighboring state if it entered the channels of interstate commerce and crossed state lines?  Was it an activity traditionally covered by state regulation?  Was the federal government trying to assert its hegemony over the activity and, if so, for what reason(s)?  If it was noncommercial, with no spillover threat, ordinarily subject to the state police power, and not a matter as to which the federal government had some unique claim, then there would no rational basis for federal intervention and no federal Commerce Clause authority to exercise.

**(B)      Application to the New Provisions**

1)      Non-commercial, non-economic

Under this revised standard, a federal ban on cockfighting affecting activities in Louisiana (and New Mexico, Puerto Rice, and the three territories) of the form contained in the 2002 law is not constitutionally justified.  Cockfighting is, from the point of view tens of thousands of Americans who attend fights in the major arenas, pits, and corner lots within Louisiana, a sport, a spectacle, an entertainment in which trained roosters demonstrate their adroitness, pluck, courage, and gameness according to the characteristics of their breed.  Those plaintiffs who are breeders rather than fighters view it as a hobby to which they are committed regardless of the cost of maintaining it.

Cockfighting is not an economic or commercial activity in the sense of being a part of a process of producing commodities, articles, or services for sale in the marketplace (or potential sale) or an activity that effects a market because it is under the control of nationally organized crime like loan sharking.  Perez v. United States, 402 U.S. 145 (1971).

The courts have tried to hold in check the potentially excessive sweep of federal criminal laws applicable to noneconomic crimes by carefully distinguishing between those that affect commercial enterprises and those that impact private individuals.  The lines were most clearly drawn in Jones v. United States, 529 U.S. 848, 854, 857-58 (2000), in which the Court, construing the federal arson statute, 18 U.S.C. § 844(i), refused to interpret it to cover property occupied as a private home as opposed to a commercial venture or business establishment in order to avoid raising the grave constitutional issue of having every building in the land fall within the federal statute's domain converting common-law state arson into a federal violation.

Similarly, although the Hobbs Act, 18 U.S.C. § 1951, enacted in 1946, covers "robbery or extortion" or if the commission or threat of "physical violence to any person or property" that "obstructs, delays, or affect commerce," 18 U.S.C. § 1951(a), the Fifth Circuit, in United States v. Collins, 40 F.3d 95 (1994), where a person was prosecuted for robbing a homeowner of cash, jewelry, his cellular telephone and automobile who was then unable to go to a business meeting, reversed the appellant's conviction because there was an insufficient showing of an interstate nexus. 40 F.3d at 99-100.  The court indicated that it would have been willing to apply this law in all likelihood on the basis of a "depletion of assets" theory if the victim had been a business entity because they "purchase on a larger scale than individuals" and extortion or robbery directed at them are "likely to have a greater effect on interstate commerce." Collins, 40 F.3d at 99-100.   Compare Stirone v. United States, 361 U.S. 212 (1960) (Hobbs Act applies extortion/robbery of business), United States v. Stillo, 57 F.3d 553, 558 n. 2 (7th Cir. 1995) (Hobbs Act applicable to law firm as victim).

There is no evidence anywhere in the legislative history of the Act or in the record in this case that cocks are sent to fights in order to be sold or that where cockfights are staged is also a

venue for the sale or exchange of roosters.  Breeders do produce cocks for sale, but, the market value of those cocks is assessed in terms of their breeding ability to produce chicks that contain desirable traits and the market is not where the fighting occurs, but on the farm where they are raised.  If cocks that fight lose, they will be sufficiently injured so as rarely to be able to fight again.  If they win, they may still be retired.  They are bred for sale to other breeders, but not at cockfights.  Those who actually fight fowl barely break even, if that.  See declaration of S. Johnson, para. 4.  Theirs is not an economically fruitful activity.  "Raising birds is an expensive proposition."  Id. at para. 5.  They do it as an avocation for pleasure.  Nearly all of them have jobs or have retired from careers that have nothing to do with fighting cocks.  Emanuel Massa remains a general contractor.  See declaration of E. Massa at para. 4.  Don Perdue is a pharmacist.  See declaration of D. Perdue at para. 2.  Larry Romero was, until he retired, working for the gas company.  See declaration of L. Romero at para. 6.  Sandra Johnson is an administrator of an organization that depends upon dues, some of which derive from the gate proceeds collected by arena managers.  See declaration of S. Johnson at paras. 3-4.  Mark Johnson ran a construction company in Texas and Louisiana and moved back to Louisiana from South Carolina to help run a cockfighting club.  See declaration of M. Johnson at para. 3.  All of them have been involved with cockfighting, primarily as a sideline, for a lengthy period (S. Johnson—19 years-plus, para. 2; E. Massa—63 years, para. 2; L. Romero—51 years, paras. 3 and 4; D. Perdue—43 years, paras. 2 and 4; M. Johnson—12 years-plus, a third-generation breeder, para. 2.

The costs of cockfighting are substantial, the prizes for winning a derby insufficient to offset them totally.  Sandra Johnson describes all of the various costs in full in paragraph 5 of her declaration.  See declaration of M. Johnson, para. 5, describing the admission fee which goes to

the winners.  The fowl cost an average of $63.67 a year to raise and have a market value of $139.70.  Declaration of S. Johnson, para. 6.  But that value is not based upon sales at cockfights. There is an international market for brood fowl who can pass their fighting traits and gameness through the bloodlines.  That market exists through visits or communications to farms, see declaration of E. Massa, at para. 4; declaration of L. Romero, at para. 5; declaration of S. Johnson, at para. 2; declaration of D. Perdue, at para. 4, 6, and not through cockfighting exhibitions or clubs.

2)      The lack of moral community consensus

        A significant number of federal criminal laws reflect a uniform, nationwide consensus as to what forms of conduct should be punished.  These federal laws incorporate their sister state laws by reference and adopt their approach, with a special federal twist.  They can result in prosecuting the same defendant for the same conduct without any double jeopardy concern in accordance with the concept of dual sovereignty.  Each government protects its own interest. Health v. Alabama, 474 U.S. 82, 92-93 (1985).  Examples in Title 18 of the Code are legion, but a few should suffice.  The federal government has unique constitutional jurisdiction over certain criminal acts that take place in its maritime jurisdiction, Article I, Section 8, Clause 3 and Article III, Section 2, Clause I, in conjunction with Article I, Section 8, Clause 18 or its territorial jurisdiction, Article IV, Section 3, Clause 2.  Those laws include ones that specifically target arson (18 U.S.C. § 81), assault (18 U.S.C. § 113), maiming (18 U.S.C. § 114), interference with funds of a carrier (18 U.S.C. § 661), receiving stolen property (18 U.S.C. § 662), false pretenses (18 U.S.C. § 1025), operating a gambling ship (18 U.S.C. § 1082(a)(2)), malicious mischief to buildings (18 U.S.C. § 1363), using the mail to transmit information about a minor (18 U.S.C. § 2425), stalking (18 U.S.C. § 2261A), sexual abuse (18 U.S.C. § 2242), abusive sexual conduct

(18 U.S.C. § 2244), robbery (18 U.S.C. § 2111), and possession of obscene matter with intent to sell (18 U.S.C. § 1460(a)(1)).

Other Federal criminal laws parallel state laws, but apply solely to equivalent harm done to (or by) officials or employees of the United States or other specially protected groups of people, e.g., assault (18 U.S.C. §§ 111-112), bribery (18 U.S.C. § 201), bank examiners (18 U.S.C. §§ 212-213), certain activities of employees making claims (18 U.S.C. §§ 205, 207), interference with fireman or law enforcement officer in the performance of official duties (18 U.S.C. § 231(a)(3)), contractual misdeeds (18 U.S.C. §§ 432, 435-443), conspiracy to injure an officer (18 U.S.C. § 372), various embezzlement and thefts by (18 U.S.C. §§ 646-656), and extortion (18 U.S.C. §§ 872, 878).

There is no additional quotient of moral judgment contained in these federal crimes. The criminals are as culpable, no more, no less, as state perpetrators. Accordingly, there is no federalism issue raised by federally labeling as criminal behavior what all of the states deem to be blameworthy, except that the federal law explicitly has the guilty act affecting federally-protected places or people. Remove the federal label, and the states would prosecute the very same behavior as a violation of their criminal laws, albeit with different levels of punishment attached. Nearly all of these are traditional common law-derived criminal acts that have universal moral justification and approval throughout the United States. That is equally true of the separate class of federal crimes that convert state crimes into federal ones when state lines are crossed, primarily because there is harm to the second state (the one entered) that would be recognized there if the act had originated there, but it seems to be more effective for the federal government to bring its criminal processes and personnel to bear to avert additional harm to the

entered state.  That is certainly the situation with respect to bribery in sporting contests (18 U.S.C. § 224(a)), traveling to evade a child support obligation (18 U.S.C. § 228(a)(2)), the use or transport of firearms, explosives, or incendiary devices to obstruct commerce (18 U.S.C. § 231(a)) participation in a criminal street gang that affects commerce by committing a state or federal offense involving violence or a substantial risk thereof (18 U.S.C. § 521), traveling to engage in domestic violence (18 U.S.C. § 2261), interstate stalking (18 U.S.C. § 2261A), and interstate travel in aid of a racketeering enterprise (18 U.S.C. § 1952, especially § 1952(b)(1) and (3) which define "lawful activity" to mean certain offenses, such as prostitution, extortion, bribery, or arson in violation of the laws of the state in which they are committed).

In all of the above examples of federal criminal law, there is no distinctive federal judgment about the moral culpability of a particular intentional act that contravenes the state one. They are generally comparable with the state moral judgment.  They are classifiable as <u>malum in se</u>, not <u>malum prohibitum</u> crimes.  This form of federal law requires no imperialist thrust to aggrandize itself and overwhelm state criminal provisions.  It can simply pull itself up with state law bootstaps.

But where no countrywide consensus exists, and there is divergence in the point of view of some states (however few) who do no wish to apply criminal sanctions to certain federally-disapproved conduct, the federal law tends to function gingerly to incorporate and abide by the state approach, not confront it.  Where bribery in sporting contests is at stake, the federal criminal provision, 18 U.S.C. § 224(b) expressly states that:

> This section shall not be construed as indicating an intent on the part of
> Congress to occupy the field in which this section operates to the exclusion of a

law of any State, territory, Commonwealth, or possession of the United States, and no law of any State, territory, Commonwealth, or possession of the United States, which would be valid in the absence of the section shall be declared invalid, and no local authorities shall be deprived of any jurisdiction over any offense over which they would have jurisdiction in the absence of this section.

With respect to the suppression of civil disorders, the federal law is equally respectful of the state coverage:

Sec. 233.—Preemption

Nothing contained in this chapter shall be construed as indicating an intent on the part of Congress to occupy the field in which any provisions of the chapter operate to the exclusion of State or local laws on the same subject matter, nor shall any provision of this chapter be construed to invalidate any provision of State law unless such provision is inconsistent with any of the purposes of this chapter or any provision thereof.

Transporting fireworks interstate is forbidden only if the transporter knows "that such fireworks are to be delivered, possessed, stored, transshipped, distributed, sold, or otherwise dealt with in a manner or for a use prohibited by the laws of such state specifically prohibiting or regulating the use of fireworks." 18 U.S.C. § 836.

Transporting intoxicating liquor into any state in which all sales are essentially prohibited, with some minor exceptions, is illegal if the liquor is not accompanied by a state-required permit or if the state's laws prohibit any such transportation. 18 U.S.C. § 1262(1) and (2). The same is the case for lottery tickets deposited in interstate commerce for a lottery in another state unless both the sending and receiving state agree that such business is permitted. 18 U.S.C. § 1301. Mailing lottery information and advertising is generally illegal, 18 U.S.C. § 1302, unless state law authorizes that lottery to be conducted. 18 U.S.C. § 1307(a)(1) and (2).

A gambling business is illegal unless it is not "a violation of the law of a State or political subdivision in which it is conducted." 18 U.S.C. § 1995(b)(1)(i). Certain crimes such as murder, kidnapping, maiming, assault with a dangerous weapon, assault resulting in serious bodily injury, or threats to commit a crime of violence "in violation of the laws of any State" can lead to punishment for racketing activity under RICO, 18 U.S.C. § 1959(a) and 1961(1)(A).

Transporting an individual in interstate commerce "with intent that such individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense" is a federal crime, 18 U.S.C. § 2421, as is using the mail to transmit information about a minor (not yet 16) with the intent to solicit any person to engage in the same behavior. 18 U.S.C. § 2425.

All of the above crimes represent a federal moral judgment that is on all fours with or else incorporates the moral judgment of every state. There is no clash, no conflict, only accommodation. There is no need for the federal government to apply its political might to encroach upon and reverse state decisions. These crimes reflect, with changes that inevitably develop over time, a social consensus, what Professor Henry Hart of Harvard termed "community condemnation," Henry M. Hart, Jr., The Aims of the Criminal Law, 23 LAW & CONTEMP. PROBS. 401, 404-05 (1958), justifying criminal sanctions.

In 1991, concurring in Barnes v. Glen Theatre, Inc., 501 U.S. 560, 572, 575 , a case permitting enforcement of a state statute banning dancing without pasties or a G-string as "public indecency," Justice Scalia noted that "[o]ur society prohibits, and all human societies have prohibited, certain activities not because they harm others but because they are considered, in the

traditional phrase, 'contra bonos mores', i.e. immoral.  Justice Scalia's point, that merely because these activities are prohibited in the name of morality they do not acquire constitutional protection, was correct, but his examples, 12 years later, are not as stable as he believed: "sadomasochism" (still universally condemned), "cockfighting" (this very case, and obviously not so with Louisiana or New Mexico), "bestiality" (nowhere approved), "suicide" (the Oregon state permission issue is unresolved, see pp. 71-72, infra), "drug use" (what about medical marijuana in California and eight other states, see pp. 72-73, infra), "prostitution" (the economic exchange dominates), "and sodomy" (but see Lawrence v. Texas, 123 S. Ct. 2472 (2003).

Where there is no consensus, as with cockfighting or assisted suicide or medical marijuana or homosexual marriage, where one or more states have expressed disagreement with the majority point of view and seek to defend their policy preferences, the Constitution should not permit horizontal encroachment by the federal government, should not increase its power at the expense of the states.  That is not the way to run a federalist railroad, sweeping the tracks clear of any dissenting state negative freedom from federal interference in the name of interstate commerce.  To encourage the federal government to utilize the crossing of a state line by a person or commodity as a basis for usurping state choice as to how its people wish to govern themselves undermines the core of federalism, given the absence of any of the factors legitimating the exercise of federal imperialism from the economic-commercial quality of the activity banned (pp. 52-55, supra) to the lack of universal agreement about the condemnability of a specific activity (pp. 55-61, supra) to the absence of spillover effects upon other states (pp. 61-62, infra) to the lack of a necessary connection between control of the state-authorized conduct and regulation of the broader economy (pp. 62-64, infra) to the void where any significant federal interest justifying the foreclosure of state choice must reside (pp. 64-65, infra) to the

damage to the scheme of federalism and its attendant values that such moral imperialism entails (pp. 65-71, infra).


3)    No spillover effects

Are there spillover effects into nearby states from cockfighting?  No mention of any appear in the legislative record.  There has been no complaints recorded from Mississippi, Texas, or Arkansas because some of their citizens, having raised and trained roosters, cross into Louisiana for the weekend.  The mere crossing of the line does not seem to trouble Louisiana's neighbors.  The state line is just that, an arbitrary point on the map in terms of any significant federal interest.  As the late Judge Henry Friendly of the United States Court of Appeals for the Second Circuit remarked with respect to Caminetti, "why should the federal government care if a Manhattan businessman takes his mistress to sleep with him in Greenwich, Connecticut although it would not if the love nest was in Port Chester, New York."  HENRY FRIENDLY, FEDERAL JURISDICTION, A GENERAL VIEW 58 (1973).  The state line is an irrelevant factor.  Its existence adds nothing to the need for federal intervention so long as the entered state has no objection and there is no adverse effect upon the departed state.


Allowing a cockfight to occur in a state that expressly welcomes it does not produce any harm in that state.  Conducting cockfights where local citizens want to have them only furthers the state's interest as a tourist venue and a place where its citizens may enjoy themselves as they see fit.  Cocks are not like diseased cattle bringing potential destruction with them.  Reid, supra, or tainted eggs, Hipolite Egg Co., spreading infection.  They do not negatively impact upon the local economy (to the contrary), unlike persons who escape across state lines to avoid the payment of their child support.  See 18 U.S.C. § 228(a)(1).  Spillover is likely when an act begun

in one stake produces harm in another, such as drunken driving or the illegal hunting of migratory birds (ultimately diminishing the supply in the down or upstream states) or the failure to pay child support.  The example supplied by Justice Breyer in <u>Morrison</u>, 529 U.S. at 657, is in point.  Justice Breyer asked "[i]f chemical emanations through indirect environmental charge cause identical, severe commercial harm outside a State, why should it matter whether local factories or home fireplaces release them?"

4)     <u>Not an essential part of a larger regulatory scheme</u>

Some private activities of a modestly economic nature may be criminally addressed by resort to the Commerce Clause if the relationship between those isolated acts and tae aim of the legislation is so close that to leave the isolated acts uncontrolled would threaten the viability of the entire program.  <u>Wickard v. Filburn</u>, 317 U.S. 111 (1942), was precisely such a case.  In <u>Wickard</u>, the court held that a wheat farmer who had exceeded his assigned allotment by harvesting wheat that he did not put into the market, but consumed domestically, was subject, nonetheless, to a fine because that private use exerted a substantial impact on interstate commerce in wheat by restricting the demand for it.  In conjunction with others growing for home use, the farmer's actions diminished the demand for wheat, which it was the purpose of the federal statute to boost in order to raise prices.  Success of the regulatory function required incorporating local production and use into the system of constraints.

While <u>Wickard</u> may have been, according to Chief Justice Rehnquist in <u>Lopez</u>, 514 U.S. at 560, "perhaps the most far-reaching example of Commerce Clause authority over intrastate activity," its approach has been followed.  In <u>Perez v. United States</u>, 402 U.S. 146 (1971), the Court upheld conviction for an extortionate loan in one state because it would channel loan shark

money to out-of-state borrowers or businesses.   402 U.S. at 155-56.   In <u>United States v.</u>
<u>Hawkins</u>, 104 F.3d 437, 439 (D.C. Cir. 1997), Justice Ginsburg, then Judge, held that federal
control over local distribution of drugs was "essential to effective federal control over the
interstate commerce in controlled substances." In <u>United States v. Luna</u>, 165 F.3d 316 (5th Cir.
1999), the Fifth Circuit found Congress exercise of the Commerce Clause in 18 U.S.C. § 922(i)
power to be constitutional by making it unlawful for any person to "receive, possess, conceal,
store, barter, sell, or dispose of any stolen firearm" shipped or transported in interstate commerce
because the regulation of intrastate traffic in stolen firearms was "an essential part of a large
regulation of economic activity." The scheme that would have been undercut if the intrastate
activity went unchecked.  <u>Luna</u>, 165 F.3d at 321.  A comparable decision was announced by the
District of Columbia court that same year in a challenge to 18 U.S.C. § 922(v).  In <u>United States</u>
<u>v. Navegar</u>, 192 F.3d 1055 (D.C. Cir. 1999), the Circuit Court found that stealing a firearm from
a licensed gun dealer had a substantial impact upon the flow of semiautomatic assault weapons
across the borders of states where laws prohibited such weapons.  <u>Navegar</u>, 192 F.3d at 1055.

There is no such requirement that cockfighting in Louisiana be suppressed in order to halt
cockfighting everywhere.   Using Commerce power to punish local wheat cultivation, loan
sharking, drug sales, or the transfer of stolen firearms, all consensually supported bad acts, is one
thing.  Using the Commerce power to oust state jurisdiction where the state's preferences are not
those shared by the federal government is quite another.

Congress itself has recognized that punishing certain classes of activities, however
intrastate in location, are an inextricable part of controlling interstate traffic in the area of
controlling drug distribution.  In 71 U.S.C. § 801(6), the Comprehensive Drug Abuse Prevention

and Control Act of 1970, Pub. L. 91-513, Title II, § 101, Oct. 27, 1970, 84 Stat. 1241, Congress stated that "Federal control of the intrastate incidents of the traffic in controlled substances is essential to the effective control of the interstate incidents of such traffic." All controlled substances look alike and "cannot be differentiated." 21 U.S.C. § 801(5). That may be true for cocks as well, except that cocks, unlike drugs, are legal in some few places. They are not universally banned. Cockfighting in Louisiana is not cockfighting in Mississippi, even if all the roosters look alike. Compare <u>McDermott v. Wisconsin</u>, 228 U.S. 115, 135 (1913).

5)      <u>Lack of any significant federal interest</u>

Absent any spillover effect of an economic or physical nature or of the necessity to foreclose local behavior in order effectively to enforce a nationwide scheme, there remains no cognizable federal interest in denying Louisiana the right to conduct cockfights. The only asserted federal interest is morality and, of course, the crossing of a state line into Louisiana. The legislative record, which is quite barren to begin with, see pp. 91-99, <u>supra</u>, suggests only one conceivable need for federal intervention, a need that flies directly in the face of federalism. There is some contention by one witness, in a hearing two years before the bill was enacted, see pp. 85-86, <u>infra</u>, never embodied in a congressional findings, that it is harder for a state to enforce its ban on cockfighting if a person who possesses cocks can respond when asked why they are in his possession by explaining that he is preparing them to fight in Louisiana. That does not qualify as a legitimate reason for overriding Louisiana's legalization. Otherwise, every time an enforcement officer cannot successfully fulfill his duties with respect to an activity that is not universally condemned, he could blame it on the neighboring state as a so-called "permissive" state. To allow such an excuse to provide the launching pad for federal homogenization of the criminal law contrary to one or more state's refusal to go along would

encourage a majority to silence the voice of any and all outliers. There is no evidence that that is what the farmers had in mind, at least where <u>malum prohibitum</u> is concerned. Moral judgments are not subject to a poll, with the majority point of view declared to be the winner, sweeping everything before it.

6)     <u>A state liberty is at stake</u>

<u>Lopez</u> and <u>Morrison</u> both seek to set out a not fully defined enclave of traditional state authority that should be protected from federal interference, phrased as a not necessarily clear "distinction between what is truly national and what is truly local," <u>Lopez,</u> 514 U.S. at 557; <u>Morrison,</u> 529 U.S. at 617-18. <u>Morrison</u> found that this distinction "preserve[d] one of the few principles that has been consistent since the [Commerce] Clause was adopted." It was an "expression of the police power, which the founders denied the national Government and reposed in the States." <u>Morrison,</u> 529 U.S. at 618. The Court in <u>Lopez</u> underscored its determination not to allow conversion "of congressional authority under the Commerce Clause to a general police power of the sort retained by the States." 514 U.S. at 567. The Court in <u>Lopez</u> made it clear that, however far it had already gone in allowing Congress to regulate any activity it found to be "related to the economic productivity of individual citizens, family law, (including marriage, divorce, and child custody), for example," 514 U.S. at 564, or to take over areas "where States historically have been sovereign" 514 U.S. at 564, it was "unwilling" to go further in invading state prerogatives. 514 U.S. at 568. State regulation of cockfighting is a perfect point at which to draw the line.

On occasion, the Department of Justice, exercising commendable discretion, has recognized the appropriate boundaries of its reach. The Mann Act enforcement policy is one

example.  See p. 36, supra.  So is the Department's development of its "Petite Policy" with respect to dual prosecutions, an outgrowth of Petite v. United States, 361 U.S. 529, 530-31 (1960).  This Dual and Successive Prosecution Policy, U.S. DEPARTMENT OF JUSTICE, U.S. ATTORNEY'S MANUAL § 9-2.142 ("the Petite Policy") "precludes the initiation or continuation of a federal prosecution, following a prior state or federal prosecution based on substantially the same act(s) or transaction(s), unless," among other prerequisites, the matter involves "a substantial federal interest" that was "demonstrably unvindicated" by the prior prosecution.  Petite Policy I(C)(1)(a and b).

The clearest boundary is where there is no federal interest, substantial or otherwise.  That is the situation here.  Why should Louisiana be denied the power to enact and administer its own criminal law and declare its own moral judgment about what is and is not legally permissible in this context.  Have the states neglected to visit the issue of cockfighting?  The record, which at least contains some data on this topic, proves that the states can, without federal urging or assistance or preemption, ban cockfighting on their own (48 have—see Appendix A), except for the two states (Puerto Rico and three territories) in which criminalization has not been approved. Why should these states lose their ability to maintain control of their criminal laws simply because almost all of the other states disagree and want to treat them as pariahs?  Must minority opinions and views always yield to the majority, even an overwhelming majority, in the name of conformity?  Is that a federal interest-moral imperialism-to which the courts are bound to defer?

Or is the only federal interest that the farm bill amendments suggest is that Congress was exceedingly well lobbied to enact a "feel-good do something" statute by a $57 million letter-writing and campaign-contributing organization as part of the animal rights movement.  See

William Eskridge & Philip Frickey, <u>The Supreme Court 1993 Term—Foreword:   Law as Equilibrium</u>, 108 HARV. L. REV. 26, 71 (1994).  Is that sufficient to sustain encroachment upon traditional areas of state concern that were in the state's power to oversee until 1976 or, even thereafter, until 2002/2003?  Does that justify the further extension of federal power, limited only by the capability of war chests and special interest lobbies, to impose upon one or two states and erase their choices in favor for a uniform federal choice simply because Congress wants votes to do so?

That, unfortunately, seems to be the primary reason for the proliferation of federal crimes in the past 20 years.  See AMERICAN BAR ASSOCIATION TASK FORCE ON THE FEDERALIZATION OF CRIMINAL LAW 2 (1997).  The Task Report emphasizes the political popularity of federal crime legislation and desire to be "tough on crime," even "if it is misguided, unnecessary, and even harmful."  <u>Id</u>. at 16 n. 28, 17.  The Report illustrates the dramatic increase in the federalization of crimes formerly prosecuted by the states, resulting in a large body of law and no "conveniently accessible complete list of federal crimes."  <u>Id</u>. at 3, 9.  The Report pins the blame for continuing federalization on "patchwork responses to newsworthy events" <u>id</u>. at 14, that " undermine the strength of the states."  <u>Id</u>. at 26.

The Task Force, chaired by Former Attorney General Edwin Mecse, III, concluded that "the diminution of local autonomy inherent in the imposition of national standards, without regard to local community values and without regard to any noticeable benefits, requires cautious legislative assessment" and "generally undermines the state-federal fabric and disrupts the important constitutional balance of federal and state systems."  <u>Id</u>. at 44, 50.  See also Sara Sun Beale, <u>Too Many and Yet Too Few:  New Principles to Define the Proper Limits for Federal</u>

Criminal Jurisdiction, 47 HASTINGS L.J. 979 (1995); Steven D. Clymer, Unequal Justice:  The Federalization of Criminal Law, 70 S. CAL. L. REV. 643 (1997).

7)      Further federalism concerns

        Courts and scholars have long recognized the values of federalism embodied in the Constitution's distribution of authority between the state and national levels.   The have emphasized how federalism helps to guarantee state-supported liberty, freedom from federal tyranny, diversity in policy by virtue of decentralized power, experimentation with various social and economic policies, the ability to express preferences by "voting with your feet" (moving to a jurisdiction that permits you to engage in behavior outlawed in a majority of other locations), and governmental accountability to the people affected by the level of government responsible for the action.   Each and every one of these essential byproducts of federalism are seriously jeopardized by what the new provisions represent:   horizontal aggrandizement by the federal government imposing its value judgments on all of the states, willing and unwilling, and suppressing any deviation from the national standard.   Homogenization is the antithesis of federalism.   See Susan Klein, Independent-Norm Idealism in Criminal Law, 90 CAL. L. REV. 1541, 1543-44 (2002); Lynn A. Baker, Should Liberals Fear Federalism, 70 U. CIN. L. REV. 433, 434-38 (2002); Lynn A. Baker & Ernest A. Young, Federalism and the Double Standard of Judicial Review, 51 DUKE L.J. 75, 110, 116-33 (2001).


        Louisiana, responding to the policy preferences of its citizens and not those of the rest of the country, has created a state liberty interest protected by state law of engaging in cockfighting. See pp. 3-4, supra.  Cf. Paul v. Duke, 424 U.S. 693, 700-01 (1976).  This liberty will be erased should the federal government be able to eliminate cockfighting in Louisiana through the new

provisions.  Protection of the state sovereignty that is at the heart of this government's federal structure exists "for the protection of individuals," New York v. United States, 505 U.S. 144, 181, 187 (1992) , reducing "the risk of tyranny from either front" by preventing "the accumulation of excessive power in any one branch." Gregory v. Ashcroft, 501 U.S. 452, 458 (1991).  See Rapacynski, From Sovereign to Process:  The Jurisprudence of Federalism after Garcia, 1985 Sup. Ct. Rev. 341, 385-86, 388-89.

Louisiana—and New Mexico—provide diversity with respect to the status of cockfighting, allowing voters in their jurisdiction to exercise policy preferences separate and apart from those of the vast bulk of voters elsewhere. Gregory, 501 U.S. at 458 (decentralized government is "more sensitive to the diverse needs of a heterogeneous society"); Pritchard, Securing the Canadian Economic Union:  Federalism and Internal Barriers to Trade in Federalism and the Canadian Economic Union, 17-18 (Treiblecock et al. eds. 1983).  This enhances the overall welfare of a greater number than the imposition of national uniformity. Michael McConnell, Federalism:  Evaluating the Founders' Design, 54 U. CHI. L. REV. 1484, 1493-94, 1503 (1982).

State choice is a prime example of state social experimentation, enabling the state to "serve as a laboratory" that permits innovation without national risk.  That is Brandeis' insightful contribution to the importance of maintaining federalism. New State Ice Co. v. Lieberman, 285 U.S. 262, 311 (1932) (dissenting).  Where there is a state or states whose policies reflect the preferences of selected groups of citizens, they are legally (if not economically) free to "vote with their feet" and move to the jurisdiction with the set of policies that appeals most to them. Charles Tiebout, A Pure Theory of Local Expenditures, 64 J. POL. ECON. 416 (1956); Richard

Epstein, Exit Rights Under Federalism, 55 LAW & CONTEMP. PROBS. 147, 150 (Winter 1992);

Jennifer Brown, Competitive Federalism and the Legislative Incentives to Recognize Same Sex

Marriage, 68 S. CAL. L. REV. 745, 747 (1995); Baker, Should Liberals Fear Federalism, 70 U.

CIN. L. REV. 433, 437 (leveling the playing field), 445; Seth Kreimer, Federalism and Freedom,

574 ANNALS. AM. ACAD. POL. & SOC. SCI. 66, 72 (2001); ALBERT HIRSCHMAN, EXIT, VOICE,

AND LOYALTY:  RESPONSE TO DECLINE IN FIRMS, ORGANIZATIONS, AND STATES 106-12 (1970).


Finally, if, as here, the federal government's negative displaces the states' affirmative,

democratic accountability may well be undermined should the citizens who are adversely

affected (e.g., cockfighters) focus their disapproval on state officials, "who cannot regulate in

accordance with the views of the local electorate," New York at 169, while the federal officers

who are really in charge "remain insulated from the electoral ramifications of their decision." Id.

That is what occurred in Printz v. United States, 521 U.S. 898, 930 (1997), when state law

enforcement officers were temporarily assigned the task of enforcing the federal Brady Act on

gun registration.  See Lopez, 514 U.S. at 576-77 (Kennedy, J. concurring).


The legislative record in this case rarely refers to these fundamental problems engendered

by federal trumping of the state law.  It never seriously addresses them.


8)      More recent instances of federal horizontal aggrandizement of moral matters at state

expense

Cockfighting is not the only arena in which the federal government is striving to secure

moral hegemony.  This controversy is repeated frequently as the federal government seeks to

craft overriding policies on assisted suicide, the administration of marijuana for medical purposes, partial birth abortion, and same sex marriage.

(a)      Assisted suicide

In 1994, the voters in Oregon, using the initiative process, passed the Oregon Death with Dignity Act.  O.R.S. 127, 800 et seq.  The law went into effect in October 1997.  Slightly over four years later, U.S. Attorney General Ashcroft issued a Federal Register directive (previously turned down by Attorney General Reno) that assisting suicide was not a "legitimate medical purpose" for dispensing federally controlled substances under the Controlled Substances Act ("CSA"), 21 U.S.C. § 801 et seq. See Dispensing of Controlled Substances to Assist Suicide, 21 C.F.R. § 1306.04, Attorney General Order No. 2534-2001, 66 Fed. Reg. 56608 (Nov. 6, 2001). Through this directive, Ashcroft sought to nullify two votes of Oregon voters (the second was in an initiative to repeal the first), a state policy choice which the Court, reviewing a comparable decision in Washington not to approve physician-assisted suicide, had declined to strike down. Glucksberg v. Washington, 521 U.S. 702, 719, 724 (1997).  Justice O'Connor, concurred wanting to entrust the decision whether or not to safeguard these "liberty interests" to the democratic-process of the "laboratory" of the States. Glucksberg, 521 U.S. at 737.


The District Court in Oregon v. Ashcroft, 192 F. Supp. 2d 1077 (2002), held that the directive, in its determination that prescribing controlled substances for physician-assisted suicide was not a "legitimate medical purpose," was unauthorized under the CSA, which contained no intent to "alter [   ] the federal-state framework by permitting federal encroachment upon a traditional state power." Oregon, 192 F. Supp. 2 at 1090, citing Solid Waste Agency v. Army Corps of Engineers, 531 U.S. 159, 173 (2001).  The District Court noted that Congress had

twice attempted to pass a specific federal statute prohibiting the use of controlled substances to assist in a suicide and twice failed, "[a]lthough," as the Court concluded, "congressional action attempting to control matters traditionally left to the state may raise constitutional issues." 192 F. Supp. 2d at 1093.   The directive was permanently enjoined.   The effect on interstate commerce of filling 70 prescriptions over 4-plus years did not seem to be sufficient to trigger Commerce clause proscription or to make controlling these drugs essential to the overall drug regulatory scheme.  See Sylvia Law, In the Name of Federalism:  The Supreme Court's Assault on Democracy and Civil Rights, 70 U. Cin. L. Rev. 367, 416-17 (2002).


(b)      Medical use of marijuana

        In November 1996 Californians enacted as an initiative measure, the Compassionate Use Act, creating an exception to California laws prohibiting the possession and cultivation of marijuana for a patient or primary caregiver who possesses or cultivates marijuana for the purpose of providing it for the patient's medical purposes with the recommendation or approval of a physician.  See United States v. Oakland Cannabis Buyer's Cooperative, 532 U.S. 483 (2001).  While the Supreme Court, in a 8 to 0 decision, ruled that there was no implied exception under the CSA for "medical necessity," 532 U.S. at 491, it conscientiously avoided deciding the underlying constitutional issue of whether or not the CSA without a medical necessity defense "exceeds Congress' Commerce Clause powers."   532 U.S. at 494 and n.7, since the Court of Appeals had not addressed such claims.


        Justice Stevens filed a separate concurring opinion, lamenting the unfortunate failure of the majority to show "respect for the sovereign States that comprise our Federal Union," 532 U.S. at 502, nine of which, including California, Alaska, Arizona, Colorado, Hawaii, Maine,

Nevada, Oregon, and Washington had, since 1996, either passed medical marijuana initiatives or enacted one.  Law, 70 U. CIN. L. REV. at 417 n. 307.  Stevens emphasized that this minority cluster of states had chosen to "serve as a laboratory" for "novel social and economic experiments without risk to the rest of the country," quoting New State Ice Co.  532 U.S. at 502.

The federalism issue of the validity of the CSA overriding the California initiative is still the subject of litigation.  On December 16, 2003, by a split vote of 2 to 1, a panel of the United States Court of Appeals for the Ninth Circuit found that two plaintiffs who were seriously ill Californians who used marijuana for medical purposes on the recommendation of their doctors were entitled to a preliminary injunction stopping Attorney General Ashcroft from pursuing them criminally under the CSA because it was likely unconstitutional.  Raich v. Ashcroft, D.C. No. CV-02-04872-MJJ (slip opinion).  The court's decision was premised on its finding that the plaintiffs had made a strong showing on the likelihood of their success on the merits given that they were to be charged not with drug trafficking, but with intrastate, noncommercial cultivation and possession of marijuana of medicinal ends.  Further, the statute lacked any jurisdictional hook linking their activities to interstate commerce as well as any findings supporting their activities' effects upon interstate commerce or more than an attenuated link to interstate commerce.  Id. at 10-25.

(c)     Partial-birth abortion

In November, 2003, the Partial-Birth Abortion Act was signed into law.  18 U.S.C. § 1531.  Its passage immediately triggered multiple litigation seeking to enjoin its enforcement on the basis of its substantive constitutional violations in light of the Supreme Court's earlier decision invalidating a similar state statute from Nebraska in Stenberg v. Carhart, 530 U.S. 914

(2000).  What the Act's challengers have so far overlooked is the equally serious question of Congress' power to pass the Act.  The Act itself is silent as to the jurisdiction of Congress to enact it.  Nowhere in the unusually detailed finding or in the legislative history is there any express discussion of a Fourteenth Amendment or Commerce Clause basis for the law.  All that exists is the definition of the violator who will be prosecuted as "[a]ny physician who, in or affecting interstate commerce, knowingly performs a partial-birth abortion."   18 U.S.C. § 1531(a).  No attempt is made to define the connection between the forbidden act and interstate commerce.  Does the partial-birth abortion have to be performed while the doctor is crossing a state line or must he cross a state line in order to undertake the procedure?  Or is it assumed that, even though the channels or instrumentalities of interstate commerce are not involved, the procedure "substantially affects" interstate commerce?  The legislation fails to resolve this matter.

There is no suggestion in the findings that such abortions are commercial in nature, and there is no requirement anywhere in the legislation that such an abortion be performed for money, that it be sold as a marketable service.  See gun possession in Lopez, 514 U.S. at 561.  Nor is there a larger scheme of economic activity that is being federally regulated of which partial-birth abortion is an intrinsic part.  See Wickard, 317 U.S. at 125, 128-29.

Abortion has been traditionally left to the states, at least where no federal funding under the Spending Clause, Article I, Section 3, Clause 1, is at stake.  Medical procedures or health care of a noneconomic nature are traditionally regulated by the state.  Pegram v. Herdrich, 530 U.S. 211, 237 (2000).  The field of abortion is left to state legislation-subject to federal judicial oversight, but not federal legislative control.  See Roe v. Wade 410 U.S. 113 (1973).  When the

74

Court upheld Connecticut's denial of Medicaid benefits (state money) to subsidize abortion in Moher v. Roe, 432 U.S. 464, 480 (1977), it almost simultaneously allowed Connecticut to deny such benefits, while expressly stating that a state was free to decide to provide such coverage if the representatives of its people, through its normal democratic processes, decided to do so. Beal v. Doe, 432 U.S. 438, 447 n. 15 (1977). It was the state's choice to go either way, not subject to federal override, although the federal government could decide not to allow its matching funds to apply in this fashion. Harris v. McRae, 448 U.S. 297 (1980).

The only federal interest in partial-birth abortion appears to be the politically popular desire to act with a broad brush to prevent a despised procedure and override some states more "narrowly tailored" prescriptions; see Stenberg 530 U.S. at 947, 950 (O'Connor, concurring), or the decision by approximately 20 states not to ban partial-birth abortion at all. Stenberg 530 U.S. at 980, 989 (Thomas, dissenting). The interstate commerce connection is insufficient to justify criminalizing this conduct at the federal level if states refuse to do so in a constitutionally correct manner. Federalism does not justify federal horizontal aggrandizement at the expense of state choice in a hotly-contested moral area. See Allan Ides, The Partial-Birth Abortion Ban Act of 2003 and the Commerce Clause (Loyola, Los Angeles Public Law and Legal Theory Research Paper No. 2003-31 (Nov. 2003) (SSRN Abstract No. 471441).

(d)     Same-sex marriage

Congress has not enacted law based upon interstate commerce seeking to outlaw state recognition of same-sex marriage. Instead, it has attempted to achieve a comparable result by way of the Full Faith and Credit Clause. Article IV, Section 1. In 1996, Congress overwhelmingly passed the Defense of Marriage Act ("DOMA"), 28 U.S.C. § 7386 and 1 U.S.C.

§ 7. One portion of DOMA was a measure defining marriage for federal purposes as exclusively heterosexual, thereby depriving same-sex couples of all the federal benefits to which married couples are entitled. 1 U.S.C. § 7. The other state-directed portion of the Act states:

> No State, territory, or possession of the United States, or Indian tribe, shall be required to give effect to any public act, record, or judicial proceeding of any other State, territory, possession, or tribe respecting a relationship between persons of the same sex that is treated as a marriage under the laws of such other State, territory, possession, or tribe, or a right or claim arising from such relationship.

The testimony that resulted in DOMA indicates that the law was designed to suppress state-authorized gay marriage as a moral threat to the institution at marriage and to "the moral and spiritual survival of this Nation." 142 CONG. REC. S. 10,068 (daily ed. Sept. 9, 1996) (remarks of Sen. Helms, Rep.-N.C.). See S. Hearing on S. 1740 Before the Sen. Common Judiciary 104th Cong. 22 (1996); Hearing on H.R. 3396 Before the Subcomm. on the Constitution of the House Comm. on the Judiciary, 104th Cong. 133 (1996).

DOMA at the time of its enactment constituted a direct attack on the 1993 decision of the Hawaii Supreme Court in Baehr v. Lewin, 852 P.2d 44 (1993). But today it would operate to prevent the recognition by the Massachusetts Supreme Court of same-sex marriage under the Massachusetts Constitution. Goodridge v. Dept. of Public Health, 798 N.E. 2d 941 (2003). It has been held, as a matter of common law conflicts and not federal law, that a state can withhold recognition of foreign marriages if a particular marriage violates a strong public policy of the state. See Andrew Koppleman, Same-Sex Marriage, Choice of Law, and Public Policy, 76 TEX. L. REV. 921 (1998), Andrew Koppleman, Dumb and DOMA Why the Defense of Marriage Act Is Unconstitutional, 83 IOWA L. REV. 1, 10 (1997). As of May, 2001, 36 states (including

Hawaii, which reversed itself), had enacted statutes forbidding recognition of same-sex marriages, P. Greenberg, <u>State Laws Affecting Lesbians and Gays</u>, National Conference of State Legisbriefs at 1 (April/May 2001). But that is each state's choice. The federal thumb does not belong on the choice-of-law conflicts balance of interests tilting it in favor of nonrecognition of same-sex marriage. The decision should belong to each state without federal legislative intervention trying to eliminate nonconforming state judgments and spread a uniform federally-supported rule. Marriage and its regulation are within a state's exercise of its police power. <u>Goodridge</u>, 798 NE.2d at 954, 967.

**(C)      Foreign Commerce Is Treated the Same as Interstate Commerce**

Article I, Section 8, Clause 3 refers to Congress' power over "commerce with foreign nations," as well as commerce "among the several states." The case law under the foreign commerce dimension of the Commerce Clause is relatively sparse with few, if any, special doctrines applicable. Accordingly, the principles of the preceding sections govern. There is, of course, the added extraterritorial moral dimension of imposing Congress' attitude toward sports upon countries that are not within our federal system and that have their own unique cultures centered on cockfighting. See Dect. of E. Massa, paras. 4 and 6. It is one thing to block an export because of national security concerns, i.e., the spillover effect from leaving this country and entering another pursuant to which the export (e.g., technology) might return to bite us. It is another to keep goods within this country and harm the livelihood of Americans in order to teach contested foreigners a lesson in morality. If the commerce ban stands, the ultimate effect of the law would be to outlaw the possession of gamecocks anywhere outside of Louisiana, New Mexico, Puerto Rico, and the three territories, because any cock bred in any other state could not

be shipped anywhere, even as breeding stock.  All that would remain is using gamecocks for food, which is hardly a tasty dish.

## V.

### DENIAL OF EQUAL PROTECTION

Romer, 517 U.S. 620 and its predecessors, Moreno, 413 U.S. 528 and City of Cleburne Texas, 473 U.S. 432 are crucial to the equal protection aspects of this case.  All three cases were purportedly decided with minimal scrutiny at the rational basis level, yet, in each case, the legislation was overturned when the Court was unable to detect, in the course of low-level review, that any of the government interests purportedly served by the law had anything to do with the law as enacted or were sufficient to sustain it.  In the case of Moreno, there was only one asserted interest that emerged from the Court's review of the "regrettably" skimpy legislature history of the purposes behind the "no hippies" in food stamps households limitation. The record was "bare of committee consideration," since the amendment first materialized in conference.  Moreno, 413 U.S. at 534 n.6.  The interest unearthed by the Court was "a bare congressional desire to harm a politically unpopular group [hippies]," Id. at 534.  There were no "independent" "considerations in the public interest" to justify the challenged amendment.  Id. at 534-35.

In Romer, singling out homosexuals in order to deny them any right to seek protection from the law was deemed a discrimination "unprecedented in our jurisprudence," 517 U.S. at 633.  Following the approach of Moreno, the court refused to view animosity directed toward the class of homosexuals as a legitimate public policy.  Id. at 634.  Romer had no legislative history

to draw upon (a referendum amending the Colorado Constitution was the subject of the case), but the Court was nonetheless able to make an "inevitable inference" about the amendment's purpose, id. at 634. It found Colorado's defense of its enactment as having no "legitimate justifications," being "status-based" and "divorced from any factual context from which we could discern a relationship to legitimate state interests." Id. 635. It was "so far removed" in scope from the particular justifications offered by the State as to be "impossible to credit," leaving it as "obnoxious" "class legislation" violating the Equal Protection Clause.

Cleburne, too, relied heavily upon the Moreno approach of canvassing the asserted goals behind a zoning ordinance that led to the denial of a special use permit for the operation of a group home housing 13 mentally retarded men and women. The Cleburne Court rejected any claim that the mentally retarded were "a quasi-suspect classication calling for a more exacting standard of judicial review than is normally accorded economic and social legislation." 473 U.S. at 442, 446. Nonetheless, the Court, without asserting that its equal protection review of the zoning ordinance was any more thorough or intensive than the "rationally related to a legitimate government purpose" standard, id. at 446, did undertake a more intensive review of the record. The Court was not content to rest with a determination that, as in more traditional rational basis scrutiny, the City of Cleburne's City Council, in refusing to grant a special use permit to the mentally retarded group home, "could have" thought that the home would pose "any special threat to the city's legitimate interests" or "might well have" believed that there were reasons for distinguishing a group home for the mentally retarded from a boarding house or a hospital, Id. at 443. The Court looked in the record for something beyond the "mere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable in a zoning proceeding" id. at 448. It was unable to locate any "permissible bases for treating a home for the mentally retarded

differently from apartment houses, multiple dwellings, and the like." Id.  The Court further

rejected two other Council objections to the location of the facility because they were either

based upon "vague, undifferentiated fears," permitting private biases to trigger an equal

protection violation, or a function of no distinction at all between the home and other comparable

uses (none of which required a special use permit).  Id. at 449.  The Court canvassed and

rebutted in detail all of the other asserted reasons why a group mentally retarded home should be

singled out for requiring a special use permit.  Id. at 450.  None of this type of  analysis appears

in any other application of the rational basis minimum scrutiny test in an equal protection case—

other than Moreno and Romer.  After reviewing the record which did not support the differences

upon which the City Council relied and dismissing every one of them as failed justifications of

difference or distinction, the Court characterized the permit requirement as resting upon "an

irrational prejudice against the mentally retarded." Id. at 450.


The problem with applying even minimal scrutiny equal protect analysis here is the

fundamental lack of clarity and agreement upon the federal purposes behind trying to deny

Louisiana (and New Mexico) sources of birds to sustain their state-authorized cockfighting.  The

legislative record does not address them, as is apparent from the lack of legislative due process

that has plagued this legislation since it first appeared in 1976.  See pp. 91-104, infra.  What were

the federal justifications for throwing a cordon sanitaire around Louisiana (and New Mexico,

Puerto Rico and the three territories) by way of the chilling effect from frightening off out-of-

staters interested in coming to Louisiana to see cockfights or to bringing their gamecocks to

participate in such contests and denying in-state breeders the ability to earn a living by shipping

their brood fowl to countries in which fighting is legal?  There are no statements of purposes or

findings to nourish a rational basis format for judicial review.  The lateness of the appearance of

the animal fighting venture amendment including live birds obviated conducting any committee hearings in 1975 or 1976 where witnesses could explain the need the legislation at the federal level in the House, while the amendment arose after the Senate had already completed its action upon the Act.  The House never went on record to describe why the amendment was inserted, although Chairman Foley, did mention cockfighting's "brutality," and "distastefulness."  That "moral" judgment generated the law's criminal thrust, according to him.

2002 was almost a rerun of 1976.  Although the House Committee conducted hearings in the fall of 2000, in the second session of the 106th Congress, those same witnesses were not reheard by the committee, whose composition had changed, as it dealt with the bill over the course of the 107th Congress.   Whether any of the justifications offered by witnesses in September 2000 were incorporated in the House bill that went to the floor in the form of an amendment to the farm bill cannot be ascertained.

Without hearings or findings or any meaningful legislative record it is difficult indeed to decide what legitimate federal interests support the Act other than the illegitimate one seized upon in <u>Moreno</u>, <u>Romer</u>, and <u>Cleburne</u> of seeking to harm groups that are politically unpopular, whether they are ethnic in character (Hispanics, Cajuns) or represent certain nationalities (Mexican, Central and Latin American, Puerto Rican) or are culturally distinct, by denying them access to a preferred activity protected by state law.

Remarks on the House floor in 1976 by the amendment's main sponsor, Rep. Krebs, D.-Calif., which demonstrate nothing bur scorn for arguments in favor of allowing cockfighting to occur in places where it was condoned, such as Puerto Rico, or was, as Chairman Foley, D.-

Wash., emphasized, sanctioned from culture and tradition among some people in some parts of the United States, echo the illegitimate hostility—animus theme of <u>Moreno</u>, <u>Romer</u> and <u>Cleburne</u>.   Sponsor Krebs was strongly opposed to "catering to certain constituents representing a small minority."  122 CONG. REC. H. 2877 (daily ed. Feb. 9, 1976).  The majority of the United States he states, "should [not] be guided by what may be a condoned activity in a certain part of these United States," with particular reference to "Puerto Rico."  <u>Id</u>. at 2876-77.  Majorities do not respect the interests of minorities.  That is precisely what the equal protection concept is there to prevent.

The Supreme Court recognized in 1986 the significance of cockfighting to Puerto Rico in <u>Posadas de Puerto Rico Associates v. Tourism Company of Puerto Rico</u>, 478 U.S. 328, 343-44. Justice Rehnquist, soon to become Chief Justice, carefully distinguished Puerto Rico's efforts to deny permission to advertise casino gambling, which was nontraditional, to its residents, allowing ads to encourage them to gamble on cockfighting, horse racing, fiesta games of chance, and the lottery, because they "have been traditionally part of the Puerto Rican's roots" and so widely sponsored by the people that the legislature could allow advertising directed to them, but not to casino gambling.

What other reasons were suggested, for making cockfighting a federal offense?  Rep. Wiggins, R.,-Cal. referred to the fact that passing the law would enable the Congress to "go on record as being against this activity."  This highlights the argument of the American Bar Association Task Force on the Federalization of Criminal Law, that the indiscriminate federalization of local crimes that occurred in the 1980s and 1990s was attributable to politicians' desire to use crime issues to "enhance their popularity and electability," NANCY

Marion, A History of Federal Crime Control Initiatives 13 (1994), by passing "feel-good, do-something" federal criminal bills, Eskridge & Frickey, 108 Harv. L. Rev. at 71 (1994) and engaging in "window dressing," Sara Sun Beale, <u>What's Law Got to Do With It?   The Political, Social, Psychological and Other Non-Legal Factors Influencing the Development of (Federal) Criminal Law</u>, 1 Buff. Crim. L. Rev. 23, 30 (1997), through "symbolic gestures, to appease the public rather than actual attempts to reduce crime." Marion, <u>supra</u>, at 244.  While all elected officials appropriately strive for re-election and to please the public, that is hardly an interest that amounts to a rational basis, even though it may be the primary motivating force for much legislation.  To use that as a legitimizing end, without anything more, would make judicial review in equal protection cases toothless and meaningless and would give constitutional <u>carte blanche</u> to legislative efforts to discriminate against those groups which are politically unpopular or looked down upon by majorities, even if they do not represent the "discrete and insular" disfavored.

The lack of any legislative record containing purposes and spelling out any reasons for adoption of the Act invites a failure to identify any legislative end that will satisfy the legitimate governmental interest test applied by the Court in low level scrutiny to ascertain if the means (here, criminal punishment) rationally fit the ends. See <u>Williamson v. Lee Optical</u>, 348 U.S. 483 (1955). This void leaves as a surviving goal either the illegitimate one identified in the <u>Moreno-Cleburne</u>-<u>Romer</u> trilogy or pure political calculation.. No votes were taken in either chamber before the amendments were tucked into the farm bill.  Indeed, the chief anti-cockfighting lobbyist testified to "some sort of emerging national consensus" for banning cockfighting, reflected in by a Penn & Schoen survey in 1997 revealing that "78 percent of Americans want cockfighting banned everywhere." <u>Hearing</u>, <u>supra</u>, at 30, 48. (Pacelle of the HSUS).  But, by

looking to the Senate floor discussion in July, 2001 (only two Senators spoke—Allard, R.-Colo. and Byrd, D.-W.Va.), the House committee hearings in 2000, and the House floor "debate" in 2001, during which only five members of Congress offered comments (Blumenauer, R.-Or., the amendments' chief proponent; Reps. Morella, R.-Md. and Tancredo, R.-Colo., both backing Blumenauer; House Agriculture Committee Chair Combest, R.-Tex. and Rep. Stenholm, D.-Tex. both opponents of the amendments), it is possible to piece together some rationales for the Act. There is no way to determine whether any members, either Senators or Congressmen, endorsed any one of these purposes that were suggested either by a witness or a member—or that a majority in either chamber ever concurred in supporting them.

First and foremost was the moral need to halt cruelty to roosters. Why was this necessary at the federal level? 47 states had already done it on their own by enacting their own criminal laws, without federal aid or prodding. Indeed, one other state (Oklahoma) did the same through a referendum in 2002, without any inducement or prompting from the federal level. Was it necessary to expand the reach of the federal crime in order to prevent backsliding by any state seeking to revitalize cockfighting within its borders? There is absolutely no evidence of that. There is not the slightest justification for allowing the federal government to dictate moral policy to three (now two) unwilling states. Nor can the federal government project its moral values overseas, not merely to territories like American Samoa, Guam, and the Virgin Islands, and Puerto Rico, where legal cockfighting flourishes, but to countries not subject in any way to the law of the United States, like Mexico and the Philippines, where cockfighting is a national sport on a scale unheard of in this country. Does the foreign commerce power permit moral imperialism, destroying (not promoting) commerce in order to force our values upon the rest of

the world in the face of long-term, very entrenched contrary traditions?  What case stands for this proposition?

A second cited argument was the necessity of closing the so-called "loophole" of 1976 and preventing the transportation of birds into the legal fighting states for fighting purposes because, despite dozens of raids on illegal cockfights by law enforcement personnel (with Humane Society investigators working undercover), the state law enforcement agencies believed that they were hamstrung since they lacked the ability to arrest and prosecute the persons whom they found raising and possessing cocks.  These individuals would defend themselves by claiming that they were preparing the birds to be shipped to Louisiana (or New Mexico or outside of the Untied States), in other words, to dispose of them legally.

Were the district attorneys or states' attorneys rendered incapable of effectively enforcing their anti-cockfighting laws because it was legal to fight in Louisiana or New Mexico?  It is palpably not true, despite Pacelle's testimony, that if law enforcement officials "don't catch them in the act of fighting," they can press no charges.  Hearing, supra, at 22.  That law enforcement officials cannot make their cases because of the way in which the pre-2002 law was written was quite exaggerated.  The constant reports of state convictions make contention seem too flimsy to be credited.  What state officials mean is that they prefer to make their cases the easy way, with the least effort, with convictions dropping in their lap like apples from a tree.  Simply happening upon the gamecocks, from their perspective, should be enough to constitute a per se violation of the law.  They did not wish to undertake any more complex investigation that might link possession to actual fighting.  The problem is not that this step is too difficult.  Even Sheriff Schlueter described how they build their cases demonstrating animal fightings in Florida as if it

were an everyday achievable occurrence, Hearing, supra, at 22-23.  The problem is that, if more evidence must be developed than finding a gamecock, prosecutors, in exercising their discretion about how to allocate their scarce resources between cockfighting and combating more serious crimes, for example, violence and drug offenses, will choose to ignore cockfighting by demanding more proof than the law actually requires, including "evidence of actual fights," so that they can be guaranteed convictions. Schlueter, Hearing supra, at 32-33, 34-35.  None of this exercise of prosecutional discretion should or can be cured by expanding the federal law as the Act does.  Local officers would still not be able to assume that anyone in possession of a cock was guilty, without a further showing, of fighting purpose and known interstate origin.  The actus reus does not automatically prove the necessary mens rea.  To that end, more investigation effort is necessary.

Despite the proponents' arguments that closing the loophole by making it illegal to ship birds to Louisiana and, thereby, making mere possession of game fowl sufficient to establish a crime, was important, that is not the crime that was created in 2002.  The crime remains possession of a cock for fighting purposes and, while that does not require a showing of actual fighting, it requires proof beyond a reasonable doubt that the bird in possession is a bird was intended to be used in a fight by the defendant.  There remain substantial legal purposes for the possession and use of game birds other than fighting, such as breeding a line of roosters, which is what all of the individual plaintiffs do, or showing them in poultry exhibitions or keeping them as backyard pets.  It is not easy to distinguish between gamecocks intended to fight and those intended for other ends, especially by looking at the bird.  Mere presence of a gamecock in interstate commerce is insufficient.  Mere presence will not do.  The purpose for the movement has to be shown.  That cannot be done at the airport by simply looking at the bird.  Even the state

law enforcement officer who argued for the change in the law at the House hearing in 2000 underlined the "tremendous burden" on law enforcement of having to tie a particular bird to fighting, something that cannot be done in transit, not unless the cock crosses state lines accompanied by fighting paraphernalia or seminal indicia.  Hearing, supra, at 20 (remarks of Criminal Investigations Section Superior, Broward County Sheriff's Dept., Lt. Sherry Schlueter.)

Although there is some disagreement among experts, the mere existence of a bird with its waffles, crests, and ear lobes cut and its chest and leg area shaved may suggest preparation for fighting, but those characteristics are equally shared by game fowl raised for breeding or show purposes not banned by the Act and by species of chickens that naturally have no combs or wattles.  "[T]here is effectively no way in transit to tell the difference between a bird that is going to be used to show or breed, or to fight." (Hearing, supra, at 36).  Use for fighting can not be shown beyond a reasonable doubt on the basis of appearance alone.  Without more, those so-called dressed for "fighting" features are insufficient to meet the prosecutor's burden of proof. He will need other evidence more consistent with fighting, such as wounds with blood clots or spurs or drugs accompanying the birds as they travel.  Without that, the government's case is likely to fail.  As even Pacelle stated in the 2000 House hearing in response to a question from Committee Chair Combest, R.-Tex., "a whole panoply of things need to be added in order for law enforcement officials to make a credible case" that the shipment of a bird is for the purpose of an animal fighting venture. Hearing, op. cit. supra, at 20.

The presence of a bird at a state line does not in and of itself prove that the sponsor or exhibitor knew the gamecock was coming to his site in order to fight.  No bird sports a "here to fight" luggage tag.  Proving possession of a gamecock and nothing more will still not avoid a

directed verdict of not guilty.   Hearing, supra, at 4, 20-22, 35-36, 39.   What is needed to overcome this barrier, after 2002 as well as before, is evidence that the birds in possession are from out-of-state to be fought instate and, thus, will be used illegally.   The contention is that state law enforcement cannot control cockfighting in 47 states because it is an underground industry, see Pacelle in Hearing, supra, at 11.   How making possession per se sufficient to constitute a crime rather than having to show that fighting is occurring or is about to occur will drive the "industry" above ground is hard to fathom.   This is a thin reed indeed, upon which to hang pre-empting state moral decision-making furthering federal aggrandizement, and threatening to convict electoral, ethnic, national, religious, and cultural minorities.   Can it pass the rational basis-plus test?

Proponents of the Act as witnesses also stated that cockfighting should be suppressed by federal law because it is "associated with illegal gambling, drug use, violence."   Pacelle, Hearing, supra, at 10; Schueter, id. at 12-13.   This guilt by association charge has no evidentiary support in any document or record placed before Congress, except for Pacelle's anecdotal ("time and time again") evidence and Schueter's stories about her work in Broward County.   Evidence of this caliber was held by the Court to be insufficient to sustain passage under Section 5 of the Fourteenth Amendment of the Religious Freedom Restoration Act, the Patent Remedy Act, the Age Discrimination in Employment Act and the Americans with Disabilities Act (as applied to the states) see pp. 95-96, infra.   Indeed, there was considerably more of it in those cases, which, nonetheless, found the legislative record insufficient to sustain the laws against constitutional challenges.   How can such material furnish a rational basis for this Act?

It should come as no surprise that many claims made in the September of 2000 hearings about the laws then being proposed in the 106th Congress had no relationship to the words signed by President Bush in May, 2002, in the 107th Congress and, therefore, did not alert House and Senate members of 2001 as to what the consequences of their actions on the farm bill amendments would be, intended or unintended. Many of the witnesses in 2000, while expressing the hope that the hearings were "designed to shed light on the issues" and allow the members "to make an informed and rational decision about this bill," Stenholm, D.-Tex. Hearing, supra, at 2, indicated, through the questions they asked of one another in the course of open discussion, great uncertainty about the bill's reach. One member, Rep. Riley R.-Ala., summarized his views of the hearing as having posed more questions than there were answers. Hearing, supra, at 28. Proponents, not familiar with the legal interpretations and applications of various state versions of criminal law relating to cockfighting or §1256 as used from 1972 to 2002 in connection with dog fights, effectively misled the audience of members to believe that cockfighting in Louisiana would not be affected (Hearing, supra, remarks of Underwood, delegate from Guam, at 5; remarks of Berry, Director, Oklahoma Husbandry Coalition, at 20; remarks of Schleuter, at 31; and remarks of Parcelle, at 11). In addition, since the hearings were conducted well over one year before the amendments were added on the House floor, the members were informed that there was only to be a ban on interstate shipment of birds for fighting purposes, not their export to foreign countries. Hearing, supra, Peterson, at 3, Pacelle, at 29. While that was correct at the time, with reference to H.R. 1275, Rep. Blumenauer, R.-Or., changed all that on October 4, 2001 when he offered his floor amendment barring exports.

The legislative record is murky, shifting, and highly incomplete, consisting of a one-day hearing in a different Congress that clarified very little and left the House Committee Chair

concerned about the broad sweep of the amendment with its chilling effect on the transportation of live birds for non-fighting purposes and on participation in the National Poultry Improvement Program certification of chicks as safe for interstate and international movement (Rep. Combest, R.-Tex. at 147 CONG. REC. H. 6274, daily ed. Oct. 4, 2001). It also produced a floor query from Rep. Stenholm, D.-Tex., about the legality of exports that impelled Rep. Blumenauer to proffer his amendment to block exports. Rep. Stenholm, D.-Tex., was troubled about passing amendments that may have "very, very serious unintended consequences," leading to interpretations of the law no one could think of when the bill was on the floor. In particular, he questioned whether the House should be making a decision for a few other States about what is legal and illegal within their borders. 147 CONG. REC., supra, at H. 6276.

An unclear "record," that contradicts the law ultimately enacted and leaves many issues unresolved, hardly provides a reasonable basis for sustaining that law, either by demonstrating the need for federal intervention to supersede the distinct and contrary moral judgment of one state (or two) or by suggesting any legitimate reason for denying certain groups, with characteristics approximating those of suspect classes, their state-protected liberty of enjoying cockfighting. Singling out these groups for discrimination because of animus or hostility to them does not qualify. If there is no legitimate end at stake, the criminal amendments of 2002 should fail under equal protection analysis incorporated and applicable to the federal government through the Due Process Clause of the Fifth Amendment.

Under generally accepted equal protection doctrine, the government is entitled to prohibit activities claimed to violate the purpose of a law one at a time, Williamson v. Lee Optical, 348 U.S. 483, 489 (1955), instead all at once. There remains, however, undispelled concern, derived

from the anti-majoritatian values implicit in equal protection doctrine, that Congress should proceed to penalize persons involved with cockfighting in which thousands or tens of thousands of roosters may be killed each year (although not every fight results in death), while leaving unaffected in any way the commercial breeding and slaughter of billions of chickens a year. Eight billion-plus broilers are killed annually to guarantee inhabitants of the United States access to a cheap supply of poultry for nourishment.  The contrast is too stark not to raise a question about the justification for dealing only with cockfighting, while leaving commercial production untouched.  Nurtured on tethers until they become two years old, with unrestricted access to supplies of air, grass, water, food, and hens, gamecocks are treated well.  They have seven-feet in radius to wander about next to their teepees.  They are not, as assembly-line chickens are, kept locked up in cages with no room in which to move about, no grass to walk on, no hens to enjoy, and limited food and water, before being killed by a mechanized method at 42 to 49 days of age. Gamecocks often survive the contests in which they participate, living on farms until they die from natural causes or else are used for breeding or show, but not for fighting.  Chickens are for being eaten while they are young.  There is no justification for focusing solely upon controlling cockfighting other than political deference to the demand of the majority for cheap food and disregard for the pastime of ethnic and national minorities who lack clout at the national legislative level.  That should not qualify as acceptable equal protection.

## VI.

## THE FAILURE OF LEGISLATIVE DUE PROCESS

As revealed by the entire 28-year legislative evolution leading to the effective limitation of cockfighting in Louisiana, see pp. 16-30, <u>supra</u>, that limitation has never been seriously and

thoughtfully addressed by the Congress in the fashion suitable for constitutional review.  Had Congress done so, the material developed en route to passage might well have enabled Congress to shield its criminal legislation from challenges under the Commerce Clause or equal protection in the guise of due process.  Congress takes a substantial risk when it places action ahead of careful consideration and neglects to create a record of the basis on which it made legislative decisions sufficient to justify its ends and means and satisfy the standards applied by the reviewing Court, even under the rubric of rational basis scrutiny.  The hurdle that must be cleared in order to enable a court to determine whether or not a particular statute meets various constitutional standards, such as the ones analyzed in Parts IV and V, supra, is best described as one of minimal qualifications of legislative deliberation.  Over 25 years ago, Hans Linde, then Professor of the Oregon Supreme Court (later a state judge), explored the shaping of a doctrine he termed "Due Process of Lawmaking."  Linde, Due Process of Lawmaking, 55 NEB. L. REV. 198 (1976).  He sought to define the set of institutional procedures that would produce properly made legitimate laws.

The Supreme Court, whether or not impelled by Professor Linde, has recently begun policing the substantive doctrines of federalism and equal protection through the backdoor of looking at Congress' "deliberative processes and its reasons for regulating." Stephen Gardbaum, Rethinking Constitutional Federalism, 74 TEX. L. REV. 795, 799 (1996).  The Court has undertaken review of the manner in which Congress (or a state under the 14th Amendment) has developed justification, other than irrational prejudice, for singling out a group of individuals for harsh treatment.  See Moreno, 413 U.S. at 534 (1973); City of Cleburne, Texas v. Cleburne Living Center, 473 U.S. at 448 (1985); Romer v. Evans, 517 U.S. at 634-35 (1996).

The Court, analyzing laws potentially conflicting with the values of federalism and equal protection, is increasingly insisting that the governmental body responsible for making those judgments demonstrate careful consideration of the issues affecting their constitutionality and prepare a record that will enable the Court to test the reasonableness of the government actions in light of the evidence assembled.  Failure to meet this minimum prerequisite has jeopardized the enforceability of laws.  The best example is Board of Trustees of the University of Alabama v. Garrett, 531 U.S. 356 (2001), in which the Court refused to apply the Americans with Disabilities Act to a state that had not made special accommodations for their employees because, when Congress passed the law it did had not assembled a documented pattern of state violations that the law had to be based upon in order to provide Congress authority to respond under § 5 of the Fourteenth Amendment.  531 U.S. 356, 368-372.  Instead of a pattern and legislative findings relating to state action, Congress had relied upon "unexamined, anecdotal accounts," resulting in "constitutional shortcomings."  531 U.S. at 370, 373.  The Court contrasted this with the "serious pattern" explored by Congress before creating the Voting Rights Act of 1965.  Id.  Justice Breyer in dissent, 531 U.S. at 376, 382-385, protested the Court's "strict, judicially created evidentiary standard, particularly in respect to lack of justification" and its echo in Justice Kennedy's concurring insistence on a constitutional predicate of documentation.  531 U.S. at 376.

Garrett is by no means the only case in which the Court zeroed in on the quality of Congress' consideration of issues and the record supporting them.  See, e.g., Rostker v. Goldberg, 453 U.S. 57 (1981), upholding exclusion of women from combat service under an intermediate level of scrutiny, because, as the Court mentioned numerous times, Congress' decision to do so reflected specific and careful consideration, 453 U.S. at 64, 70-71, 72, 95,

reasonable evaluation of evidence, 453 U.S. at 68, a "studied choice," 453 U.S. at 72, full awareness, 453 U.S. at 71, as well as a "considered response" to testimony, 453 U.S. at 81. Lopez and Morrison illustrate this approach.

Perhaps the most elaborate exposition of the concept occurred in Justice Stevens' 1980 dissent in Fulliove v. Klutznick, 448 U.S. 448, 532, 549-52 (1980), criticizing the "minority business enterprise" provision of the Public Works Employment Act of 1977, because of the marked defect in the unusual procedures that led to its passage—no mention in "any testimony or inquiry in any legislative hearing on the bill," no mention " in the statement of purpose of the Act or in the reports either the House or the Senate Committee that processed the legislation," and only "a brief discussion on the floor of the House as well as in the Senate on two different days, but only a handful of legislators spoke and there was virtually no debate." Justice Stevens found this to be "perfunctory consideration" for a constitutional policy decision, quite relevant to "a consideration of the procedural character of the decision making process and its failure to "guarantee the kind of deliberation" that a constitutional issue merits  See Frickey & Smith, supra; Neal Devins, Congressional Fact Finding and the Scope of Judicial Review, 50 DUKE L.J. 1169 (2001); Dan Coenen, supra, at 1655-89 (2001); Barry Friedman, Legislative Findings and Judicial Signals:  A Positive Political Reading of United States v. Lopez, 46 CASE. W. RES. L. REV. 757 (1996).

Imposing for requirement of "some" record and "some" findings as a precondition of satisfying even the most non-intrusive level of judicial review is based upon, Friedman, supra, at 768, points out, "deference to Congress' judgment about what legislation is necessary [and proper] in the interest of interstate commerce.  But to defer to implicit findings is to defer to

nothing....   [A]bsent findings, there is nothing to defer to other than the fact that Congress obviously wanted to pass a particular act.  If this [is] deference...; why engage in judicial review at all?"  The question is whether courts should defer to Congress on the constitutional question when Congress has failed to consider that question.

Lopez made a feint in the direction of requiring a complete legislative record linking guns near schools with interstate commerce, but did not send the case back for findings, even though Congress belatedly added some four years after passage of the law (which the Court proceeded to ignore).  Lopez, 514 U.S. at 563.  See Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796, 2125-26.  Justice Breyer, in his dissent, undertook to compile a record based upon numerous "reports and studies generated both inside and outside government,"  514 U.S. at 619 and Appendix at 631-44.  See also Souter, J., dissenting in Lopez, 514 U.S. at 612-14.  Congress supported the Violence Against Women Act with "numerous findings" in Morrison, but the Court disregarded them because they relied too heavily on a method of reasoning that the Court had already rejected in Lopez.  Morrison, 529 U.S. at 614-15.

The Court ultimately became very concerned with Congress' deficiencies in fact-finding not in Commerce Clause cases, but in a series of decisions invalidating statutes enacted pursuant to Section 5 of the Fourteenth Amendment, where Congress failed to build a sufficient record sustaining the appropriateness of the legislation that could be translated into constitutionally necessary findings of congruence and proportionality.  Boerne v. Flores, 521 U.S. 507, 520, 530-31 (1997) (anecdotal evidence only).  Three successive cases reinforced this theme.  Florida Prepaid Postsecondary Education Expense Board v. College Savings Bank, 527 U.S. 627, 640 (1999) (no pattern of patent infringement by states with systematic failure by the state to provide

95

remedies); <u>Kimel v. Florida Board of Regents</u>, 528 U.S. 62, 89-91 (2000) (legislative record reveals that "Congress had virtually no reason to believe ..." because of "the lack of evidence" that there was widespread unconstitutional age discrimination by the states) (with the problem perhaps "inconsequential"); and <u>Board of Trustees of the University of Alabama v. Garrett</u>, 531 U.S. 356, 369-72 (2001) (Congress assembled a record with many incidents documenting discrimination against persons with disabilities, but only a half a dozen examples to support a finding that states were responsible; no legislative findings but "unexamined, anecdotal accounts"; no documented pattern of unconstitutional state action).

In <u>Garrett</u>, 531 U.S. at 373, Chief Justice Rehnquist compared this with the persuasive record Congress assembled when enacting the Voting Rights Act of 1965, 531 U.S. at 967, and stressed that careful documentation of "a marked pattern of unconstitutional action" in the legislative process leading to the passage of the Voting Rights Act of 1965 contrasted favorably with the evidence or lack thereof Congress compiled before enacting Title I of the Americans with Disabilities Act of 1990.

The Court has embraced the need for a requirement of adequate legislative fact-finding and justification for action and some modicum of legislative deliberation upon the reasons for acting in constitutionally sensitive areas as a way of guaranteeing the protection of the constitutional values being threatened.  The Court has yet to spell out in detail precisely how much evidence is necessary, whether actual hearings must be held, whether hearings without findings will suffice, whether hearings must be balanced between proponents and opponents of the law or may be staged and skewed towards a predetermined result, or whether there has to be proof of evaluation of the evidence in the form of a committee report or a committee legislative

markup.  But, even if the details are still uncertain, there is no doubt at all about the need for some sort of record, some sort of legislative review in order to make viable judicial review of Congress' rational basis for acting.  The Court will not substitute its imaginative reconstruction for Congress' deliberations and hypothesize what Congress "might well" have thought, if there is no evidence Congress gave the matter much thought at all.

How do the new provisions measure up against that minimal standard for legislative deliberation?  Not well.  Not well at all.  In 1976, when "animal fighting ventures" involving game birds were included in the Animal Welfare Act for the very first time, that inclusion occurred precipitously on the last days of markup in the House Agriculture Committee without warning and without any prior study, hearings, reports, or record of any sort.  There was discussion of the amendment 18 days later when the bill was before the House, but most of its ramifications were still unclear, particularly since a critical provision was later altered in conference.  The justification for federal intervention, opposed by every relevant federal actor or agency, was sparse, at best.

26 years later the law was amended after cockfight opponents, at the instigation of the Humane Society of the United States, introduced bills to close the so-called "loophole" and make it impossible to ship gamecocks from anywhere in the United States into the states that still considered it to be legal to stage cockfights within their borders  The noose was drawn tighter around the only remaining "permissive" legislatures in Louisiana and New Mexico (Oklahoma, for a while, and Puerto Rico and the three territories) in the name of an "overwhelming consensus on the part of the American public" to protect animals and "almost universal aversion to" such a barbaric sport.  147 CONG. REC., supra, at H. 6274.  The amendment's major House

97

proponent offered his universal ban because "47 states have outlawed the practice, and there is strong evidence that the citizens of the three remaining States are likewise strongly opposed.  In all likelihood, there will be another one or two states that will outlaw this through their legislatures, and, if not, then by the people themselves."  Rep. Blumenauer R.,-Or's. solution, of course, was not to allow these state developments to continue on their own course and pace (if they would), but immediately to shortcircuit any state authority to decide otherwise.  The federal moral judgment, wrapped in the robes of interstate commerce, would sweep the states before it. No committee hearings of any kind on cockfighting legislation were scheduled for the 107th Congress, although one had been conducted the year before in front of a committee whose composition was inevitably altered.

The lack of contemporary hearings or a report or a record was not viewed as a barrier to passage of bills further restricting cockfighting.  There was no extended or serious floor discussion of the matter in either chamber before final passage.  Senator Allard, R.,-Colo., told the Senate, imaginatively redefining terms, that his amendments protected "States rights to . . . keep cockfighting legal if they so choose."  147 CONG. REC. supra, at S. 8433.  Rep. Blumenauer, R.-Or. referenced the apparent consensus on his side to halt cockfighting.  There was simply no debate at all, merely a quick vote, followed by an on-the-spot further amendment by Rep. Blumenauer, R.-Or., in instant response to a floor query, banning the shipment of live gamecocks from any state, even a legal one like Louisiana, to any foreign country.  That was coupled with boosting the penalty for violating the law to a felony of $15,000 or two years in jail or both.  These amendments came up without any notice, generated almost no back-and-forth, and proceeded to take their slight space in an overwhelmingly detailed farm bill.  Thereafter, in conference, the conferees reduced the maximum felony prison term of two years to one, but

maintained the maximum $15,000 fine, and tightened the language making it a crime to ship a gamecock in commerce for the purpose of engaging in an animal fight and to fight a bird in a fight in which any participating gamecock had crossed state lines in order to fight.

In the intervening year—and two Congress sessions—the progenitors of the 107th Congress blitz have kept up the pace, offering bills, so far unsuccessfully, to balloon the prison term back to two years in jail (a felony) and to add on a new federal crime, to bolster those already in place.

There still have been no hearings nor significant committee discussion nor meaningful floor debate in either chamber in 2001, 2002, or 2003, the sessions when these bills have been under consideration.   The only extant hearings on cockfighting took place in the House Committee in the fall of 2000, although that bill (in the second session of the 106th Congress) was not the same bill that passed in 2002.  It is hard to hold the members of the 108th Congress accountable for what the members of the 106th Congress did not learn in their pell-mell rush to enact anti-cockfighting legislation.  Everyone may have agreed—by a strong majority—that they wanted to use federal power to suppress cockfighting instead of patiently awaiting the evolution of state law, but nowhere did they record any reasons for their decision or specify the agreed-upon purposes for the new restrictions.   The embargo on mailing birds-out-of-state appeared overnight and was imposed without airing its consequences.  The perverse effect, in connection with the control of Exotic Newcastle disease, of forcing gamecock breeders and owners underground for fear of federal prosecution if they openly offer to have their flocks inspected by the Department of Agriculture was never explored.

**(A)**   **NAFTA**

Since time has been at a premium, what should have been thorough evaluation of arguably unconstitutional congressional product was significantly truncated.  So swift was the progress of this legislation and so limited was the congressional attention paid to its impact that Congress overlooked how it might relate to the major treaty it had authorized President Clinton to sign in 1992, the North American Free Trade Agreement, Dec. 17, 1992, U.S.–Can.–Mex., 32 IL.M. 389 (chs. 1091) and its legislative implementation of that treaty in the North American Free Trade Agreement Implementation Act, Pub. L. No. 103, 107 Stat. 2037 (1993) (codified as amended at 19 U.S.C. §§ 3301-3473) (eff. Jan. 1, 1994) ("NAFTA").

Pursuant to Article 2021 of NAFTA "[n]o private Party [signatory country] may provide for a right of action under its domestic law against any other Party on the ground that a measure of another Party is inconsistent with the Agreement."  Instead, Article 2022-1 encourages alternative dispute resolution of international commercial disputes between private parties within the free trade area and, establishes the Free Trade Commission "comprising cabinet level representatives of the parties or their designers" to resolve disputes over NAFTA's application. Article2001-2(c).

Although no private cause of action exists under NAFTA, which means that a violation of any of its terms by the United States cannot be raised by any individual or organization such as plaintiffs, Mexico, if it so desired, could bring the matter before the Commission.  It is quite likely that the United States is now in violation of NAFTA by virtue of the of 7 U.S.C. § 2156 (g)(2)(B), which, when combined with § 2156 (b), makes it unlawful to knowingly sell gamecocks in foreign commerce, encompassing movement "from any State into any foreign

country." This amounts to an export embargo on gamecocks being shipped to Mexico. Since gamecocks are treated as an agricultural good under NAFTA (see Mexican tariff 0105.91.01), that embargo directly contravenes Article 309-1's rule forbidding any "Party [the United States] from adopting "any prohibition ... on the exportation or sale for export of any good destined for the territory of another Party...." Agricultural goods from the United States are covered under Annex 703.2, Market Access, Section—Mexico and the United States—Section 2 (Quantitative Restrictions). Gamefowl have been a major item of export from the United States to Mexico— until now.

**(B)** **Unfunded Mandates**

The second statutory limitation that Congress bypassed in its haste to act was the Unfunded Mandates Reform Act of 1995 ("UMRA"), Pub. L. No. 104-4, 109 Stat. 48 (codified primarily in 2 U.S.C. §§ 658 and 659a-g as well as §§ 1501-1571). The UMRA was part of the revolutionary—at the time—Contract with America drafted with the purpose, among others, of assisting "Congress in its consideration of proposed legislation in revising federal programs containing federal mandates affecting ... the private sector." The idea was to promote informed and deliberate decision by Congress on the appropriateness of federal mandates in any particular instance by requiring analysis of the impact of private sector mandates. 2 U.S.C. §1501(3), (4), and (5). These analyses were to be performed for any legislative provision imposing an "enforceable duty" upon the private sector (persons or entities), 2 U.S.C. § 658(7)(A), and were to take the form of "reports" by the Senate or House authorizing committees accompanying bills containing such mandates that would identify and describe them, 2 U.S.C. § 658b(c)(1), assess their direct costs to the private sector, 2 U.S.C. § 658b(c)(2), and include a statement from the Director of the Congressional Budget Office of the estimated direct cost of each for five fiscal

years following their effective date, 2 U.S.C. §§ 658b(f) and 658c(b). No such cost estimate was required if the Director estimated that direct costs "will not equal or exceed" a certain specified threshold, 2 U.S.C. § 658c(c), originally set at $100 million but, adjusted for inflation, now to slightly over $110 million. 2 U.S.C. § 658c(b)(1).

These requirements were supposed to be enforced by members raising points of order against a bill in the Senate or the House that failed to incorporate them. There could be no consideration of any bill reported by a committee on the floor unless the committee had previously published a statement from the Director of the Congressional Budget Office on the direct cost of the mandate. 2 U.S.C. § 658d(a)(1). The Senate was the only chamber to issue a report. on this bill. See S. REP. NO. 106-297 at 2 (106th Cong., 2d Sess.) (2000). In the Senate, the presiding officer is supposed to consult with the Committee on Governmental Affairs "to the extent practicable" concerning the applicability of this rule to a pending bill, 2 U.S.C. § 658d(d), with the mandate level to be estimated by the Senate Committee on the Budget. 2 U.S.C. § 658d(e).

What happened in this case was that, in S. REP. NO 106-297, 106th Cong., 2d Sess. (2000) to accompany S. 345, the Committee on Agriculture, Nutrition, and Forestry, as part of its regulatory impact statement, S. REP. NO. 106-297 at Part III, 2, set forth the Congressional Budget Office's (CBO) estimate that the cost to all of the breeders who would not be able to ship their birds across state lines for the purpose of fighting "would be below the annual threshold for private sector mandates." CBO sent this report to the Congress on March 27, 2000, based upon information from "industry and government sources." Id. at 3. Those sources allegedly told

CBO that "the net income derived from the legal sales of live birds for the purpose of fighting is less than $100 million a year." Id.

It is unknown what USDA told CBO, but, apparently, the Humane Society of the United States (HSUS), the bill's chief proponent from the public interest sector, persuaded CBO to look only at the economic impact on 21 states where HSUS claimed the possession of gamecocks with the intent to fight was legal and also to concentrate exclusively there on the "net income derived from the legal sales of live birds." Id.  See Hearing, supra, at 11, 25 (testimony of Pacelle).  But in every state, the breeding of cocks is per se legitimate, unless they are later sent to illegal states to fight or, are fought in their home states.  Thus, the value of the birds produced in all 50 states (minus Louisiana, New Mexico, and at that time, Oklahoma) should have been estimated and the heavily impacted private gamecock sector in the three territories (American Samoa, Guam, and the Virgin Islands) and Puerto Rico, should also have been included.  The cost of the ban on shipping gamecocks for fighting purposes is not properly measured by looking only to the net income the breeders will lose.  The income is "net" because the breeders have made large outlays in their home states to enable them to hatch, grow, nurture, house, and transport the birds.  See declaration of S. Johnson, paras. 5-6 and declaration of L. Romero, paras. 4-5.  Those sums, which used to go into the pockets of local suppliers of goods and services, will be lost to the private sector.  They should not have been ignored, especially the cost of feed.  They constitute significant actual outlays that will not be made in those states.  If all of these items were cumulated, the $110 million bar would have easily been topped, even by looking to Louisiana by itself.

Why did CBO make these mistakes so that UMRA was determined not to apply to this earlier version of the Act?  The only plausible answer is excessive haste in rushing to legislate, which led to unthorough research into the private sector economics of raising gamecocks and effective, but dubious, evasion of the standards developed for applying UMRA.  This is the same quite undeliberate speed with which the Congress handled anti-cockfighting proposals in 1976 and continues to handle them.  CBO never got a second chance to review its assessment of economic impact because the Act was amended on the floor of both the House and the Senate and was never reported out of committee again.

In the House, there can be a vote of the full House on whether to consider the bill, even if it does not contain a mandate, while, in the Senate, the point of order may be waived or overturned by the chair of the full Senate.  2 U.S.C. § 1515(1).  There is, however, no right in any person under the Act that can be enforced in any judicial action, 2 U.S.C. § 1571(b)(2). No report or noncompliance with the Act or any decision concerning the Act's applicability is subject to judicial review.  2 U.S.C. § 1571(b)(1).  If both chambers are unconcerned or there is no opportunity to object (as here), UMRA is of no use.

The real problem with ignoring legislative due process is not that the law loses its legitimacy because the Government did not dot all (or any) of its "s's" and cross all (or any) of its "t's" or that Congress can utilize that "ignorance" to disregard legal restrictions it had previously imposed upon itself.  It is that the legislation, lacking such a foundation, does not furnish sufficient evidence of its goals and purposes to justify its ends in the face of federalism or Commerce Clause authority and equal protection challenges.

Wherefore, plaintiffs respectfully request that their motion for declaratory judgment holding the 2002 amendments to the Act unconstitutional be granted.

```
                    COUNSEL FOR PLAINTIFFS:
                    OLIVIER AND BRINKHAUS

                    BY
                        ARMAND J. BRINKHAUS
                        LA BAR ROLL NO.  3469
                        957 NAPOLEON AVENUE
                        P. O. DRAWER E
                        SUNSET, LA  70584
                        337/662-5242--Tel.
                        337/662-5813--Fax
```

John R. Kramer
Professor of Law
Tulane University School of Law
6329 Freret Street
New Orleans, Louisiana  70118