RECEIVED

MAY 3 1 2005

F. ERT H. SHEMWELL, CLERK
V. TERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

UNITED GAMEFOWL BREEDERS, ET AL          CIVIL ACTION NO. 03-970

VERSUS                                    JUDGE DOHERTY

ANN VENEMAN, ET AL                        MAGISTRATE JUDGE HILL

## RULING

The plaintiffs herein are five (5) gamefowl breeders who have engaged in the business and/or hobby of cockfighting in the United States, together with a non-profit corporation which represents the interests of approximately 100,000 gamefowl enthusiasts throughout the country. They have brought a facial challenge to certain provisions of the Animal Welfare Act, as it was amended in 2002. The plaintiffs seek a declaration that the 2002 Amendments are unconstitutional because (a) they are outside the scope of Congress' authority under the Commerce Clause; (b) they violate the equal protection doctrine; and (c) Congress provided insufficient legislative due process prior to enacting the legislation. The plaintiffs' Petition for Declaratory Judgment is opposed by the United States of America, as well as intervenor-defendant, The Humane Society of the United States.

The parties agree that there is no factual dispute presented herein and, therefore, the plaintiffs' claims were submitted to this Court on briefs. All briefing has now been completed and the matter is under advisement. For the following reasons, this Court finds that the plaintiffs' claims are without merit; the request for declaratory and injunctive relief will be denied and the plaintiffs' claims dismissed.

## PROCEDURAL HISTORY

The plaintiffs filed a Complaint for Temporary Restraining Order, Preliminary and Permanent Injunction, and Other Relief.[1]  Shortly thereafter, this Court held a telephone status conference for the purpose of hearing oral argument on the plaintiffs' emergency request; during the conference, this Court denied the request for a temporary restraining order.[2]   Later, the parties agreed that the plaintiffs' claims do not present a factual dispute and that the only issues to be addressed by this Court are those presented by the plaintiffs' constitutional challenges.[3]

After the plaintiffs agreed that their request for preliminary injunction should be deferred to the merits, this Court set a briefing schedule on the question of whether the plaintiffs had standing to assert the claims contained in their Complaint.  Once briefing as to standing was completed, this Court ruled that all of the named plaintiffs, except Bruce Kinsinger, have standing to assert the claims that are contained in the Complaint.  Accordingly, Mr. Kinsinger's claims were dismissed without prejudice.[4]  The plaintiffs whose claims remain pending before this Court are: Sandy Johnson, Emanuel Massa, Mark Johnson, Don Perdue, Larry Romero, and the United Gamefowl Breeders Association, Inc.

Once this Court's standing ruling was issued, the parties completed the briefing process and submitted the matter for this Court's ruling on the merits.  The Humane Society of the United States moved for leave to intervene as a defendant in this matter, asserting that it has a substantial interest

---

[1]     Record, Document 1.

[2]     Record, Document 5.

[3]     Record, Document 10, at 4-6.

[4]     Record, Document 15.

2

in the outcome of the plaintiffs' legal challenge herein. The Motion to Intervene was granted by this

Court. As a result, the Humane Society appears as an intervenor/defendant herein.

The only evidence before this Court is the declarations made by the plaintiffs which were

attached to the Complaint as well as to the plaintiffs' standing brief.[5] Because neither the defendant

nor the intervenor has presented evidence challenging the plaintiffs' declarations, this Court accepts

the plaintiffs' declarations and factual allegations as true, correct, and complete for purposes of

ruling on the merits of their claims.

**FACTS**

Mark Johnson is the manager of a cockfighting venue known as the Bayou Club, which is

located in Vinton, Louisiana. The Bayou Club holds cockfighting derbies on weekends, beginning

in November through the third week of August each year. Prior to the effective date of the 2002

Amendments, Mr. Johnson predicted that the Amendments' effect would be to lessen the size of the

weekend derbies that he hosts because there would not be enough Louisiana roosters to fill the card

at each event. His experience since May 2003 has been consistent with his prediction: there has been

a reduction in the number of exhibitors in the cockfighting derbies over the time since the

Amendments took effect. He expects the Club will eventually have to shut down for lack of

business, thus costing him his job. He raises roosters as a hobby, but does not sponsor them in

fights.

Sandy Johnson is the Director of Administration of the United Gamefowl Breeders

Association, Inc. [hereinafter sometimes referred to as "UGBA"], as well as a member of its Board

of Directors. Ms. Johnson faces the loss of her positions with the UGBA as a result of the reduction

---

[5]       Record, Documents 1, 11.

in the number of people participating in cockfighting throughout the country. Additionally, she and her husband own an ongoing enterprise breeding, selling and fighting gamefowl. The sales of gamefowl, for both breeding and fighting purposes, are primarily to customers in Guam, Saipan, and Mexico.

Emanuel Massa is currently the President of the Louisiana Game Breeders Association. He is a Louisiana resident who owns a farm where he raises brood fowl and gamecocks. He ships brood fowl within the United States, but until recently sold both brood fowl and gamecocks to people from outside of the United States. Due to the risk of criminal liability, he will stop selling gamefowl because he has no way of controlling use of the gamefowl that he has sold.

Don Perdue is a resident of West Virginia who currently holds the position of Acting President of the UGBA. He raises and breeds a unique strain of gamefowl. Since 1999, he has been selling gamefowl in Louisiana and/or in Guam. In order to avoid the risk of criminal liability under the 2002 Amendments, he intends to stop selling and giving away excess fowl. Rather, he now will destroy them, instead.

Larry Romero is a breeder of gamecocks who is a resident of Louisiana. His customers for brood fowl are almost entirely from out-of-state and foreign countries. The 2002 Amendments will deprive him of his gamefowl-selling business because of the fear of criminal liability in the event they are then used for fighting purposes. He does not fight gamefowl, but he does "occasionally handle gamecocks in the pits."

The UGBA has fifteen thousand (15,000) dues-paying members. UGBA members who breed gamefowl must invest considerable sums into the necessary infrastructure, including feed, quarters, real property, medical supplies, etc. The UGBA is involved in protecting and furthering the interests

4

of its members by having Sandy Johnson, and others, meet with national poultry organizations, as well as with officials of the United States Department of Agriculture, the United States Postal Service and the various state association leaders. The UGBA also funded legislative appearances, as well as extensive lobbying efforts, through Ms. Johnson, Don Perdue and other paid lobbyists, concerning the amendments that are the subject of the instant litigation. The UGBA also sponsors surveys to gather information about the game fighting industry in Louisiana and other states. If the UGBA continues the aforesaid activities and services, the UGBA's directors and members are concerned that there is a risk of criminal liability for aiding and abetting the actions that have now been made illegal.

## THE ANIMAL WELFARE ACT AND ITS 2002 AMENDMENTS

The provisions under challenge by the plaintiffs in this matter are codified as amendments to the Animal Welfare Act. Before discussing the specific provisions at issue, the Court will briefly address the cockfighting provisions in the Animal Welfare Act generally.

The Animal Welfare Act, as originally enacted in 1966, did not address animal fights. However, the Act was substantially revised by Congress in April, 1976, and one of the revisions involved the addition of a section prohibiting interstate commerce in animals for the purpose of sponsoring or exhibiting those animals in fighting ventures. The prohibitions contained in the 1976 amendments, however, contained an explicit exemption for cockfighting in states where cockfighting was not prohibited by state law: "the activities prohibited by this subsection shall be unlawful with respect to fighting ventures involving live birds only if the fight is to take place in a State where it would be in violation of the laws thereof."[6]

---

[6]    21 U.S.C. § 2156(d) (1999).

The plaintiffs' constitutional challenges are directed at provisions amending the Animal Welfare Act which were enacted as part of the Farm Security and Rural Investment Act of 2002.[7] The provisions under challenge [herein sometimes referenced as "the 2002 Amendments" or "the Amendments"] are codified as part of 7 U.S.C. § 2156. Although enacted in May 2002, the relevant provisions did not take effect until May 2003.

The 2002 Amendments make it illegal for any person knowingly to sell, buy, transport, deliver or receive for the purpose of transportation in interstate or foreign commerce, any animal for the purpose of having the animal participate in an animal fighting venture. 7 U.S.C. § 2156(b). This change had the effect of eliminating the exception that previously permitted the interstate movement of gamefowl for the purpose of participating in a fight if the fight was permitted by state law. Furthermore, the new amendments prohibit individuals from sponsoring or exhibiting gamefowl in a cockfighting venture if they know that another gamebird is participating in the venture illegally: it is illegal "for a person to sponsor or exhibit a bird in [a] fighting venture only if the person knew that any bird in the fighting venture was knowingly bought, sold, delivered, transported or received in interstate or foreign commerce for the purpose of participation in the fighting venture." 7 U.S.C. § 2156(a)(2). The potential fine for violation of § 2156 is now $15,000, up from $5,000. 7 U.S.C. § 2156(e). Finally, the prohibition against the importation of animals for use in an animal fighting venture was expanded to prohibit, as well, the export of such animals between any state and any

---

[7]      P.L. 107-171, at §§ 10302(b), 10303(b).

foreign country.  7 U.S.C. § 2156(g)(2)(B).[8]

## APPLICABLE LAW AND ANALYSIS

The plaintiffs have identified three bases upon which they argue this Court should find the 2002 Amendments are unconstitutional: (a) Congress acted outside of its constitutional authority under the Commerce Clause when it enacted the Amendments; (b) the provisions violate the Equal Protection Component of the Fifth Amendment; and (c) Congress did not provide sufficient legislative due process prior to enacting the Amendments.  Each of these arguments will be addressed in turn.

## I.   The Commerce Clause

After several decades of relative stability and predictability in Commerce Clause analysis, the applicable jurisprudence entered a period of upheaval and revision when the United States

---

[8]    The pertinent provisions of Section 2156 of Title 7 read as follows:

(a)(1) Except as provided in paragraph (2), it shall be unlawful for any person to knowingly sponsor or exhibit an animal in an animal fighting venture, if any animal in the venture was moved in interstate or foreign commerce.

(2) With respect to fighting ventures involving live birds in a State where it would not be in violation, it shall be unlawful under this section for a person to sponsor or exhibit a bird in the fighting venture only if the person knew that any bird in the fighting venture was knowingly bought, sold, delivered, transported, or received in interstate or foreign commerce for the purpose of participation in the fighting venture.

(b) It shall be unlawful for any person to knowingly sell, buy, transport, deliver, or receive for purposes of transportation, in interstate or foreign commerce, any dog or other animal for purposes of having the dog or other animal participate in an animal fighting venture.

* * *

(e) Any person who violates subsection (a), (b), or (c) of this section, shall be fined not more than $15,000 or imprisoned for not more than one (1) year, or both, for each such violation.

* * *

(g) For purposes of this section . . . the term "interstate or foreign commerce" means (A) any movement between any place in a State to any place in another State or between places in the same State through another State; or (B) any movement from a foreign country into any State or from any State into any foreign country.

7

Supreme Court issued its decision in United States v. Lopez, 514 U.S. 549, 115 S.Ct. 1624 (1995).

The Fifth Circuit recently described the trend, the changes, and the effect on the role of the judiciary

in considering such challenges:

> Since 1937, the scales of the federal courts' Commerce Clause jurisprudence tipped
> more towards according to Congress "considerably greater latitude in regulating
> conduct," rather than to maintaining a distinction between "what is truly national and
> what is truly local." A new era emerged with the Court's decisions in Lopez and
> Morrison, which clarified the legal standards applicable to a constitutional challenge
> under the Commerce Clause. Based on those two landmark cases, it is now clear that
> while courts still maintain a wide degree of deference to Congress's power to enact
> legislation pursuant to the Commerce Clause, such power is now subject to certain
> "outer limits."

United States v. Bredimus, 352 F.3d 200, 204-05 (5th Cir. 2003) (internal citations omitted).

Thus, the jurisprudence presents a court considering a Commerce Clause challenge with the

obligation to undertake a delicate balancing act. "Without any judicially enforceable limits and with

inevitable political pressures, the Commerce Clause all too easily would become the general police

power denied to Congress by the Constitution. Morrison and Lopez therefore reaffirm our

longstanding duty to enforce the limits of the Commerce Clause. Naturally, '[d]ue respect for the

decisions of a coordinate branch of Government demands that we invalidate a congressional

enactment only upon a plain showing that Congress has exceeded its constitutional bounds.' At the

same time, however, the constitutionality of any statute, including a statute enacted under the

Commerce Clause, 'is ultimately a judicial rather than a legislative question, and can be settled

finally only by [the Supreme] Court,' and initially by the lower federal courts." United States v.

Kung-Shou Ho, 311 F.3d 589, 597 (5th Cir. 2002) (citations omitted).

8

### A.    Applicable Law and Standards

"The Congress shall have the Power . . . To regulate Commerce with foreign Nations, and among the several States. . . ." U.S. Const., art. I, § 8, cl. 3. "The Commerce Clause grants Congress the constitutional authority to regulate Commerce . . . and [] concomitant power to protect the nation's commerce by enacting such laws as it deems necessary and proper." Groome Resources, Ltd. v. Parish of Jefferson, 234 F.3d 192, 202 (5th Cir. 2000) (citations omitted). "In interpreting the commerce power, courts are bound both by the 'first principles' of a Constitution that establishes a federal government with 'enumerated powers,' and our judicial role, which requires deference to properly enacted congressional regulations." Id.

"We turn first to the framework establishing [the] outer limits. In reviewing an act of Congress passed under its Commerce Clause authority, we apply the rational basis test as interpreted by the Lopez court." Id. at 203. Specifically, the court's duty is to "evaluate whether 'a rational basis exists for concluding that a regulated activity sufficiently affects interstate commerce.'" Id. at 204, quoting Lopez, 514 U.S. at 557.

"The Lopez Court described 'three broad categories of activity' that Congress may regulate pursuant to its Commerce Clause power. 'First, Congress may regulate the use of the channels of interstate commerce.' 'This category extends beyond the regulation of highways, railroads, air routes, navigable rivers, fiber-optic cables and the like.' This category was one of the categories used to prohibit racial discrimination in public accommodations and has been used to prevent illicit goods from traveling through the channels of commerce." Groome, 234 F.3d at 203 (internal citations omitted). Moreover, "within this category Congress has regulated the interstate transport or shipment of stolen goods, kidnaped persons, prostitutes, and illegal lottery tickets." Kung-Shou Ho, 311 F.3d

9

at 597 (citations omitted).

"'Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities.' 'Congressional regulation or protection of persons or things that move in interstate commerce must ensure that, in fact, a particular threat – whether posed by an interstate or intrastate activity – actually threatens persons or things with a plain and clear nexus to interstate commerce." Groome, 234 F.3d at 203 (internal citations omitted).

"'Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, i.e., those activities that substantially affect interstate commerce.'" Id. at 203.

A court need not use the three-categories analysis established in Lopez where Congress has clearly focused its attention on interstate commerce. "Recourse to the formal categories described in Lopez is unnecessary when an act of Congress directly regulates interstate commerce or enterprises engaged in interstate commerce." United States v. Robinson, 119 F.3d 1205, 1211 n.3 (5th Cir. 1997).

**B.      Analysis of the 2002 Amendments**

As noted hereinabove, the 2002 Amendments accomplish three objectives which the previous law did not: (a) it is now illegal to move gamefowl interstate for the purpose of engaging in cockfighting ventures; (b) it is now illegal to import or export gamefowl for the purpose of engaging in cockfighting ventures; and (c) it is now illegal to sponsor or exhibit a gamebird in a cockfighting venture if one has knowledge that another gamebird in that venture is participating illegally.  Each

10

of these elements is addressed separately below,[9] but the analysis begins with the plaintiffs' argument that cockfighting is not "commerce" that Congress' regulating power can reach.

1.    Cockfighting is "Commerce."

The plaintiffs argue that cockfighting is not "commerce," but a hobby or sport-related activity which should not be subject to regulation pursuant to the Commerce Clause.

> Cockfighting is, from the point of view [sic] tens of thousands of Americans who attend fights in the major arenas, pits, and corner lots within Louisiana, a sport, a spectacle, an entertainment in which trained roosters demonstrate their adroitness, pluck, courage, and gameness according to the characteristics of their breed. Those plaintiffs who are breeders rather than fighters view it as a hobby to which they are committed regardless of the cost of maintaining it. . . . Cockfighting is not an economic or commercial activity in the sense of being a part of a process of producing commodities, articles, or services for sale in the marketplace . . . .[10]

The plaintiffs have not cited to this Court any authority suggesting that "commerce" is limited to "process of producing commodities, articles, or services for sale in the marketplace." Moreover, the argument studiously ignores the well-established line of jurisprudence declaring that "commerce" is defined much more broadly than the plaintiffs' formula  suggests.

"The commerce power is the power to regulate; that is, to prescribe the rule by which commerce is to be governed. This power, like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution." Lopez, 514 U.S. at 553, 115 S.Ct. at 1627, *quoting* Gibbons v. Ogden, 22 U.S. (9

---

[9]     None of the parties has briefed the separate elements of the legislation in the way that this Court addresses them *infra*.  Instead, the parties chose to address their arguments to Congress' general right to regulate the interstate movement of gamefowl. However, given the analysis set forth in the applicable jurisprudence, it is the Court's belief that the more particularized analysis better identifies the issues and clarifies the reasons for this Court's ruling.

[10]     Plaintiffs' Memorandum in Support of Motion for Declaratory Judgment [hereinafter sometimes referred to as "Plaintiffs' Brief"], at 52.

11

Wheat.) 1, 196 (1824). *See also* Jordan v. Tashiro, 278 U.S. 123, 127-28, 49 S.Ct. 47, 48-9 (1928) ("in a broad sense ['commerce'] embraces every phase of commercial and business activity and intercourse"); Welton v. Missouri, 91 U.S. 275, 280 (1876) (noting that commerce "comprehends intercourse for the purposes of trade in any and all its forms, including the transportation, purchase, sale, and exchange of commodities between the citizens of our country and the citizens or subjects of other countries, and between the citizens of different States."). Thus, the Supreme Court has made very clear its rejection of the limitations upon "commerce" which the plaintiffs seek to impose.

The Fifth Circuit has followed the Supreme Court's lead on this issue. "This circuit has also recognized a broad reading of commercial and economic activities under the Commerce Clause," citing in support of this conclusion cases finding that the payment of child support obligations are subject to regulation pursuant to the Commerce Clause, as are (i) illegal gambling, (ii) the unlawful structuring of commercial transactions so as to avoid federal banking reporting requirements, (iii) protests designed to interfere with the delivery of abortion-related services, and (iv) car-jacking. Groome, 234 F.3d at 208-09 (citations omitted). Indeed, in the child support case cited by the Groome court, United States v. Bailey, 115 F.3d 1222 (5th Cir. 1997), the Fifth Circuit specifically addressed the question of whether child support payments – the movement of wealth between individuals with no accompanying business transaction of any type – constituted "commerce" which could be regulated by Congress. The majority noted:

> That 'commerce' has been defined to *include* 'trade,' does not compel the conclusion
> . . . that 'commerce' is *limited* to trade. Were we to support such a narrow definition,
> we would find ourselves inimical to those cases holding, for example, that it is
> interstate commerce to transport a woman from one state to another in a common
> carrier; to carry across a state line in a private automobile five quarts of whiskey
> intended for personal consumption; and to transmit information over interstate
> telegraph lines. The construction of the term 'commerce' is a broad one and embraces

12

economic activity beyond that which is traditionally considered commerce.

Id. at 1228 n.7 (emphases in original).

The evidence provided by the plaintiffs in their declarations demonstrates unmistakably the commercial nature of cockfighting.  A few examples illustrate the point:

- Mr. Johnson declares that he runs a cockfighting arena and that the effect of the 2002 Amendments is undermining the continuing viability of his business ("[M]y business – and that of other people dependent on mine – have been drastically, adversely affected."  Supplemental Declaration of Mark Johnson, at 1-2, ¶ 2.).

- Payment is exchanged for the privilege of participating in a fight and winning a fight brings financial rewards ("The fighters have to pay from $200 to over $1,000 in order to enter their roosters in the derbies, all of which goes to the winners."  Declaration of Mark Johnson, at 3, ¶ 5.).

- People could and did earn enough money to support themselves through cockfighting (raising broodfowl without the ability to sell interstate and in foreign commerce for the purpose of fighting "will barely enable [him] to make a living." Declaration of Larry Romero, at 3, ¶ 5).

- The Director of Administration of the UGBA – one of the plaintiffs herein -- describes it as a "trade organization." Declaration of Sandy Johnson, at 7, ¶ 10 (emphasis added).

The plaintiffs' own declarations demonstrate that cockfighting is a form of (or involves) commerce.[11]

For the foregoing reasons, this Court rejects the plaintiffs' argument that cockfighting is not a commercial endeavor subject to regulation by Congress pursuant to the Commerce Clause.

---

[11]     In an attempt to avoid the conclusion that cockfighting is a commercial endeavor, the plaintiffs suggest that it is not a lucrative investment. "Those who actually fight fowl barely break even, if that . . . Theirs is not an economically fruitful activity . . . . The costs of cockfighting are substantial, the prizes for winning a derby insufficient to offset them totally." Plaintiffs' Brief, at 54.  However, this Court has found no basis in the law – nor have the plaintiffs identified any – for concluding that the amount of money which may be made in a commercial endeavor is relevant to the Commerce Clause analysis, nor that commerce must be lucrative before it may be regulated by Congress.

2.  The Prohibition Against the Interstate Movement of Gamefowl is Constitutional.

The 2002 Amendments prohibit the interstate movement of gamefowl (whether through the mechanisms of purchase, sale, transport, or delivery) where the purpose of the movement is to have the bird participate in a "cockfighting venture." This provision clearly is linked directly to the movement of gamefowl between or among states. Therefore, it reflects Congress' direct regulation of interstate commerce and, pursuant to the Fifth Circuit's declaration, this Court need not determine into which of the three categories this particular provision fits. Robinson, 119 F.3d at 1211 n.3. Instead, under such circumstances, the analysis proceeds directly to the rational basis test, which calls for a determination "whether a rational basis exists for concluding that a regulated activity sufficiently affects interstate commerce" to justify its regulation by Congress. Groome, 234 F.3d at 204.

Answering this question need not long delay the analysis, as the answer clearly is in the affirmative. First, Congress was aware that a substantial amount of money was expended annually as a result of the flow across state lines of gamefowl for the purpose of cockfighting ventures, which clearly evidences an effect on interstate commerce.[12] This fact alone establishes a rational basis for Congress' determination that the amount of the interstate activity involved with cockfighting justified the decision to regulate the interstate movement of gamefowl.

In addition to the evidence of the sheer magnitude of the financial impact on interstate commerce, however, Congress received evidence suggesting that the interstate commerce in gamefowl was undermining some states' ability to enforce their own cockfighting prohibitions. In

---

[12]     The plaintiffs agree that the amount of money flowing across state lines as a result of cockfighting is well in excess of $110 Million (Plaintiffs' Brief, at 103) and, quite possibly, in excess of $1 Billion (Declaration of Sandy Johnson, at 6, ¶ 8).

September, 2000, the House of Representatives' Committee on Agriculture held a hearing on the subject of the interstate movement of gamefowl for the purpose of cockfighting.[13]  During that hearing, testimony was presented by Lieutenant Sherry Schuleter, a detective who works for the Broward County Sheriff's Department, that law enforcement was having a difficult time enforcing cockfighting prohibitions in states where cockfighting was illegal because people sponsoring cockfights in those states could always explain the presence of cockfighting equipment on their property by declaring that the equipment was intended to be used in Louisiana or New Mexico or Puerto Rico.[14]

According to the testimony, this defense makes it difficult to prove a violation except in those instances where actual fights were interrupted while they were occurring.[15]  When challenged on whether such a situation had ever actually occurred, Lieutenant Schuleter produced a newspaper article from *The Palm Beach Post* describing the dismissal of a felony animal-fighting charge against a defendant who asserted the precise defense Lieutenant Schuleter described.[16]  Lieutenant Schuleter also made the Committee aware that law enforcement's efforts to eliminate cockfighting sought to

---

[13]     *Prohibition of Interstate Movement of Live Birds for Animal Fighting: Hearing on H.R. 1275 Before the Committee on Agriculture of the House of Representatives*, 106th Congress, Serial 106–59 (2000) [hereinafter sometimes referenced as "Hearing"].  The plaintiffs repeatedly downplay or minimize legislative activity that occurred prior to the 107th Congress (the Congress during which the 2002 Amendments were passed), suggesting that such activity should be ignored in this Court's analysis.  However, the Fifth Circuit has repeatedly recognized that the passage of legislation often results from "congressional discussion" over the course of several years and different sessions, and the Court has made clear its position that information relevant to particular legislation "clearly subsist[s] in the cumulative memory of Congress." Groome, 234 F.3d at 212.  *See, also*, United States v. Knutson, 113 F.3d 27, 29 (5th Cir. 1997). Legislative findings made in an earlier congress must be acknowledged by a reviewing Court.  "Even though they were not explicitly reiterated in support of § 922(o), they clearly subsist in the cumulative memory of Congress." Id. at 30.

[14]     Hearing, at 19, 31, 34.

[15]     Id.

[16]     Hearing, at 41.

address other enforcement issues, as well: "because of the other crimes that occur in conjunction with

it, that create a dangerous environment, not only for law enforcement officers investigating it, but for

those in attendance, particularly children, who are often found at these spectacles."[17]

The legislative record contains multiple declarations that Congress' purpose for enacting the

2002 Amendments was to close the loophole that was undermining law enforcement efforts in those

states where cockfighting had been prohibited.[18]  In 2000, the Senate Committee on Agriculture,

Nutrition and Forestry declared that, "[t]his legislative change will also help law officers enforce

cockfighting bans in the [48] states in which cockfighting has been banned. . . . This loophole in the

AWA undermines the ability of state and local law officers to enforce their state bans.  Cockfighters

elude prosecution in states where the practice is illegal by claiming that they are raising fighting birds

for shipment to states where it is still lawful."[19]  During the following session of Congress, the same

committee used substantially similar language in reporting that the animal fighting provisions "seek

to close loopholes in the Animal Welfare Act that have made it difficult for law enforcement

personnel to enforce laws relating to animal fighting . . .[and] The Committee notes that there are 142

State and local law enforcement agencies that have endorsed the effort to close the loophole in the

animal fighting provisions of the Animal Welfare Act.  Law enforcement officials have indicated to

the Committee that the current Federal law, which allows shipment of birds to States and countries

where cockfighting is legal, has undermined the effectiveness of their State bans against

---

[17]        Id.

[18]        The explanation appears in multiple reports because basically identical legislation was reported out of the same Senate committee in two consecutive years – both before and after a change in control between the Democrat and Republican parties.

[19]        S. Rep. No. 106-297 (2000).

16

cockfighting."[20]

Thus, Congress had before it ample reason to believe that cockfighting substantially impacts interstate commerce and that the interstate movement of gamefowl for the purpose of engaging in cockfights was adversely affecting the states where such gamefowl were being raised, trained, and prepared for fights. This evidence and analysis provided Congress with a clear rational basis for concluding that the interstate movement of gamefowl sufficiently affected interstate commerce so as to justify the legislation that was enacted. At least one other justification appears in some parts of the legislative record: the "morality" of cockfighting and Congress' role in choosing to regulate interstate commerce to suppress "immoral" behavior. The prominence of this argument in the plaintiffs' briefing deserves some comment, but the issue will play no role in this Court's ruling.

Some members of Congress, when they spoke on the floor of the House or the Senate, declared that they were doing so for "moral" reasons: they perceived that cockfighting is a barbaric practice which they were happy to suppress in any way available to them, including the legislation now under challenge.[21] Moreover, in the hearing held by the House Committee on Agriculture, the primary sponsors and supporters of the legislation also identified the "moral" element as one that motivated them highly.[22] On the basis of such comments, the plaintiffs cast the 2002 Amendments as "moral imperialism" on the part of an Overbearing Federal Government squelching minorities' interests in quaint and harmless self-expression, and seek relief from such aggression in the name of "morality."

---

[20]     S. Rep. No. 107-117 (2001).

[21]     Plaintiffs' Brief, at 9, 20, 81-82 (*quoting* floor comments prior to passage of the 1976 amendment); 27-28, 83-84 (discussing the Hearing, as well as Senate and House floor discussions or comments).

[22]     *See, e.g.,* Hearing, at 12, 14-17, 55.

However, this Court notes – and notes that the plaintiffs have acknowledged – that Congress' ability to prohibit interstate commerce for "moral" reasons is (and has long been) firmly established. 'Congress's ability to regulate morality under the Commerce Clause . . . 'to keep the channels of commerce free from immoral and injurious uses has been frequently sustained, and is no longer open to question.'" Bredimus, 352 F.3d at 207, *quoting* Caminetti v. United States, 242 U.S. 470, 491, 38 S.Ct. 192 (1917). Thus, it is no argument against congressional authority to declare that Congress is acting on "moral" grounds against those committing acts which an overwhelming majority of the states have declared to be criminal. While there might be limits on Congress' authority to legislate "morality" and it might one day be necessary for the courts to explore and define those outer limits, it is not necessary that this Court do so here because Congress clearly had sufficient other grounds for enacting the 2002 Amendments. Under such circumstances, Congress' other motives and purposes are not relevant to the Commerce Clause analysis. *See* United States v. Darby, 312 U.S. 100, 115, 61 S.Ct. 451, 457-58 (1941).

This Court finds that the prohibition against the interstate movement of gamefowl for the purpose of engaging in cockfighting ventures – codified in pertinent part at 7 U.S.C. § 2156(b), (e), and (g) – falls within the scope of Congress' authority pursuant to the Commerce Clause.

3.    The Prohibition Against Foreign Commerce in Gamefowl is Constitutional.

In addition to prohibiting interstate commerce, the 2002 Amendments establish an identical prohibition of foreign commerce: gamefowl may not be imported or exported for the purpose of engaging in cockfighting. Specifically, the statute makes it unlawful to "knowingly sell, buy, transport, deliver, or receive for purposes of transportation, in interstate or *foreign commerce*, any dog or other animal for purposes of having the dog or other animal participate in an animal fighting

18

venture" where "foreign commerce" is defined as "any movement from a foreign country into any State or from any State into any foreign country."[23]  The plaintiffs have not included a separate substantive argument as to the foreign commerce aspect of the 2002 Amendments.[24]

Both the Fifth Circuit and the United States Supreme Court have declared that Congress' efforts to regulate foreign commerce are accorded a more deferential standard than similar efforts in the interstate commerce context. "[W]e find the deference accorded to Congress . . . even more compelling when, as here, the commerce at issue is foreign, as opposed to interstate.  The Supreme Court has long held that Congress's authority to regulate foreign commerce is even broader than its authority to regulate interstate commerce." Bredimus, 352 F.3d at 207-08.  See, e.g., Japan Line, Ltd. v. County of Los Angeles, 441 U.S. 434, 448, 99 S.Ct. 1813, 1821 (1979).

The provisions at issue here clearly are directed at foreign commerce and clearly prohibit the import and export of a very specific item, i.e. gamefowl for the purpose of having them participate in cockfights.  That Congress has the authority to prohibit the import and/or export of certain items for any number of reasons (moral and otherwise) – and that it has been doing so, as to many and varied items, throughout the entirety of this country's history, for reasons beyond reckoning – is so patently true that it needs no further citation or discussion by this Court.  The only basis the plaintiffs have identified for finding this particular regulation outside the scope of Congress' authority is the "added extraterritorial moral dimension of imposing Congress' attitude toward sports upon countries that are not within our federal system and that have their own unique cultures centered on

---

[23]      7 U.S.C. § 2156(b), (g)(2) (emphasis added).

[24]      Plaintiffs' Brief, at 77.

19

cockfighting."[25] While the plaintiffs might have identified a valid policy reason for opposing the legislation, this Court's role is not to advise Congress on the wisdom of its legislation, but to evaluate whether Congress has acted within the scope of its constitutional authority.  The plaintiffs' argument is inapposite.

In light of the very broad deference accorded to congressional enactments regulating foreign commerce, and for the same reasons that the identical prohibition on interstate commerce falls within Congress' authority, this Court finds that the provision prohibiting the import or export of gamefowl for the purpose of engaging in cockfighting – codified in pertinent part at 7 U.S.C. §2156(b), (e) and (g) – is within the scope of Congress' authority pursuant to the Foreign Commerce Clause.

4.      The Prohibition Against the Knowing Cooperation in Illegal Cockfighting is Constitutional.

The third challenged provision prohibits individuals from sponsoring or exhibiting gamefowl in a cockfighting venture where the individual knows that any bird has been brought to the venture illegally: "With respect to fighting ventures involving live birds in a State where it would not be in violation, it shall be unlawful under this section for a person to sponsor or exhibit a bird in the fighting venture only if the person knew that any bird in the fighting venture was knowingly bought, sold, delivered, transported, or received in interstate or foreign commerce for the purpose of participation in the fighting venture." 7 U.S.C. § 2156(a)(2).  Because this provision does not, on its own terms, apply solely to people who themselves have engaged (or are engaging) in interstate or foreign commerce, but includes those who simply know about others engaging in such commerce, it applies to individuals engaging in completely intrastate (rather than interstate) commerce.  As a

---

[25]      Plaintiffs' Brief, at 77.

result, the analysis of this specific provision must use the more elaborate analysis discussed above.

Congress' commerce authority does extend to activities which are wholly intrastate in nature but which substantially affect interstate commerce. Groome, 234 F.3d at 203-04. The analysis of whether Congress may regulate intrastate commerce pursuant to the Commerce Clause calls for the Court to consider four factors originally identified in United States v. Morrison, 529 U.S. 598, 120 S.Ct. 1740 (2000), and reiterated by the Fifth Circuit in Groome.

The first factor is the "economic nature of the regulated activity," Groome, 234 F.3d at 204, or whether the regulated activity is or is not commercial in nature. This Court has already considered, and rejected, the argument that cockfighting is not "commerce." As the wholly intrastate activity regulated by this provision is participation in cockfighting activities and for the reasons set forth in Section I(B)(1), *supra*, this Court finds that the provision addresses an economic activity.

The second factor to be considered is whether Congress included an "express jurisdictional element" specifically linking its regulation to interstate commerce. Id. This factor is relevant to the analysis only when the regulated activity has "no obvious interstate economic connection." Groome, 234 F.3d at 211. The provision under consideration, however, does include a specific jurisdictional element in the definition of the prohibited conduct (*i.e.*, participating in a cockfighting where *another gamebird has been moved in interstate or foreign commerce* in order to participate in that venture) and, therefore clearly does provide an "obvious interstate economic connection."

The third factor to be considered is Congress' formal findings as to the interstate impact that prompted its regulation. "[W]hile Congress [is] not required to make formal findings, the existence of such findings may enable us to evaluate the legislative judgment that the activity in question substantially affects interstate commerce, even though no such substantial effect is visible to the

naked eye." Id. at 204 (citations omitted).  The plaintiffs argue that Congress has not made any formal findings concerning the effect on interstate commerce of the activities prohibited by the 2002 Amendments.  Neither the United States nor the Humane Society has produced any evidence whatsoever that Congress made specific findings about the scope of the problem addressed by the provision currently under consideration (that prohibiting individuals from participating in cockfighting ventures – even though they are participating legally – if they have knowledge that any gamebird involved in the fighting venture was transported to the cockfight illegally).  This Court has reviewed the record identified by the parties and found that Congress did declare the purpose for which the entire legislation was enacted but did not, in any way this Court has found, specifically address the interstate component of this particular aspect of the legislation.

The fourth factor identified by the Morrison court could be described as a proximate cause inquiry: "the Court cautioned against accepting an 'attenuated' connection between the regulation and the interstate activity.  Concerned that causal, 'but-for' arguments could lead to an evisceration of any limitations on federal power, the Court held Congress to a more direct link."  Groome, 234 F.3d at 204-05 (citation omitted).  Specifically, the United States Supreme Court has rejected the "costs of crime" and "national productivity" arguments because "they would permit Congress to 'regulate not only all violent crime, but all activities that might lead to violent crime, regardless of how tenuously they relate to interstate commerce.'"  Groome, 234 F.3d at 214 (citation omitted).

As was the case in Groome – where the Fifth Circuit considered and rejected the argument that the Fair Housing Amendments Act prohibition against discrimination in housing for the mentally handicapped was outside the scope of Congress' Commerce Clause powers – this factor does not require elaborate discussion here.  There is no need to link inference to inference through a long chain

22

of causation in order to discern a connection between the prohibited conduct and interstate commerce. This prohibited activity here is only one link away from actual interstate commerce: it applies to those cockfighters who know that another participant has violated the legal prohibition against interstate movement of a gamebird for the purpose of engaging in that venture.

By including this provision, Congress clearly sought to create an additional disincentive to those who might otherwise violate the prohibition against the illegal interstate commerce in gamefowl: their competitors now have an incentive to refuse to participate in such fights, thus turning their travel across state lines into a wasted effort. By placing others' self-interest at odds with the interests of those who would violate the law, Congress is using a time-honored, well-established method of discouraging criminal activity by regulating those with whom criminals must interact in order to reap the benefits of criminal behavior. In this way, the intrastate activity being regulated is analogous to the wholly intrastate activities regulated by Congress in various criminal statutes such as the general aiding and abetting statute, the prohibition against receiving stolen goods of various types, and similar federal statutes.[26]

Having considered the four factors identified in Morrison and Groome, this Court finds that, despite the lack of formal legislative findings as to the impact on interstate commerce of this aspect of the legislation, the regulation of the wholly intrastate economic activity at issue (i.e. the participation in a cockfighting venture with knowledge a bird that has been brought to the venture illegally) is so closely related to interstate commerce that it falls within the scope of Congress' commerce power. The enactment of 7 U.S.C. § 2156(a)(2) by Congress did not violate the Commerce Clause.

---

[26]     See, e.g., 18 U.S.C. §§ 2, 922(i), 2315.

5.    Federalism Concerns are not Implicated.

This Court, having considered the three separate elements of the 2002 Amendments and found

that each of them meets the constitutional requirements for regulation by Congress pursuant to its

commerce power, must address one final issue in the Commerce Clause analysis.  The Fifth Circuit

jurisprudence requires this Court to consider a more generalized constitutional concern about

"unbounded federal power, and a concomitant federal invasion into areas of traditional state

authority." Groome, 234 F.3d at 215.  In other words, this Court must consider, as the final step in

the Commerce Clause analysis, whether the 2002 Amendments implicate federalism concerns.  In the

words of the Lopez court, this analysis calls for preserving distinctions between what is "truly

national and what is truly local."   514 U.S. at 568.

The plaintiffs' federalism arguments are energetically presented.  They describe the 2002

Amendments as interfering with states' rights to choose to permit cockfighting within their borders,

declaring that the Amendments "overrid[e] the states' traditional police power" and that the new rules

will have the effect of outlawing possession of gamecocks in those states where it is now legal to do

so, characterizing Louisiana and New Mexico as "outliers" losing "their ability to maintain control

of their criminal laws" due to Congress' "oust[ing] state jurisdiction," "foreclos[ing] state choice,"

and engaging in "federal imperialism" or, alternatively, "moral imperialism" in an ongoing  "battle

for control over morality" with the states, a battle in which the 2002 Amendments represent the latest

"imperialist thrust."[27]  Notwithstanding the hysteria reflected in such argument, however, the

plaintiffs' federalism concerns, in this particular context, are misplaced for many reasons, only a few

which may be addressed herein.

---

[27]        Plaintiffs' Brief, at 3, 33, 39, 44, 57, 60, 63, 66, 77-78.

First, cockfighting involving only gamefowl raised in the state in which a fight is held is a wholly intrastate activity which the 2002 Amendments clearly do *not* address or limit in any fashion. The plaintiffs have acknowledged this fact. "All that remains possible for any person to do in Louisiana in connection with cockfighting, without being subject to criminal penalties under federal law, is to conduct cockfights without the presence of an out-of-state [gamebird] . . ."[28] Because wholly intrastate cockfighting is not regulated by the 2002 Amendments, Congress' regulatory efforts address only *interstate commerce* – an area the Constitution specifically reserves to the federal government for regulation and protection. When Congress is acting within the scope of its commerce power, federalism concerns play a much smaller role than otherwise. "[P]rinciples of federalism and comity are not compromised when the regulated activity falls inside constitutionally-defined perimeters of congressional control." United States v. Bailey, 115 F.3d 1222, 1232 (5th Cir. 1997). Therefore, the mere fact that Congress has chosen to regulate this particular aspect of interstate commerce in this particular way does not necessarily raise federalism concerns.

Second, Congress has openly declared its intent not to displace state law – or otherwise interfere inside state boundaries – unnecessarily:

> The provisions of this chapter shall not supersede or otherwise invalidate any such State, local, or municipal legislation or ordinance relating to animal fighting ventures except in case of a direct and irreconcilable conflict between any requirements thereunder and this chapter or any rule, regulation, or standard hereunder.

7 U.S.C. § 2156(h). As Louisiana has not, to this Court's knowledge, enacted cockfighting legislation designed to grant benefits to or affect people outside of Louisiana, the 2002 Amendments leave untouched Louisiana's choice to permit cockfighting within its borders. The plaintiffs have identified

---

[28]   Plaintiffs' Brief, at 2.

no way in which the 2002 Amendments have impacted – much less displaced, replaced, overridden, or endangered in any way whatsoever – the Louisiana legislature's decision to permit cockfighting by Louisiana gamefowl within Louisiana's borders, nor its governance of such activities.

The real impact the plaintiffs have felt – and, in all likelihood, will continue to feel – from the enactment of the 2002 Amendments is not on Louisiana's sovereignty or its ability to regulate cockfighting but on the private cockfighting industry itself, which might not be sustainable at its former level without the input of thousands of gamefowl from outside the state.[29] To the extent that Louisiana's cockfighting industry *requires* the participation of gamefowl bred, raised, and trained in states that have prohibited such activities in order to thrive, and to the extent that the ability to transport gamefowl from other states into Louisiana encourages or enables cockfighting violations in states that have prohibited such activities, the ability to bring gamefowl into Louisiana to participate in cockfighting has been undermining other states' regulatory efforts. The concept of federalism does not apply to the federal government's relationship with private industry, nor does it protect private industry's interest in the availability of a large market. The plaintiffs have not demonstrated any way in which Congress' decision to support other states' effort to eliminate cockfighting within their borders, while it definitely impacts Louisiana's cockfighting industry, in any way impinges upon Louisiana's sovereignty or undermines the structural federalism reflected in the Constitution.

Third, federalism implicates the relationship between the federal government and *all* of the states, not just a few of them. The plaintiffs' "local" focus is limited to Louisiana and New Mexico,

---

[29]     Under the 2002 Amendments, Louisiana's cockfighters "would have to rely solely on Louisiana-bred roosters, but there are not enough of them to fill a weekly bill of 1,000 fighting cocks." Declaration of Mark Johnson, at 4, ¶ 7.

and they invoke the desire of the citizens in those states to have Congress uninvolved in their cockfighting industries. Were it true that the 2002 Amendments accomplished *only* the goal of interfering in Louisiana and New Mexico, the federalism issue would look very different. However, these states and their citizens comprise only a very small proportion of the United States. There are 48 *other* states as well, plus the District of Columbia, all of whose interests (at least when it comes to cockfighting) are at odds with those of Louisiana and New Mexico. Congress' enactment of the 2002 Amendments did not undermine those states' regulatory choices, but supported them by neutralizing the potential for citizens in the 48 states to avoid *local* efforts to eliminate cockfighting by using the "escape to Louisiana" (or New Mexico or Puerto Rico) defense as a shield against local enforcement efforts. In this way, the national legislation has *reinforced* state governments' control over cockfighting within their sovereign territories and eliminated the loophole that was permitting people to use other states as a shield to create immunity for themselves from the local enforcement of local laws. Such efforts do not undermine federalism. To the contrary, this is "classic cooperative federalism, with the state and federal governments united in the desired result."[30]

Ever since <u>Gibbons v. Ogden</u>, it has been recognized that the United States Constitution expressly grants to Congress the full authority to regulate interstate and foreign commerce. With the 2002 Amendments, Congress has limited its regulation to interstate and foreign commerce and only those aspects of cockfighting that undermine local efforts to govern that which is "truly local." For these reasons, this Court finds that Congress' enactment of the 2002 Amendments constitutes a legitimate regulation of interstate commerce and does not implicate federalism concerns.

---

[30]      Plaintiffs' Brief, at 43.

## II.    Equal Protection

The plaintiffs' second challenge to the 2002 Amendments is that their enactment violates the equal protection doctrine.  The challenged provisions are facially neutral; in no way do they differentiate among different citizens participating in the interstate movement of gamefowl for the purpose of cockfighting, nor do they create any class or division of people to whom the prohibitions will or will not apply.  As the statute does not create categories of people who are treated differently, any difference that exists is in terms of the statute's impact, not its terms.

### A.    Applicable Law and Standards

As applied to the United States government, rather than to state and local governments, the Equal Protection Clause is found as a component of the Fifth Amendment's due process right.  *See* Bolling v. Sharpe, 347 U.S. 497 (1954); Stoneburner v. Secretary of the Army, 152 F.3d 485, 491 (5th Cir. 1998).  The Supreme Court's "approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment." Weinberger v. Wiesenfeld, 420 U.S. 636, 638 n.2, 95 S.Ct. 1225, 1228 n.2 (1975).  "The Equal Protection Clause commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws.'"   Vacco v. Quill, 521 U.S. 793, 799, 117 S.Ct. 2293, 2297 (1997).  "This provision creates no substantive rights.  Instead, it embodies a general rule that States must treat like cases alike but may treat unlike cases accordingly." Id. (citations omitted).

The United States Supreme Court has warned against courts overstepping the bounds of their role in considering equal protection challenges.  "Whether embodied in the Fourteenth Amendment or inferred from the Fifth, equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.  In areas of social and economic policy, a statutory classification that

neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." Federal Communications Commission v. Beach Communications, Inc., 508 U.S. 307, 313, 113 S.Ct. 2096, 2101 (1993). "Where there are 'plausible reasons' for Congress' action, 'our inquiry is at an end.'" Id., 508 U.S. at 313-14, 113 S.Ct. at 2101. "The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted.'" Id., 508 U.S. at 314, 113 S.Ct. at 2101.

According to the Supreme Court, a statute that does not create different classes of people normally cannot present an equal protection problem. "Generally speaking, laws that apply evenhandedly to all 'unquestionably comply' with the Equal Protection Clause." Vacco, 521 U.S. at 800, 117 S.Ct. at 2297-98. The Fifth Circuit has also noted that the first step of the equal protection analysis – proof of the existence of differential treatment – is a step that cannot be skipped and, importantly, the mere decision to prohibit one kind of conduct without prohibiting different conduct by the same or different individuals, does not constitute the type of different treatment prohibited by the Equal Protection Clause. "The focus of the ordinance is to proscribe only those aspects of quarrying that are likely to implicate the public's health, safety, morals, or general welfare. The ordinance applies to all actors within the city limits . . . . That everyone is forbidden to engage in certain activities is not the same as treating similarly situated actors differently." Vulcan Materials Company v. City of Tehuacana, 238 F.3d 382, 389 (5th Cir. 2001).

Where, as here, the challenged statute is facially neutral, a plaintiff's only available equal

protection claim is that the statute has a disproportionate impact upon a definable class of people. In such cases, the plaintiff must prove the legislature's discriminatory intent in enacting the statute to begin with. "Presented with a neutral state law that produces disproportionate effects along racial lines, the Court of Appeals was correct in applying the approach of Arlington Heights to determine whether the law violates the Equal Protection Clause of the Fourteenth Amendment: '[O]fficial action will not be held unconstitutional solely because it results in a racially disproportionate impact . . . . Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.' Once racial discrimination is shown to have been a 'substantial' or 'motivating' factor behind enactment of the law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." Hunter v. Underwood, 471 U.S. 222, 227-28, 105 S.Ct. 1916, 1920 (1985) (citations omitted).

The Fifth Circuit has recently reiterated that a plaintiff asserting an equal protection challenge to a facially neutral act must demonstrate "discriminatory intent or purpose" in order to show an equal protection violation. Walker v. City of Mesquite, TX, 402 F.3d 532, 535 (5th Cir. 2005). "Discriminatory purpose in an equal protection context implies that the decisionmaker selected a particular course of action at least in part because of, and not simply in spite of, the adverse impact it would have on an identifiable group." Woods v. Edwards, 51 F.3d 577, 580 (5th Cir. 1995), *citing* United States v. Galloway, 951 F.2d 64, 65 (5th Cir. 1992).[31]

---

[31]     The plaintiffs argue that they have been deprived of a "state liberty interest" in transporting gamefowl interstate for the purpose of engaging in cockfights. As noted above, the equal protection doctrine grants heightened protection to suspect classes and to fundamental constitutional rights. The plaintiffs do not argue that their "state liberty interest" in cockfighting is fundamental in nature so as to trigger heightened scrutiny analysis under the equal protection doctrine, nor do they identify any unique analysis in the jurisprudence which should apply when a "state liberty interest" (as opposed to any other type of interest) is at stake.  In the absence of any reason to believe that an extraordinary analysis applies when Congress interferes with a "state liberty interest," this Court will apply the standard analysis set forth hereinabove.

### B.    Analysis of the 2002 Amendments

Because the 2002 Amendments are facially neutral, the plaintiffs must prove that (1) there is a substantial, disproportionate effect flowing from the 2002 Amendments to a discrete class of people; and (2) racial discrimination was a substantial or motivating factor in Congress' decision to enact those amendments.

On the first prong, the plaintiffs argue, in their Brief, that cockfighting is a cultural expression of Cajuns, Hispanics, Filipinos, and others.[32]   Accepting the plaintiffs' representation as true for present purposes, Mark Johnson's Declaration clearly supports the conclusion that *some* Cajuns and/or *some* Hispanics have, in all likelihood, been substantially impacted by the 2002 Amendments. However, the plaintiffs have not provided this Court with any information comparing the impact on Cajuns and/or Hispanics with the impact on African-Americans, Caucasians, Asian-Americans, or any other ethnic, national, or racial group subject to the Amendments.  Without such comparative information, this Court has no way to ascertain whether the first prong of the equal protection analysis (*i.e.* the existence of a *disproportionate* impact upon one or more discrete groups) exists.  As such, the plaintiffs have not carried their burden of proving the first prong of the equal protection analysis.

The plaintiffs have poured significant effort into addressing the second prong of the equal protection analysis – concerning Congress' alleged discriminatory purpose or motivation in choosing to enact the 2002 Amendments.  Specifically, the plaintiffs have demonstrated that Congress was

---

[32]        The plaintiffs describe these groups as those "approximating" suspect classes.  Plaintiffs' Brief, at 90.  As this Court finds that no equal protection violation has been proven, it is unnecessary to rule upon whether Cajuns, Hispanics, Filipinos, or the other groups identified by the plaintiffs as having a special interest in cockfighting are the types of "identifiable groups" granted "suspect class" protection under the equal protection doctrine.

aware that the Amendments would have a cultural impact on minorities[33] and argue strongly that the "morality" question could be interpreted as aggression against despised minorities. However, it is not necessary that this Court evaluate Congress' purpose and the plaintiffs' arguments because, even were the plaintiffs able to demonstrate a discriminatory intent on the part of the Congress, they have not demonstrated that such intent has translated into a disproportionate impact upon the groups they have identified.

The plaintiffs have not demonstrated that the 2002 Amendments were enacted in violation of the equal protection doctrine; therefore, those claims will be dismissed with prejudice.

## III.   Legislative Due Process

The plaintiffs' final claim is that Congress violated their legislative due process rights when it enacted the 2002 Amendments. In asserting this claim, the plaintiffs seek to have this Court recognize a citizen's right to legislative due process and impose upon Congress the obligation to comply with certain approved processes before it may enact legislation.[34]

The plaintiffs' first hurdle with regard to their legislative due process claim is proving that a right to legislative due process exists. Nowhere in the 100+ page brief, replete with citations, have the plaintiffs identified a single opinion issued by any court anywhere which recognizes the existence of a citizen's constitutional right to legislative due process. Without the direct support of applicable

---

[33]     The Department of Agriculture reported, in a cost estimate in 1976, that the "potential cultural impact" in those states where cockfighting is legal would drive up the cost of enforcing such prohibitions. Moreover, Congressman (later Speaker) Foley acknowledged that "in some parts of the world the fighting of live cocks has become an activity regarded as culturally sanctioned by tradition." Plaintiffs' Brief, at 19, 20, *citing* 122 Congressional Record at H2865, 2876.

[34]     It is important to note that this claim is separate and apart from the other constitutional challenges the plaintiffs have asserted. The plaintiffs have argued, in support of their Commerce Clause and equal protection claims, that the legislative record does not justify Congress' actions, and this Court has addressed those arguments in those contexts. The current claim stands alone, outside the context of a specific constitutional challenge, and seeks to have this Court evaluate the sufficiency of congressional procedures prior to enacting the 2002 Amendments.

jurisprudence, the plaintiffs rely on characterizations found in dissenting opinions, interpretations proffered in law review articles, and extrapolations that reflect, at best, an incomplete reading of the jurisprudence.

In the jurisprudence the plaintiffs have marshaled in support of their claim, *none* of the cited cases involves a claim for legislative due process. To the contrary, each and every case the plaintiffs have cited in support of their argument discusses legislative history in the context of considering a constitutional challenge to a specific act. Because the constitutionality of the statutes at issue in those cases *turned* on the congressional motives, purposes, or justifications that led to their enactment, the courts were required to consider the content (and sufficiency) of the legislative history in order to determine, as a constitutional matter, whether Congress had acted within its authority. Such questions often arise in the context of equal protection challenges, where the justification for creating categories of people who are treated differently than others can mean the difference between a constitutional act and an unconstitutional one,[35] as well as contexts where two constitutional principles (for instance, state sovereign immunity and Congress' authority pursuant to the Commerce Clause) are in conflict. In such circumstances, Congress' decision to sacrifice one principle (such as state sovereign immunity) in favor of the another (such as congressional authority to regulate interstate commerce) must be supported with sufficient evidence to justify the sacrifice such a choice entails.[36]

The use of legislative history as a source of evidence as to whether or not Congress acted

---

[35]     *See, e.g.,* Romer v. Evans, 517 U.S. 620, 116 S.Ct. 1620 (1996); City of Cleburne, Texas v. Cleburne Living Center, 473 U.S. 432, 105 S.Ct. 3249 (1985);  United States Department of Agriculture  v. Moreno, 413 U.S. 528, 93 S.Ct. 2821 (1973).

[36]     *See, e.g.,* Board of Trustees of the University of Alabama v. Garrett, 531 U.S. 356, 121 S.Ct. 955 (2001); Kimel v. Florida Board of Regents, 528 U.S. 62, 120 S.Ct. 631 (2000); Florida Prepaid Postsecondary Education Expense Board v. College Savings Bank, 527 U.S. 627, 119 S.Ct. 2199 (1999); City of Boerne v. Flores, 521 U.S. 507, 117 S.Ct. 2157 (1997).

33

within the scope of its authority is utterly distinct from the simple announcement the plaintiffs would have this Court make: that Congress cannot enact legislation – no matter how clearly within the scope of its authority – without observing certain externally-imposed formalities and requirements. The jurisprudence cited by the plaintiffs does not address claims analogous to those the plaintiffs have asserted here and does not acknowledge the distinction discussed herein. As a result, this Court finds that the jurisprudence cited by the plaintiffs does not support the conclusion that legislative due process is a constitutional right the plaintiffs can claim.

Of equal importance with the plaintiffs' lack of jurisprudential support for the existence of a legislative due process right is the fact that the recognition of such a right would be highly questionable in light of the separation of powers doctrine – a concept the plaintiffs did not address in their briefing. "The doctrine of separation of powers is concerned with the allocation of official power among the three co-equal branches of our Government. The Framers 'built into the tripartite Federal Government . . . a self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of the other.'" Clinton v. Jones, 520 U.S. 681, 699, 117 S.Ct. 1636, 1647 (1997). "[O]ne of the most vital functions of this Court [is] to police with care the separation of the governing powers." Public Citizen v. United States Department of Justice, 491 U.S. 440, 468, 109 S.Ct. 2558, 2574 (1989) (Kennedy, J., concurring).

"[I]t remains a basic principle of our constitutional scheme that one branch of the Government may not intrude upon the central prerogatives of another. . . . Even when a branch does not arrogate power to itself, moreover, the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties." Loving v. United States, 517 U.S. 748, 757, 116 S.Ct. 1737, 1743 (1996). "So long as Congress adopts lawful and rational means to enforce the

34

constitution, the separation of powers doctrine requires that the judiciary, rather than Congress, must defer.  Even if the judiciary may deem the congressional course as unwise, the courts must acknowledge the nature of the limits that circumscribe congressional power: 'Let the end be legitimate. Let it be within the scope of the constitution and all means which are appropriate, which are plainly adapted to that end, which are not prohibited but consistent with the letter and spirit of the constitution are constitutional.'"   Jones v. City of Lubbock, 727 F.3d 364 (5ᵗʰ Cir. 1984), *quoting* McCulloch v. Maryland, 17 U.S. (4 Wheat) 316, 341 (1819).

Given the structural impediments in the Constitution to the federal courts' imposition of limits on the procedures by which Congress' may enact legislation – and the fundamental prohibition against "impairing another [branch] in the performance of its constitutional duties," in the words of the Loving court – the plaintiffs' burden of persuasion on their legislative due process claim is heavy, and one they have not made any attempt to meet. In light of the fact that the plaintiffs have not cited any jurisprudence supporting the existence of a citizen's right to legislative due process, and as they have not shown that such a right could survive a separation of powers analysis, this Court finds that the plaintiffs have not demonstrated the existence of a claim of legislative due process upon which relief could be granted.  As such, it is not necessary for this Court to rule upon the plaintiffs' complaints about the sufficiency of Congress' consideration of the 2002 Amendments.[37]

---

[37]   Those complaints include – but might not be limited to – alleged insufficiencies in (a) the number, length and timing of hearings; (b) the length, meaningfulness of, and carefulness of consideration during floor debates in the House and Senate; (c) the members' understanding of the facts and the legal ramifications of the legislation; and (d) the amount of delay between proposal and enactment of the statute; as well as (e) the lack of a recorded vote and (f) potential inconsistencies with the North American Free Trade Agreement and the Unfunded Mandates Reform Act of 1995. *See* Plaintiffs' Brief, at 10, 13-14, 97-104.

## CONCLUSION

For the foregoing reasons, this Court finds that the Congress did act within the scope of its authority pursuant to the Commerce Clause of the United States Constitution when it enacted the 2002 Amendments, that the Amendments do not violate the Equal Protection component of the Fifth Amendment, and that Congress was not bound by any doctrine of legislative due process when it enacted the 2002 Amendments. As a result, the plaintiffs' claims are without merit and they will be dismissed with prejudice.

THUS DONE AND SIGNED in Lafayette, Louisiana, this 27 day of May, 2005.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE

COPY SENT by fax
DATE 5-31-05
BY MB
TO Brinkhaus,
Kramer, Miscarity,
Thompson, Roy, Brooks,
Colley

36